**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | |
| | * | **Criminal Case No. TDC-20-0033** |
| **PATRIK MATHEWS** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MOTION TO SUPPRESS
<u>TITLE III INTERCEPTION EVIDENCE</u>**

Comes now Patrik Mathews, through his attorney, Joseph A. Balter, and moves this Honorable Court to suppress all evidence seized as a result of the government's interception of oral communications over the Title III wiretap. As grounds for this motion, Mr. Mathews states the following:

1.      The defendant, Patrik Mathews, is charged with being an Alien in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(5) and Transporting a Firearm and Ammunition in Interstate Commerce with Intent to Commit a Felony, in violation of 18 U.S.C. § 924(b).

2.      On or about December 18, 2019, Jamie M. McCall, Assistant United States Attorney for the District of Delaware filed an application for a warrant authorizing the interception of oral communications occurring in 29 Wenark Drive, Apartment 1, Newark, DE 19713 ("Target Residence"), pursuant to 18 U.S.C. § 2518.

4.      The application stated that there is probable cause to believe the Target Residence is  being and will continue to be used by Brian Lemley and Patrik Mathews in connection with the commission of violations of the predicate offenses: "8 U.S.C. § 1324 (Bringing in and Harboring

Certain Aliens, and conspiracy to do so) and 18 U.S.C. § 922(g)(5) (alien in possession of firearm); and the non-predicate offenses 18 U.S.C. § 2 (aiding and abetting violations of 8 U.S.C. § 1324 and 18 U.S.C. § 922(g)(5)); 18 U.S.C. § 2101 (Inciting a Riot); 18 U.S .C. § 249 (Attempt to Commit a Hate Crime); and 18 U.S.C. § 371 (Conspiracy to Commit Violations of §§ 2101, 249, and 922(g)(5)) (hereinafter referred to as 'Target Offenses')."

5.      The interception of the oral communications violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and the Fourth Amendment to the United States Constitution, and must therefore be suppressed in this criminal case.

6.      Mr. Mathews contends that the evidence obtained as a result of the interceptions of the telephonic communications should be suppressed on the grounds that (1) there was no probable cause to support the issuance of the warrants, (2) the wiretap was unnecessary and the agents failed to meet the exhaustion requirements under Title III, and (3) the minimization procedures employed were improper,.

7.      Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522,[1] establishes the statutory scheme that governs the interception of wire, electronic, and oral communications. Under Title III, an application for a court order authorizing the interception of such communications must be authorized by the Attorney General or an Assistant Attorney General specially designated by the Attorney General.   *See* 18 U.S.C. § 2516(1).   The application must contain:

> (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

---

[1]      Title III was amended and retitled by Title I of the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1851.   It continues, however, to be commonly referred to as Title III.

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (I) details as to the particular offense that has been, is being, or is about to be committed, (ii) . . . a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).

8.     The judge to whom such an application is made may approve the requested interception only if he or she determines that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [enumerated] offense"; "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception"; "normal investigative procedures have been tried and have failed or

–3–

reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and "there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense[.]" 18 U.S.C. § 2518(3). Upon approval of the order, the judge must specify the persons, if known, and places that are subject to the order, the type of communications to be intercepted and the offense to which it relates, the identity of the applicant, the person authorizing it and the agency authorized to execute it, and the period for which it is effective. 18 U.S.C. § 2518(4). The order must terminate the surveillance when the objective is attained and may extend in no event longer than thirty days. The order must also direct that it be executed as soon as practicable and in a manner that minimizes the interception of extraneous matter. 18 U.S.C. § 2518(5).

9.     By codifying this elaborate set of procedural requirements, Congress sought to ensure that electronic surveillance by law enforcement authorities did not occur "except under carefully defined circumstances and after securing judicial authority." *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir. 1975). "Procedural steps provided in the Act [therefore] require strict adherence." *Id.* (citing *United States v. Giordano*, 416 U.S. 505 (1974)); *see also Gelbard v. United States*, 408 U.S. 41, 46 (1972) ("Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions.").[2]

---

[2]     Given that the government has chosen to rely only on the redacted applications, affidavits, and orders, the sufficiency and legality of those documents under Title III and the Fourth Amendment may be based only upon that

–4–

10.     Mr. Mathews contends that the interception orders were not based on probable cause and are therefore in violation of Title III and the Fourth Amendment to the United States Constitution.

The affidavit in support of the application for the wiretap incorporated extensive statements from the defendants and other members of the Base that were constitutionally protected free speech, rather than information that would create probable cause to believe the surveillance of oral communications within the Target Residence would provide evidence of one of the crimes listed in the warrant application.

### a.     The Affidavit Failed to Establish Sufficient Probable Cause for the Majority of Suspected Crimes Listed in the Warrant Application.

The warrants application stated there was probable cause that Mathews and Lemley engaged in the following predicate offenses: harboring an alien and alien in possession of firearm. The application also listed the following non-predicate offenses: inciting a riot and attempt to commit a hate crime. Similar to the prior warrants, leading up to the Title III warrant, the majority of the affidavit contained background about the Base and statements made by the defendants and other members of the Base, which show that Base members engaged in hate speech in support of

---

same redacted information.   In other words, when the government chooses to withhold certain information from Title III affidavits provided to the defendant, it must then defend the Title III application, affidavit, and order "without relying on the redacted information[.]" *United States v. Danovaro*, 877 F.2d 583, 588 (7th Cir.1989); *See also United States v. Yoshimura*, 831 F. Supp. 799, 806-07 (D. Hawaii 1993) (defendant entitled to information redacted from Title III affidavit submitted to obtain series of wiretap authorizations which led to his arrest, unless government would not be relying on redacted information in establishing probable cause for wiretaps related to defendant's case); *United States v. Coles*, 2007 WL 2916510, *6 (E.D. Pa. Oct. 5, 2007) (if government does not rely on redacted information as evidence essential to establishing necessity under Title III, and it does not intend to introduce redacted information itself into evidence, defendant's due process rights are not impacted by non-disclosure; "however, . . . were the redacted information essential for the Government's demonstration of necessity, the Defendant's due process rights might be significantly implicated to the point where a different balance between the three interests would need to be struck.").

the nonpredicate offenses. These numerous statements not only fail to come close to providing probable cause, but they also attack constitutionally protected free speech via groundless implication. Without this lengthy narrative aimed at characterizing the Base as a dangerous organization, it is extremely unlikely that such an invasive 24-hour audio surveillance wiretap would be authorized because it was unnecessary to prove the relatively minor predicate offenses.

1. **The Affidavit Failed to Allege Probable Cause Because It Relied Upon Information Derived from the Defendant's Exercise of Free Speech Protected Under the First Amendment. The Defendant's Speech Did Not Incite Imminent Violence or Other Unlawful Act and Cannot Provide Probable Cause for The Issuance of a Title III Warrant.**

The affidavit sets forth information about the "Base", a white supremacist group that seeks to preserve a white ethno-state against the inevitable break down in civilization and has proclaimed war" upon minority communities. In the summer of 2019, the defendant a Canadian national, who associated with Base activities, gained attention in the Winnipeg, Manitoba media when a local reporter "outed" him in a news article as a Base associate. Not long after, he fled Canada for the U.S. and met up with other Base members including the codefendants. The affidavit traces many of his statements and movements over the next several months till the date of the application for the warrant. While there are many accusations of "hate speech" and general advocacy of violence, there are no accusations which allege that defendant or others incited an imminent act of violence.

The affidavit describes Base white supremacist activities such as on-line communications with encrypted messaging and chat rooms for the purpose of recruitment, advocating for a white ethno-state and advocating abstract acts of violence in connection with what was believed to be the coming race war. Many of the statements made by group members include virulent anti-Black and anti-Semitic statements. The Base runs training camps that involve the use of weapons, and discuss instrumentalities of violence, such as ways to improvise explosive IED devices. Significantly, however, the affidavit made no allegation with respect to any specific acts of violence attributed to the Base.

As an example of the type of extremist, violent speech that the defendant engaged in, the affidavit offers an excerpt of a personal, recorded video statement he made that was recovered from a laptop computer searched at the target residence during the execution of a sneak and peak warrant on 12/13/2019. The affidavit includes the following transcript taken from the recorded statement:

> Testing of course the audio on this, seeing if there is enough vocal disruption in terms of my voice. The time for words has ended. The time for podcasts has ended. The time for talk has ended. If you're wasting your time simply thinking there's going to be movementarian approach to the coming problems, you think that podcasts are the solution they're not, if you think talking is a solution, it is not. If you think politics is a solution, you are a damn fool. To quote Ryan Thorpe [Winnipeg Free Press reporter] as there is no technical record of the person he likes to attribute this to, so to quote Mr. Thorpe the system does not want a peaceful solution, the system has prevented a peaceful solution at every possible tum. It is the system that is fomenting violent revolution, not us, and they shall now reap what they have sown. The time for violent revolution is now, that time is already here, it's here right now as we speak. You have one of two options if you understand the truth and you understand the gravity of the situation. Your two options are as follows. Option number one, prepare for the collapse. Option

number two, bring the collapse. That is it. If you are not getting physically fit, if you are not getting armed, if you do not acquiring weapons, ammunition, and training right fucking now, then you should be preparing to do what needs to be done. Derail some fucking trains, kill some people, and poison some water supplies. You better be fucking ready to do those things. If not, then you are not going to be ready for what's coming. If you want the white race to survive, you're going to have to do your fucking part. You were born sadly in the wrong century. For those who want to do nothing and who want a comfortable life, that's not an option. This is the age of war. This is the age of entire this is the age of strife, this is the century upon which this current civilizations rotting Jew infested country comes to a collapse. You were born in the wrong century for complacency. That's all for now.

The speech involved in this case is protected speech under the First Amendment to the United States Constitution. In *Brandenburg v. Ohio*, 395 U.S. 444 (1969), the Supreme Court held an Ohio Statute that sanctioned criminal syndicalism, which purported to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate, and which failed to distinguish mere advocacy from incitement to imminent lawless action, violated the First Amendment. In *Brandenburg*, the defendant was a leader of the Ku Klux Klan. The evidence presented at his trial to support the criminal syndicalism charge included a Klan video with pictures of firearms and phrases that were derogatory to Blacks and Jews. In one statement, the Klan leader stated "We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengenance taken. *Id.* at 446. The Court, in finding the Ohio law unconstitutional, held that constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *Id* at 447.

*Brandenburg* stands for the proposition that *advocacy* of racist and violent ideas alone is protected by the First Amendment and cannot be the subject of criminal sanction. It is only when such advocacy is directed to *inciting or producing imminent lawless action and is likely to incite or produce such action* that the speech may be subject to criminal sanction. The *Brandenburg* principles naturally extend to whether probable cause is presented in an affidavit in support of a warrant. Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 (1925).[3]

In the case of suspicion based on alleged hate speech or advocacy of violence, there must be probable cause that the speech has crossed the line from mere advocacy to speech directed at inciting or producing imminent lawless action and likely to incite or produce such action. In this case there is no basis for a finding that the law enforcement officers had reasonable trustworthy information that showed that the speech incited or produced imminent lawless conduct. In other words, while the speech advocated may have expressed odious ideas and advocated violence in a general sense, there was no evidence that the speech had crossed the line from personal opinions to incitement and imminent violence.

---

[3]   *See Mink v. Knox*, 613 F.3d 995, 1003(10thCir. 2010) ("**Error! Main Document Only.**It goes without saying that a government official may not base her probable cause determination on an "unjustifiable standard," such as speech protected by the First Amendment. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) ("the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." ) (internal quotations marks and citations omitted); see also *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir.2006) ("an officer may not base his probable-cause determination on speech protected by the First Amendment."); *Sandul v. Larion*, 119 F.3d 1250, 1255–56 (6th Cir.1997) (where plaintiff's speech did not constitute fighting words and was thereby protected speech, it could not serve as basis for violation of city ordinances at issue.")

The exercise of first amendment speech is a sacred right in our democracy. The incursion of the defendant's privacy rights in this case are stunning. Following the sneak and peek warrant, which allowed the agents to invade the defendant's media devices and download every bit of personal information, the government obtained warrants that allowed for constant audio and video surveillance of the defendant's every move within his residence for a period of a month. The incursion was far greater than even the standard wiretap in which only telephonic communications are intercepted. Such shocking incursions of personal privacy cannot be the penalty for exercising one's First Amendment right to free speech no matter how odious that speech may be. An inherent danger in allowing the punishment of protected speech is that it tends to chill the exercise of the free speech right. A similar danger exists if the mere advocacy of unpopular speech can result in the issuance of a warrant and the ensuing government privacy incursion. The privacy incursion in this case was extreme and can only be expected to chill the exercise of the free speech right.

**2.      The Affidavit Failed to Establish Probable Cause for The Enumerated Target Crimes.**

While the affidavit alleges Harboring of an Alien, in violation of 8 U.S.C. § 1324 and Alien in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(5) as the predicate offenses under Title III, 189 U.S.C. § 2618, it is clear from the affidavit's emphasis on the activities of the Base, and the hate and violence speech which is the focus of the content of the application, that the true target offenses are violations of the Anti-Riot Act, 18 U.S.C §2101 and the Hate Crimes Act, 18 U.S.C §249. The affidavit does not contain probable cause that either act was violated.

The Anti-Riot Act, 18 U.S.C. § 2101(a), provides that it shall be unlawful to travel in interstate commerce . . . with intent - (1) to incite a riot; or (2) to organize, promote, encourage,

participate in, or carry on a riot; or (3) to commit any act of violence in furtherance of a riot; or (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot. The definition of a riot, 18 U.S.C. § 2102(a) provides the definition of a riot as: "[a]s used in this chapter, the term 'riot' means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual."

The definition section also recognizes free speech may be implicated in the term "to incite a riot" and makes clear that the "mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts."

The allegations in the affidavit do not establish probable cause that the defendant, or any co-conspirator, made any attempt to incite a riot. There were no specific acts of violence in connection with a riot; there were no threats of the commission of an act of violence with the ability of immediate execution of such threat. Rather, the speech alleged in the affidavit represented mere advocacy, not incitement with the threat of imminent violence.

−11−

In *Nwanguma v. Trump*, 903 F.3d 604 (2018), the court considered whether Trump's action of saying, "get em out of here" (in reference to protestors at one of his rallies) constituted incitement and whether the speech would be protected by the First Amendment under Brandenburg. The court held that Trump's words did not amount to "incitement," but also emphasized that his speech was protected by the First Amendment in any event. The court held under the Brandenburg test, only speech that explicitly or implicitly encourages the imminent use of violence or lawless action is outside the protection of the First Amendment. The Brandenburg test precludes speech from being sanctioned as incitement to riot unless: (1) the speech explicitly or implicitly encouraged the use of violence or lawless action; (2) the speaker intends that his or her speech will result in the use of violence or lawless action; and (3) the imminent use of violence or lawless action is the likely result of his or her speech. *Id.* at 609-610.

The target offense of Attempt to Commit a Hate Crime, 18 U.S.C. § 249, provides: "(1) [o]ffenses involving actual or perceived race, color, religion, or national origin. Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person."

There are no allegations in the affidavit to establish probable cause of an attempt at a hate crime. While the defendant, and alleged co-conspirators, may have made statements expressing racial animus, no statements or actions arise to the level of an attempt to cause bodily injury motivated by hate. Like the Anti-Riot Act, The Hate Crimes Act prohibits prosecution based solely on a defendant's belief and opinions. *See U.S. v. Mullet*, 868 F.Supp.2d 618, 623 (2012)

((Citing "Rules of Construction", Pub.L. No. 111–84, 123 Stat. 2841 (providing that the statute shall not be "construed to allow prosecution based solely upon an individual's expression of racial, religious, political, or other beliefs or solely upon an individual's membership in a group advocating or espousing such beliefs" and shall not be construed to diminish any First Amendment rights)).

It is clear from this analysis of First Amendment law and the statutory inciting a riot and commission of a hate crime that the affidavit failed to provide probable cause in support of the nonpredicate offenses. The affidavit alleges as predicate offenses violation of 8 U.S.C. § 1324 (Bringing In and Harboring Certain Aliens, and conspiracy to do so) Alien in Possession of a Firearm in Violation of 18 U.S.C. §922(g)(5).

The government's theory is that co-defendant, Lemley, knowingly harbored Mathews, an alien. It would appear that at the time of the application for the Title III warrant, the government had ample evidence to pursue this charge and the extraordinary means of a Title III intercept was totally unnecessary. The government had clearly established that Mathews was a Canadian national and had entered the country unlawfully. There was considerable evidence that when Mathews fled Canada, he was picked up by Lemley, who knew he was an alien. There was no reason to engage in the extraordinary incursion of the installation of a 24/7 eavesdropping bug in the Delaware residence to obtain evidence of Lemley knowingly harboring Mathews. The defendant contends that harboring charge cannot justify the sweep of the Title III warrant in this case. The harboring charge did not represent the essential thrust of the government's suspicion of the defendant in this case, his activities with the white supremist Base group.

–13–

In regards to firearm possession, the government alleged that it needed interception of oral communications to determine whether Mr. Mathews possessed a firearm. A 24-7 wiretap of the home to determine such a simple piece of information is entirely inappropriate under Title III. The government used the same reasoning to request the CCTV surveillance of the home, which was authorized one week prior to the wiretap. Realistically, it is quite clear that the government failed to meet the Title III exhaustion requirements before requesting the wiretap of the home to determine a fact easily discovered through visual surveillance and traditional investigatory methods.

11.     Mr. Mathews contends that the wiretap applications failed to demonstrate that less intrusive investigative alternatives were attempted and had failed or were unlikely to succeed.

Title III requires that a wiretap application contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ." 18 U.S.C. § 2518(1)(c); *see also* 18 U.S.C. § 2518(3)(c) (prior to authorizing wiretap, issuing judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"). In enacting Title III, Congress did not expect that wiretapping would be routinely used when traditional investigative techniques could suffice to expose illegal activity. *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *see Dalia v. United States*, 441 U.S. 238, 250 (1979) ("The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed.") (footnote omitted); *United States v. Giordano*, 416 U.S. 505, 515

(1974) (electronic interception of oral and wire communications is not to be routinely employed as a first step of an investigation); *see also United States v. Clerkley*, 556 F.2d 709, 715-16 (4th Cir. 1977) (because it is extraordinary investigative procedure, wiretap should not be authorized unless traditional investigative techniques have been tried and failed or are shown to be unlikely to succeed); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1988) ("Wiretaps are extraordinary investigative means. Their intrusiveness mandates that courts, in authorizing them, exercise great care in protecting individual privacy."); *United States v. Bobo*, 477 F.2d 974, 979 (4th Cir. 1973) (electronic surveillance is to be allowed only when "judicially authorized under the most precise and discriminating circumstances which meet the requirements of the Fourth Amendment"); *United States v. Lyons*, 507 F. Supp. 551, 555 (D. Md. 1981) ("[C]ourts examine closely challenges for noncompliance [with Title III's exhaustion requirement] and reject applications that misstate or overstate the difficulties involved.") (footnote omitted), aff'd, 695 F.2d 802 (4th Cir. 1982).

A judge faced with determining whether to authorize a Title III interception in a particular case must also consider the nature of the alleged criminal activity and its inherent susceptibility to detection by means other than electronic surveillance. A mere boilerplate recitation of the difficulties of gathering usable evidence is not a sufficient basis for authorizing a wiretap. *See United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992). Importantly, the Title III application must demonstrate why normal investigative measures will not succeed or have not succeeded in the particular case. *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983) (per curiam); see also *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977) ("[T]he affidavit, read in its entirety, must give a factual basis sufficient to show that ordinary

investigative procedures have failed or will fail in the particular case at hand."); *United States v. Ashley*, 876 F.2d 1069, 1075 (1st Cir. 1989) (government has burden of showing "a 'reasonable likelihood' that alternative investigatory techniques would fail to expose [the information sought to be discovered by way of wiretap]").

In the current case, agents could have easily determined whether Mr. Mathews possessed a firearm and already knew Mr. Lemley was harboring him prior to applying for the Title III warrant. Instead, the 24-hour audio surveillance of the home was requested as an intended fishing expedition, related to the nonpredicate offenses. The affidavit included evidence obtained from the sneak-and-peek warrant, in which agents discovered an AR-15 upper receiver, along with drill bit shavings, indicating that the defendants were likely building an AR-15. Mr. Mathews had also told the undercover agent that he intended to obtain a firearm.

Shortly after the wiretap was authorized, Mr. Mathews was observed working on the assembly of the AR-15 via CCTV footage. In fact, thirteen days after the wiretap was authorized, the undercover agent simply messaged Mr. Lemley and asked if he could hang out with them at their residence and Mr. Lemley promptly invited him to visit and stay with him and Mathews for a weekend. Lemley gave the undercover agent his address and they all went to the shooting range together where agents could easily observe Mr. Mathews in possession of a firearm.

The exhaustion requirements under Title III exist to prevent the most invasive surveillance techniques from being implemented unless entirely necessary. Courts require this type of surveillance to be the last resort, rather than the first option. *See, e.g., Giordano*, 416 U.S. at 515. In the present case, the exhaustion section begins by stating, "even if a search warrant uncovered a firearm inside the Target Residence, law enforcement agents may not be able to

prove that MATHEWS possessed the firearm (in violation of 18 U.S.C. § 922(g)(5), which criminalizes alien possession of firearms), as opposed to LEMLEY (not in violation of 18 U.S.C. § 922(g)(5)). The oral communications sought by the proposed order would prove conclusively whether MATHEWS possessed the firearm." Affidavit at ¶135. The Affidavit goes on to state, "Interception of oral communications within the Target Residence is necessary in this matter because normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, or appear unlikely to succeed if tried, or are too dangerous to be tried." Affidavit at ¶136. The Affidavit goes on to state, "As indicated above, this investigation has usefully employed at least one UCE. However, no UCE has been to the Target Residence (or has even been told by LEMLEY or MATHEWS of the location of the Target Residence)." *Id.*

Following this brief introduction, the entire remaining portion of the exhaustion section focused on the difficulties of intercepting oral communications via traditional investigative methods, rather than articulating why the interception of oral communications was even necessary to determine whether Mr. Mathews possessed a firearm. Certainly, it is difficult to intercept the communications people have within their own homes without bugging the home, but that is not the point. Agents easily could have determined whether Mr. Mathews possessed a firearm and who was harboring him simply by asking Mr. Mathews and Mr. Lemley. And that is exactly what the undercover agent did. He asked if he could visit, Mr. Lemley said yes and provided the address and they talked all about how Mr. Mathews assembled the AR-15 and they went shooting at the gun range together. Clearly, even the simplest investigative strategies had not even been attempted to determine who possessed the gun, prior to applying for 24-hour audio

–17–

surveillance of the home. It is also quite apparent that the predicate offenses had little to do with the government's motive for the wiretap. For these reasons, the wiretap violated the Fourth Amendment and the corresponding evidence should be suppressed.

12.      Evidence obtained from the wiretap should be suppressed because the minimization procedures were not properly employed. Title III requires that a wiretap order "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). Compliance with this statutory directive is judged on a case-by-case basis. *Scott v. United States*, 436 U.S. 128, 139 (1978). Relevant factors in this determination include the government's reasonable expectations concerning the content of and parties to a conversation, and the degree of judicial supervision while the wiretap is being executed. *Clerkley*, 556 F.2d at 716. The burden of proving that the executing agents complied with the statutory minimization requirement falls upon the government. *United States v. Rizzo*, 491 F.2d 215, 217-18 (2d Cir. 1974). To satisfy the minimization requirement, agents must show a "high regard" for the right of privacy of those who are being subjected to surveillance, and must reduce unnecessary intrusions into the speakers' privacy "to the smallest degree possible." *United States v. Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995) (quotations omitted).

The minimization requirements for the interception of oral communications at 29 Wenark Drive, Apartment 1 stated:

The authorization is limited to oral communications regarding offenses involving:

(1) 8 U.S.C. § 1324 (Bringing in and Harboring Certain Aliens, and conspiracy to do so)
(2) 18 U.S.C. § 922(g)(5) (alien in possession of firearm)

–18–

and the aiding and abetting of such offenses, in violation of 18 U.S.C. § 2, as well as 18 U.S.C. § 2101 (Inciting a Riot), 18 U.S.C. § 249 (Attempt to Commit a Hate Crime), and 18 U.S.C. § 371 (Conspiracy to Commit Violations of §§ 2101, 249, and 922(g)(5)). (the "TARGET OFFENSES").

Out of the 1136-page line sheet document detailing intercepted conversations, there was very limited information pertaining to the predicate offenses of harboring an alien and alien in possession of a firearm. Almost the entirety of the wiretap intercepted communications which appeared to be hateful or abhorrent in nature, as well as conversations that related to violence. None of these conversations actually displayed a realistic plan that Mr. Mathews and Mr. Lemley had to commit any of the nonpredicate offenses. For example, Session 1016 records the defendant stating, "PJM: I'm always thinking of schemes and evil plans for the evil world. I'm thinking of I don't know going to a 5G tower and you have this string hanging down with a 2x4 with a pin in it that you can pull the string to release it and it will come down and hit someone." Directly after that statement, the recording is minimized.

Similar sequences occur throughout the wiretap. In many instances, Mr. Mathews and Mr. Lemley are playing video games that involve military missions and conversations intertwine between the video game and real life, making it appear like the defendants had some sort of plan when a lot of their hypothetical plans are just conversation that derives from missions within the video game. Many of these "plans" are clearly imaginary ideas Mathews and Lemley discuss during the idle hours spent playing video games. An excerpt from Session 376 exemplifies this point:

PJM: UNINT... open up the battle space a little, and maybe ill wreck some shit here just for good measure. they'll build a nuclear defense frame (believed to be video game chatter)
PJM: If I were to acquire a US Army uniform, and somehow got on base, snuck in, how long do

you think it would take for anybody to think anything of it
BML: You cant just sneak in with a uniform you genius, you need a CAC card.
PJM: UNINT Those places are fenced, you just have to jump a fence.
BML: you dont belong anywhere, so theyre going to be like who are you, well they"ll look at your uniform, well Hello Master Sergeant like who the fuck are you? BML laughs
PJM: yeah i dont know the US ranks that well.

Mr. Mathews and Mr. Lemley consistently engaged in conversations like this, while in the home, yet neither of them took any active steps towards committing any sort of act. Further, numerous hours of recordings were simply constitutionally protected free speech, which never should have been recorded or included in the wiretap.

As abhorrent as racism and anti-Semitism are, such speech is not evidence of a hate crime. If this government allowed the interception of all hate speech as potential evidence of a hate crime, that would essentially eliminate freedom of speech under First Amendment. The wiretap consistently included any language related to racism and hate when the minimization instructions required agents to limit the monitoring of oral communications to those which pertain to harboring, alien in possession of a firearm, attempt to commit a hate crime, inciting a riot, and aiding and abetting in such acts. Therefore, the agents failed to properly follow the minimization requirements and the Title III Wiretap should be suppressed.

12.     Additionally, evidence obtained from the extension of interception of oral communications, authorized on January 8, 2020 should be suppressed because the reauthorization was unnecessary. The request stated that interception of communications "shall continue until conduct is intercepted that fully reveals: (1) the manner in which the above-named described offenses are being committed; (2) the precise nature, scope, and extent of the above-described offenses, and (3) the identity and roles of accomplices, aiders and abettors, co-

conspirators, and participants, or for a period of thirty (30) days from the date the Order is entered." Twenty-four-hour monitoring of communications was never the appropriate method to discover this type of information. Further, the undercover agent had already scheduled to visit Mr. Lemley and Mr. Mathews' residence at the time that the extension was filed, which was likely to and proved to be a more effective way of discovering precise information that was unlikely to be discussed, during the every day activity of Mr. Lemley and Mr. Mathews.

WHEREFORE, for all the reasons discussed above, and any others that may develop at a hearing, this Court should exclude any evidence seized pursuant to the Title III orders issued in this case.

Respectfully submitted,


/S/
_____

JOSEPH A. BALTER          #04496
Law Office of Joseph A. Balter, LLC
Mt. Washington Mill
1340 Smith Avenue, Ste 200
Baltimore, Maryland 21201
Telephone:   (410) 375-7082
Facsimile:    (410) 779-1201
Email:           joseph@josephbalterlaw.com


## REQUEST FOR HEARING

Pursuant to Rule 105.6 of the Local Rules of the United States District of Maryland, a hearing is requested on the defendant's motion.


/S/
_____

JOSEPH A. BALTER          #04496