**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | |
| | * | **Criminal No. TDC-20-33** |
| **BRIAN MARK LEMLEY, JR.,** | * | |
| **PATRIK JORDAN MATHEWS, and** | * | |
| **WILLIAM GARFIELD BILBROUGH** | * | |
| **IV** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BRIAN MARK LEMLEY'S MOTION TO SUPPRESS
EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................... iii

I. PROCEDURAL BACKGROUND ....................................................... 2

    A.      September 5, 2019 Warrant for Historical Information and Prospective Location Information from Phone Linked to Lemley .................................. 2

    B.      October 2, 2019 Warrants for Prospective Location Information from Phone Linked to Lemley and Location History Associated with Lemley Email ........................................................................... 4

    C.      October 18, 2019 Warrant for Information from Google Associated with Lemley Account ................................................................. 6

    D.      October 28, 2019 Warrants for Prospective Location Information from Phone, Information from Reagan.com Account and Twitter Account .......... 7

    E.      November 8, 2019 Warrant for Information from Lemley Google Account and Lemley Microsoft Account .................................... 7

    F.      November 18, 2019 Warrant for Prospective Location Information from Phone Linked to Lemley ................................................... 8

    G.      December 11, 2019 Video Warrant ............................................ 8

    H.      December 11, 2019 Sneak-and-Peek Warrant ............................. 10

    I.      December 13, 2019 Warrant for Information from Lemley Google Account, Lemley Microsoft Account, and Prospective Location Information from Phone Linked to Lemley ................................ 11

    J.      December 18, 2019 Application for Title III Wiretap ................... 11

    K.      January 14, 2020 Warrant Authorizing Searches of Delaware Apartment and Lemley's Truck ............................................. 11

II. ARGUMENT ............................................................................... 13

    A.    Legal Background ................................................................. 14

    B.    Analysis ............................................................................. 16

1. The Affidavits Failed to Establish Probable Cause .......................... 16

 a. Inciting a Riot ................................................................ 16

 b. Conspiracy and Attempt to Commit a Hate Crime ............. 18

 c. Distribution of Controlled Substances ............................. 19

 d. Bringing in and Harboring Unlawful Aliens..................... 21

  i. Bringing in Aliens ................................................. 21

  ii. Harboring Aliens ................................................... 23

 e. Conspiracy .................................................................... 27

 f. Possession of a Firearm by an Unlawful Alien ................. 28

 g. Attempt to Commit a Hate Crime.................................... 31

 h. Conspiracy to violate §§ 2101, 249, and 922(g)(5) ........... 32

2. The Video and Wiretap Affidavits Failed to Establish Necessity ..................................................................................... 33

3. Evidence Seized Pursuant to the Subsequent Search Warrants Is Inadmissible ................................................................................ 34

III. CONCLUSION.................................................................................... 35

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE**

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000) ........................................................14

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ...................................................30

*United States v. Aguilar*, 477 F. App'x 1000 (4th Cir. 2012) (unpublished) .....................23

*United States v. Anderson-Bagshaw*, 509 F. App'x 396 (6th Cir. 2012) (unpublished) ......15

*United States v. Anderton*, 901 F.3d 278 (5th Cir. 2018) ...................................................26

*United States v. Brunson*, --- F.3d ---, 2020 WL 4374972, at *1 (4th Cir. July 31, 2020) ...........14

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019) ......................................................20

*United States v. Camara*, 908 F.3d 41, (4th Cir. 2018) ....................................................27

*United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012) ..................................... 25, 26, 28

*United States v. Daley*, 378 F. Supp. 3d 539 (W.D. Va. 2019) .................................... 17, 18

*United States v. DeQuasie*, 373 F.3d 509 (4th Cir. 2004) ..................................... 31, 34, 35

*United States v. Doyle*, 650 F.3d 460 (4th Cir. 2011) ................................................ 23, 28

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012) ................................................ 19, 32

*United States v. Falls*, 34 F.3d 674 (8th Cir. 1994) ............................................. 15, 16, 33

*United States v. Flores-Blanco*, 623 F.3d 912 (9th Cir. 2010) ............................... 21, 23, 28

*United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011) ....................................................28

*United States v. Kahn*, 415 U.S. 143 (1974) ...........................................................33, 34

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018). ....................................................14

*United States v. Koyomejian*, 970 F.2d 536 (9th Cir. 1992) (en banc) .................. 15, 16, 33

*United States v. Larios*, 593 F.3d 82 (1st Cir. 2010) .......................................................16

iii

*United States v. Leavis,* 853 F.2d 215 (4th Cir. 1988)....................................................33

*United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc)......................................22

*United States v. Lyles*, 910 F.3d 787 (4th Cir. 2018)......................................................14

*United States v. Lyons*, 507 F.Supp. 551 (D. Md. 1981) ...............................................33

*United States v. Markiewicz*, 978 F.2d 786 (2d Cir. 1992) .............................................17

*United States v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990) ...........................15, 16, 33

*United States v. Muldoon*, 931 F.2d 282 (4th Cir. 1991) ......................................15, 16, 33

*United States v. Nerber*, 222 F.3d 597 (9th Cir. 2000) ..................................................15

*United States v. Pratt*, 351 F.3d 131 (4th Cir. 2003)................................................19, 32

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) ..............................................20

*United States v. Silveus*, 542 F.3d 993 (3d Cir. 2008) ...................................................25

*United States v. Sterling*, 860 F.3d 233 (4th Cir. 2017)...........................................19, 32

*United States v. Terry*, 909 F.3d 716 (4th Cir. 2018) ....................................................14

*United States v. Torralba-Mendia*, 784 F.3d 652 (9th Cir. 2015)......................................27

*United States v. Torres*, 751 F.2d 875 (7th Cir. 1984)...................................................15

*United States v. Vargas-Cordon*, 733 F.3d 366 (2d Cir. 2013) ...........................25, 26, 28

*United States v. Williams*, 740 F.3d 308 (4th Cir. 2014).............................................14, 30

*Utah v. Strieff*, 136 S. Ct. 2056 (2016) ....................................................................14

## **STATUTES**

8 U.S.C. § 1324 ............................................................................................ *passim*

8 U.S.C. § 2518............................................................................................15, 33, 34

18 U.S.C. § 249............................................................................................ *passim*

iv

18 U.S.C. § 371 ................................................................................................2, 16, 27

18 U.S.C. § 922 ....................................................................................................... *passim*

18 U.S.C. § 2101 ..................................................................................................... *passim*

18 U.S.C. § 2518 ...............................................................................................15, 33, 34

21 U.S.C. § 841 .............................................................................................9, 12, 16, 20

18 U.S.C. § 922 ....................................................................................................... *passim*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
|    v. | * | |
| | * | Criminal No. TDC-20-33 |
| BRIAN MARK LEMLEY, JR., | * | |
| PATRIK JORDAN MATHEWS, and | * | |
| WILLIAM GARFIELD BILBROUGH | * | |
| IV | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## BRIAN MARK LEMLEY'S MOTION TO SUPPRESS
## EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

Defendant Brian Mark Lemley, Jr., through undersigned counsel, hereby moves this Honorable Court to suppress evidence seized pursuant to search warrants as well as all derivative evidence. During the investigation of the defendants in this case the government used dozens of warrants to obtain extensive private information and used information obtained illegally from earlier warrants to seek further private information, ultimately obtaining authorization to take the unusual and highly intrusive step of clandestinely entering Mr. Lemley's apartment and installing audio and video monitoring equipment therein, allowing agents to watch and listen to activity within the apartment for weeks. Countless hours of recordings of activity and conversations within the apartment were made and line sheets from that monitoring totaled over 1,000 pages.

As will be demonstrated herein, the overarching problem with the applications and supporting affidavits is that while they set forth evidence that Mr. Lemley associated with a group that included members who used hateful and sometimes violent rhetoric, that he attended meetings with these individuals where "training" occurred, and that he spent time

1

with and lived with a man who had fled Canada after being revealed as a white nationalist, they do not establish the requisite probable cause that Mr. Lemley or any co-defendant had committed any of the target crimes listed in the affidavits. Further, agents turned to the exceedingly intrusive approach of installing monitoring equipment within Mr. Lemley's apartment without exhausting other, less intrusive investigative methods. Finally, later warrant affidavits relied upon evidence obtained in earlier searches not supported by probable cause. All evidence obtained pursuant to these warrants must be suppressed.

## I.   PROCEDURAL BACKGROUND

### A.   September 5, 2019 Warrant for Historical Information and Prospective Location Information from Phone Linked to Lemley

On September 5, 2019 assistant U.S. attorneys in Maryland submitted an application for an order requiring Verizon Wireless to disclose detailed records for a cellular phone linked to Mr. Lemley, including subscriber, call detail, and cell tower information, for the previous four months as well as all information about the location of the phone for 30 days prospectively.[1] A supporting affidavit signed by FBI Special Agent Rachid Harrison asserted that locating the telephone would show Mr. Lemley's location and would lead to evidence of three "Target Offenses": inciting a riot, under 18 U.S.C. § 2101; conspiracy to commit and attempt to commit a hate crime, under 18 U.S.C. §§ 371 and 249; and distribution of controlled substances, under 21 U.S.C.. 9/5/19 Affidavit, attached as Exhibit A. Special Agent Harrison asserted that the location of the telephone "will lead to locations where

---

[1] As the investigation into these defendants unfolded, affidavits submitted in support of the challenged warrants built on previous affidavits, containing identical allegations and adding additional evidence in later affidavits based upon the results of previous warrant searches and investigation. The defense here describes each warrant application chronologically and will seek to avoid repeating facts and arguments that apply to multiple applications.

Lemley and other Base members conduct firearms and tactical training; locations at which unidentified members of the Base reside; and locations where members of the Base store narcotics, firearms, and promotional materials and manuals used to plan, coordinate, and commit the Target Offenses." *Id*. at 21.

Special Agent Harrison's affidavit began by asserting that Mr. Lemley was a member of "The Base," a "white supremacist organization" that "has proclaimed war against minority communities within the United States and abroad." *Id*. at 4. Base members allegedly used encrypted chat rooms to discuss, "among other things, recruitment, creating a white ethno-state, committing acts of violence against minority communities (including African-Americans and Jewish-Americans), the Base's military training camps, and ways to make improvised explosive devices ('IEDs')." *Id*. According to a news article cited in the affidavit, the Base's founder, Rinaldo Nazzaro, told followers that "The Base is designed to unite white nationalists to prepare for violent insurgency against various targets, including the U.S. government and non-white minority groups." *Id*. at 8. Some members of the Base, unidentified by name, allegedly talked about "potential violence or 'direct action' against minority groups" in a secure chat room. *Id*. at 9-10. The affidavit included various written online posts attributed to Nazzaro discussing violence. *Id*. at 12-17.

In addition to general background information about The Base, the affidavit asserted that "an FBI Agent Undercover Employee ('UCE')" was admitted into The Base and was permitted to join The Base's APP-1 chat room." *Id*. at 17. The UCE reported that Lemley, using the moniker "cantgoback," regularly communicated on APP-1 with other members of The Base. *Id*. at 18. Without attributing any statement to Lemley in particular or indicating whether Lemley participated in any identified discussion, the affidavit indicated that

members of The Base discussed topics on APP-1 including "shooting it out with law enforcement, suicide by cop; and the importance of not letting law enforcement take them alive if they come with a warrant." *Id*.

According to the affidavit, Mr. Lemley attended a "regional training camp" in Georgia from August 2 through August 4, 2019 at which members engaged in "tactical training and firearm drills." *Id*. at 19. The UCE claimed Lemley "offered Base members in attendance at the training camp the Schedule II Controlled Substance Adderall, prior to training," and "[a]t least some members in attendance took the Adderall." *Id*. In mid-August, 2019, Lemley allegedly attended another Base "training camp" near Bangor, Pennsylvania. *Id*. at 20.

**B.      October 2, 2019 Warrants for Prospective Location Information from Phone Linked to Lemley and Location History Associated with Lemley Email**

On October 2, 2019, assistant U.S. attorneys in Maryland submitted an application for an order requiring Verizon Wireless to provide information about the location of Mr. Lemley's phone for an additional 30 days and requiring Google to provide location history from November 13, 2017 through the present associated with an email account linked to Mr. Lemley and any devices associated with the account. A supporting affidavit signed by FBI Special Agent Harrison asserted that locating the telephone and email would show Mr. Lemley's location and would lead to evidence of the three previously-identified "Target Offenses," and one added offense: bringing in and harboring certain aliens, under 8 U.S.C. § 1324. 10/2/19 Affidavit at 4, attached as Exhibit B.

The October 2, 2019 affidavit largely repeated the information set forth in the earlier September 5, 2019 affidavit, but added some additional information. Specifically, the affidavit indicated that Lemley's target email account was linked to a Twitter account that

contained posts and images of anti-Semitic and racist language, Base propaganda, and was linked with known Base members.  *Id.* at 21.

The affidavit also identified co-defendant Patrik Mathews and alleged that Mr. Lemley was playing a role in harboring him.  The affidavit asserted that on August 19, 2019, Canadian police searched the home of a Base member living in Winnipeg, Canada, identified as Patrik Mathews.  *Id*. at 24.  The Canadian Armed Forces reportedly "relieved MATHEWS of duty" shortly thereafter, and he was reported missing to the Canadian police on August 28, 2019.  *Id*.  On September 2, 2019, Canadian authorities discovered Mathews' pickup truck, which had been abandoned near the Manitoba-Minnesota border.  *Id*.  The affidavit further asserted that:

> Based on conversations that took place on [a chat app] from late August and early September 2019, agents believed that MATHEWS may have crossed into the United States with the assistance of Base Members in the United States. Additionally, agents believed LEMLEY was harboring MATHEWS.  Since being reported missing, MATHEWS did not enter the United States at a legal point of entry.

*Id*.

The affidavit also relied on evidence discovered through execution of the September 5, 2019 warrant.  The affidavit asserted that the phone linked to Mr. Lemley was located in the area of Chincoteague Island, Virginia on at least two occasions in September, that Mr. Lemley had been encountered with another white male by a park ranger on September 3, 2019, and that agents obtained photo and video footage of Mr. Lemley and a passenger agents believed was Mathews at the Chesapeake Bay Bridge Tunnel on September 14, 2019.  *Id.* at 25-26.   Phone records also suggested that Mr. Lemley arrived in Rome, Georgia in the vicinity of a "known Base member's residence," early on the morning of September 15, 2019 and that he turned back towards Maryland approximately five hours after his arrival.  *Id*. at

26.  Law enforcement saw Mr. Lemley on US Route 340 in Maryland, allegedly "en route to his residence," on the morning of September 16, 2019, and there did not appear to be any passenger in his vehicle.  *Id*. at 26.

C.     **October 18, 2019 Warrant for Information from Google Associated with Lemley Account**

On October 18, 2019, assistant U.S. attorneys in Maryland submitted an application for an order requiring Google to produce extensive information from November 13, 2017 through the present for an account associated with Mr. Lemley, including contents of all e-mails and chats, YouTube video upload history, all photographs, all search history, and all location history.  10/18/19 Affidavit, attached as Exhibit C at 36-38.[2]  A supporting affidavit signed by FBI Special Agent Harrison asserted that these materials would lead to evidence of the same four "Target Offenses."  *Id*. at 3.

The October 18, 2019 affidavit largely repeated the information set forth in the earlier October 2, 2019 affidavit, but added some additional information.  The affidavit alleged that during a discussion in a Base chat room in September 2019, Mr. Lemley wrote, "Hey mr fed" and "I spent about 35% of my day daydreaming about killing you today," and "I day dream about killing so much that I frequently walk in the wront [sic] directions for extended periods of time at work."  *Id*. at 20.  The affidavit also relied upon information obtained through the earlier October 2, 2019 warrant to Google for Mr. Lemley's email.  Google location records, according to the affidavit, indicated that Mr. Lemley had picked up co-defendant William Bilbrough en route to the August 2-4, 2019 "training camp" in Georgia.  *Id*. at 21.  Google

---

[2] The application also sought information related to a Gmail account associated with co-defendant Bilbrough.  For this and subsequent applications that also sought information about others, the associated exhibits will not include attachments describing those materials.

location records also indicated that Mr. Lemley traveled from Maryland to Howe, Indiana on August 31, 2019, then to Chincoteague, Virginia.  *Id*. at 25-26.  Further, the affidavit described locations transmitted by Mr. Lemley's phone and additional location data from Google obtained through the September 5, 2019 warrant to describe travel by Mr. Lemley to allegedly pick up Mr. Mathews and take him to Georgia in mid-September.  *Id*. at 27.

### D.  October 28, 2019 Warrants for Prospective Location Information from Phone, Information from Reagan.com Account and Twitter Account

On October 28, 2019, assistant U.S. attorneys in Maryland submitted an application for an order requiring Verizon Wireless to produce further prospective location information for a phone linked to Mr. Lemley, and Reagan.com and Twitter to produce subscriber and content information for accounts linked to Mr. Lemley.  10/28/19 Affidavit, attached as Exhibit D.  The affidavit submitted in support of the application essentially mirrored the earlier October 2, 2019 affidavit, with some added facts establishing Mr. Lemley's connection to the Reagan.com and Twitter accounts.  The affidavit also relied upon information obtained in reliance upon the October 18, 2019 warrant.  *See, e.g*., *Id*. at 29-32 (describing contents of emails obtained in reliance upon 10/18/19 warrant to Google).

### E.  November 8, 2019 Warrant for Information from Lemley Google Account and Lemley Microsoft Account

On November 8, 2019, assistant U.S. attorneys in Maryland submitted an application for an order authorizing several warrants.  Relevant to Mr. Lemley were two:  the first to Google to produce extensive information from October 18, 2019 through the present for an account associated with Mr. Lemley, including contents of all e-mails and chats, YouTube video upload history, all photographs, all search history, and all location history; and the second to Microsoft to produce all records related to an email address associated with Mr.

Lemley, including the content of all email communications.  11/9/19 Affidavit, attached as Exhibit E. The affidavit submitted in support of the application essentially mirrored the earlier October 28, 2019 affidavit, with some added facts obtained from earlier warrants.[3] Specifically, the affidavit described email communications linked to Mr. Lemley obtained through the above October 28, 2019 warrant that were described as Mr. Lemley's initial contact with The Base.  *Id*. at 47-48.  The affidavit further reported that location information from Lemley's phone suggested that Lemley traveled to Georgia with Bilbrough to attend a Base "training camp."  *Id.* at 49.  The affidavit also described law enforcement surveillance of Lemley and Mathews apparently renting an apartment in Delaware.  *Id*. at 50-51.

### F.    November 18, 2019 Warrant for Prospective Location Information from Phone Linked to Lemley

On November 18, 2019, assistant U.S. attorneys in Maryland submitted an application for an order authorizing Verizon Wireless to produce additional prospective location information for a phone linked to Mr. Lemley and other information related to the co-defendants.  11/18/19 App., attached as Exhibit F.  The affidavit was essentially identical to the earlier warrant affidavits.

### G.    December 11, 2019 Video Warrant

On December 11, 2019, assistant U.S. attorneys in Delaware submitted an application for an order authorizing FBI agents to install a closed-circuit television in the apartment Mr. Lemley and Mr. Mathews shared in Newark, Delaware.  Video App., attached as Exhibit G, at 1-5.  The application asserted Lemley and Mathews were using the apartment to commit certain "Target Offenses": bringing in and harboring aliens, and conspiracy to do so, under

---

[3] The affidavit also "incorporated by reference" and attached as exhibits the October 18, 2019 and October 22, 2019 affidavits discussed above.

8 U.S.C. § 1324; possession of a firearm by an unlawful alien, under 18 U.S.C. § 922(g)(5); aiding and abetting the preceding offenses, under 18 U.S.C. § 2; distribution of controlled substances, under 21 U.S.C. § 841; inciting a riot, under 18 U.S.C. § 2101; attempt to commit a hate crime, under 18 U.S.C. § 249; and conspiracy to commit violations of §§ 2101, 249, 922(g)(5).  *Id*. at 2.  It therefore sought permission to conduct "monitoring and recording of visual, non-verbal conduct and activities by means of video surveillance."  *Id*. at 1.  Agents had rented an apartment adjacent to the apartment in which Mr. Lemley and Mr. Mathews were living.  *Id*. at 3.  The government sought permission for law enforcement agents to install surveillance equipment by drilling into the apartment through the wall of that adjacent apartment.  *Id*.  They further requested permission to enter the apartment surreptitiously, by breaking and entering on multiple occasions, if necessary, to install, maintain, and remove electronic visual surveillance equipment.  *Id*. at 4.

A supporting affidavit signed by Agent Harrison was attached to the application that contained the same information from the earlier affidavits as well as some additional information.  The affidavit alleged that in late September and October 2019 Mathews conducted internet searches for, among other things, "Build your own AR-15," "Complete AR-15 Firearms," and "Ten D&H 5.56 30rd Aluminum Magazines & Ten Magpul PMAG 5.56 30rd Magazines –Accessories."  *Id*. at 48.  Mathews had also allegedly searched for the publication "The Siege," a book authored by a man alleged to advocate for "violence to cause destabilization in American society."  *Id*. at 49.  The affidavit also described statements by Mathews allegedly overheard by the UCE while Mathews was in Georgia.  According to the affidavit, the UCE heard Mathews say, among other things, that he had "fled Canada with the help of other Base members after Canadian law enforcement seized [his] guns"; that he

hoped to "mak[e] money in order to purchase firearms and body armor"; that he "wanted to move north within the United States and find work that did not require a social security card"; that, with respect to The Base's "future operations," "if he were told where to go, what to do, and given a means to do it, he would do so"; and that once other "ghosts" (i.e., people who wish to remain secret) joined The Base, they "could begin doing 'jobs.'"  *Id*. at 60-62.

In addition, the affidavit asserted Mathews "received multiple emails from Indeed.com regarding job searches and applications in the labor and construction industries." *Id*. at 49.  Agent Harrison wrote that, "[i]n [his] training and experience, . . . sometimes employers in those fields pay in cash and do not require proof of citizenship, which would make them attractive to MATHEWS, who has no status to live or work in the United States." *Id*. at 49-50.  Agent Harrison opined that Mathews "intended to acquire firearms to conduct attacks and is actively discussing future attacks when physically present with like-minded individuals – just as he is when he is inside the Target Residence with Lemley ."  *Id*. at 63.

### H.     December 11, 2019 Sneak-and-Peek Warrant

Later that day, Agent Harrison submitted an application to Judge Andrews for a "sneak-and-peek" warrant, authorizing agents "to search the [Newark apartment] but not to seize evidence."  Sneak-and-Peek App. at 3, attached as Exhibit H.  The application, which incorporated by reference the affidavit submitted in support of the video warrant, asserted probable cause to believe a search of the apartment would reveal physical evidence of the same Target Offenses.  *Id*. at 3-4.  Specifically, Agent Harrison claimed Lemley's and Mathews' computer hard drives "or other storage media" might contain "records" or "data" relevant to those offenses.  *Id*. at 4.  The application therefore sought permission to "inspect[], photocopy[], photograph[], reproduc[e], and imag[e] any electronic storage media (including computer hard drives and removable storage media), software, documents, and

other tangible objects of any kind found within the [apartment]." *Id.* at 5. After Judge
Andrews signed the warrant, agents surreptitiously entered the apartment, searched it, copied
the contents of computer media, and installed surveillance equipment.

I.    **December 13, 2019 Warrant for Information from Lemley Google
      Account, Lemley Microsoft Account, and Prospective Location
      Information from Phone Linked to Lemley**

On December 13, 2019, assistant U.S. attorneys in Maryland submitted an application
for an order requiring Google to produce extensive information from November 8, 2019
through the present for an account associated with Mr. Lemley, including contents of all e-
mails and chats, YouTube video upload history, all photographs, all search history, and all
location history. 12/13/19 Affidavit., attached as Exhibit I. The application also sought
authorization for a warrant to Microsoft to produce all records from November 8, 2019
through the present related to an email address associated with Mr. Lemley, including the
content of all email communications. *Id.* Finally, the application sought authorization for
Verizon Wireless to produce prospective location information for a phone linked to Mr.
Lemley and other information related to the co-defendants. *Id.* The affidavit was essentially
identical to the earlier warrant affidavits.

J.    **December 18, 2019 Application for Title III Wiretap**

On December 18, 2019, assistant U.S. attorneys in Delaware submitted to Judge
Andrews an application for an order authorizing "the interception of oral communications."
12/18/19 App. at 1-2, attached as Exhibit J. The application sought permission to wiretap
the Newark apartment using equipment that agents had previously installed when they
installed the video-surveillance equipment. *Id.* at 3-4. In support of that request, the
application asserted that Lemley and Mathews were using the Newark apartment to commit
a list of "Target Offenses," and that audio surveillance of the apartment would reveal

11

evidence of those crimes.  *Id*. at 2-3.  Those "Target Offenses" included all crimes identified in the applications for the video and sneak-and-peek warrants, except for distributing controlled substances under 21 U.S.C. § 841.  *Id*. at 2.

Attached to the application was an updated affidavit from Agent Harrison (the "wiretap affidavit").  That affidavit largely repeated the background information and allegations in the video affidavit, but also included new facts learned through execution of the video and sneak-and-peek warrants.  Specifically, the wiretap affidavit alleged that, based on their search of the apartment, agents believed Lemley slept in the unit's only bedroom, while Mathews slept on a bed in the living room.  Wiretap Affidavit at 65.  Agents found Base "propaganda flyers, communication devices, and empty rifle cases" in the bedroom closet.  *Id*.  On the floor of the apartment's common area, they discovered a "pellet gun," which "[a]t first glance . . . looked like a real firearm."  *Id*.  They also located an empty pistol holster near a bet believed to be used by Mathews.  *Id*. at 65.  Video surveillance conducted on December 13, 2019, showed Mathews "holding a revolver handgun while in conversation with LEMLEY."  *Id*. at 70.  Although they were not sure, agents believed that gun was the pellet gun they observed on the floor.  *Id*.

In "a common area closet," the affidavit asserted, agents discovered a box containing "go bags" with Meals Ready to Eat and knives, and "certain necessary items to build an assault rifle," among them an upper receiver and a lower receiver of the same caliber.  *Id*. at 66-67.  The box also contained "drill shavings and drill bits," which suggested to Agent Harrison that someone had attempted to configure the parts into a working firearm.  *Id*. at 68.  In addition, the affidavit alleged agents found a piece of paper with a list of items near Mathews' bed; one of those items—"SKS," which Agent Harrison believed to refer to the

12

configured firearm—had been crossed out.  *Id*. at 65-66.  Agent Harrison claimed the handwriting in the list was Mathews', based on a comparison to a letter Mathews wrote his father, which agents found in the apartment.  *Id.*

Finally, the wiretap affidavit alleged agents "obtained images" of Lemley's and Mathews' "electronic devices."  *Id*. at 68.  Mathews' laptop allegedly contained "several videos of himself making oral statements," some of which discussed killing people in furtherance of "the movement," and including one in which he "discusse[d] his illegal journey into the United States."  *Id*. at 68-69.

### K.     January 14, 2020 Warrant Authorizing Searches of Delaware Apartment and Lemley's Truck

On January 14, 2020, Delaware assistant U.S. attorneys submitted an application requesting a search warrant for the Delaware apartment shared by Lemley and Mathews and the truck used by Mr. Lemley.  1/14/20 Affidavit., attached as Exhibit K.  An affidavit from Special Agent Kristopher Long referenced an attached affidavit from Agent Harrison to provide probable cause for the requested warrants.  1/9/20 Affidavit, included in Exhibit K. That affidavit repeated the background information and allegations in the earlier affidavits, much of which was based upon evidence obtained pursuant to earlier warrants, but also included detailed accounts of statements and conduct by Lemley and Mathews recorded since audio and video monitoring in the apartment began on December 13, 2019.  *Id*. at 71-86. It also listed additional target offenses, evidence of which was gathered during the surveillance authorized by the video and wiretap warrants described above.

## II.    ARGUMENT

The affidavits submitted in support of the above warrant applications did not establish probable cause to believe that Lemley, Mathews, or anyone else had committed any of the

enumerated Target Offenses, or that evidence of those offenses would be found in the target locations.  All evidence seized pursuant to those warrants must therefore be suppressed.  In addition, illegally obtained evidence cannot contribute to probable cause in any subsequent affidavits.

### A.    Legal Background

"As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause."  *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018).  A warrant is supported by probable cause if the facts alleged in the affidavit establish "a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018). "Probable cause only exists when an officer has a reasonable belief that a law has been broken," and an "officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by law."  *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014); *see also Doe v. Broderick*, 225 F.3d 440, 452 (4th Cir. 2000) ("[A] mere hunch that illegal activity is afoot will not provide a valid foundation for the issuance of a search warrant.").

"In general, evidence discovered as a result of a Fourth Amendment violation is subject to suppression under the exclusionary rule."  *United States v. Terry*, 909 F.3d 716, 721 (4th Cir. 2018).  That rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality."  *Utah v. Strieff*, 136 S. Ct. 2056, 2058 (2016).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 "authorizes federal judges to issue orders approving wiretaps when detailed statutory requirements are met."  *United States v. Brunson*, --- F.3d ---, 2020 WL 4374972, at *1 (4th Cir. July 31,

2020).   Relevant here, a court may authorize "interception of wire, oral, or electronic communications" if it finds there is probable cause to believe that (1) "an individual is committing, has committed, or is about to commit" certain enumerated crimes, and (2) "particular communications concerning th[ose] offense[s] will be obtained through such interception."  18 U.S.C. § 2518(3)(a), (b).  A defendant "may move to suppress the contents of any wire or oral communication intercepted" pursuant to Title III if "the communication was unlawfully intercepted."  *Id.* § 2518(10)(a)(i).   A communication was "unlawfully intercepted," and therefore subject to suppression, if the application in support of the wiretap order does not establish probable cause.  *See, e.g.*, *United States v. Muldoon*, 931 F.2d 282, 285 (4th Cir. 1991).

Although it appears the Fourth Circuit has never decided the question, other courts have held silent video surveillance is "neither prohibited nor regulated" by Title III.  *United States v. Koyomejian*, 970 F.2d 536, 537 (9th Cir. 1992) (en banc); *see also, e.g.*, *United States v. Mesa-Rincon*, 911 F.2d 1433, 1436-37 (10th Cir. 1990).  Nevertheless, courts have recognized that "[h]idden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement."  *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000); *see also United States v. Falls*, 34 F.3d 674, 680 (8th Cir. 1994) ("[S]ilent video surveillance . . . results in a very serious, some say Orwellian, invasion of privacy."); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) (describing video surveillance as "exceedingly intrusive"); *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 421 (6th Cir. 2012) (unpublished) (Moore, J., concurring in the judgment) ("As every court considering the issue has noted, video surveillance can result in extraordinarily serious intrusions into personal privacy.").   An order authorizing video surveillance is therefore

15

invalid—and its fruits must be suppressed—if the supporting application fails to establish probable cause.  *E.g.*, *Koyomejian*, 970 F.2d at 541-42; *Mesa-Rincon*, 911 F.2d at 1437-38; *Falls*, 34 F.3d at 679-80; *United States v. Larios*, 593 F.3d 82, 91 n.8 (1st Cir. 2010).

> **B.    Analysis**

> **1.    The Affidavits Failed to Establish Probable Cause**

The first warrant was issued on September 5, 2019 on the basis of Agent Harrison's affidavit, which asserted probable cause that the location information for Mr. Lemley's cellular telephone would reveal evidence of three "Target Offenses": inciting a riot, under 18 U.S.C. § 2101; conspiracy to commit and attempt to commit a hate crime, under 18 U.S.C. §§ 371 and 249; and distribution of controlled substances, under 21 U.S.C. § 841.  9/5/19 App. at 3-4.  Subsequent warrant affidavits added additional "Target Offenses": bringing in and harboring aliens, and conspiracy to do so, under 8 U.S.C. § 1324; possession of a firearm by an unlawful alien, under 18 U.S.C. § 922(g)(5); aiding and abetting the preceding offenses, under 18 U.S.C. § 2; and conspiracy to commit violations of §§ 2101, 249, 922(g)(5).  The affidavits contain information suggesting that Lemley was a member of The Base, that some Base members espoused a white supremacist ideology and discussed violent acts, that Mr. Lemley attended gatherings of Base members.  Nevertheless, the affidavits do not demonstrate probable cause to believe that Mr. Lemley or others had committed the target offenses listed in each application, or that agents would find evidence of those crimes in the target locations.  Each target offense will be addressed in turn.

> **a.    Inciting a Riot**

The first Target Offense identified in the September 5, 2019 affidavit and those that followed was inciting a riot, under 18 U.S.C. § 2101.  That statute, known as the Anti-Riot Act, provides, in relevant part:

Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—

> (1) to incite a riot; or
>
> (2) to organize, promote, encourage, participate in, or carry on a riot; or
>
> (3) to commit any act of violence in furtherance of a riot; or
>
> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;

and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph—

Shall be fined under this title, or imprisoned not more than five years, or both.

§ 2101(a).

The statute defines a "riot" as:

a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

18 U.S.C. § 2102(a). "The statute requires the government to prove a defendant's intent at two points in time—when the defendant uses a facility of interstate commerce with the intent to incite a riot, and when the defendant commits an overt act to further any of the purposes articulated in subparagraphs (A) through (D)." *United States v. Markiewicz*, 978 F.2d 786, 813 (2d Cir. 1992). In addition, "the overt acts themselves . . . necessarily must . . . constitute a clear and present danger." *United States v. Daley*, 378 F. Supp. 3d 539, 556

(W.D. Va. 2019).  There must be "a sufficiently close relationship to imminent violence or lawless action."  *Id.*

The September 5, 2019 affidavit and all subsequent affidavits are devoid of any facts indicating that Lemley traveled across state lines or used any facility of interstate commerce with the intent to incite or participate in a "public disturbance" involving actual or threatened "acts of violence" that constituted "a clear and present danger."  The affidavits assert that in early August 2019, Lemley traveled to Georgia to participate in a Base "training camp," where he participated in "tactical training and firearm drills."  *See, e.g.*, Ex. A, 9/5/19 App. at 19.  He also allegedly traveled to another training camp in Pennsylvania later that month.  *Id*. at 20.

These allegations—the only part of the affidavits arguably relevant to § 2101—do not demonstrate that Lemley intended to incite or participate in a "public disturbance." § 2102(a).  Even if it could be argued that Mr. Lemley's alleged participation in chat rooms or trainings show that Lemley wished to participate in The Base's "future operations," the affidavits fail to show that such operations would consist of groups of "three or more persons" who would pose, or threaten to pose, a "clear and present danger" of bodily injury or property damage.  Much less do they establish that Lemley actually performed an "overt act" that itself "constitute[d] a clear and present danger."  *Daley*, 378 F. Supp. 3d at 556. The affidavits do not support probable cause as to the offense of inciting a riot.

### b.    Conspiracy and Attempt to Commit a Hate Crime

The second target offense identified in the September 5, 2019 affidavit and those that followed is attempt to commit a hate crime.  Under 18 U.S.C. § 249, it is illegal to "willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[] to cause bodily injury to any person" because

of the victim's race, color, national origin, or various other characteristics.  None of the affidavits submitted in support of the above search warrant applications establishes probable cause to believe Lemley or others committed this offense.

"An attempt to commit a crime, which is recognized as a crime distinct from the crime intended by the attempt, punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance."  *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003).  To convict a defendant of attempt, the government must show he took a "substantial step" toward commission of a substantive offense.  *United States v. Sterling*, 860 F.3d 233, 242 (4th Cir. 2017).  A "substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose.  It is more than mere preparation but less . . . than completion of the crime."  *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012) (ellipsis in original).

Nothing in the above affidavits demonstrates that Lemley "put in motion" events that would have resulted in a hate crime, "but for some intervening circumstances."  *Pratt*, 351 F.3d at 135.  There was no "substantial step" toward commission of a hate crime that constituted "more than mere preparation."  *Engle*, 676 F.3d at 423.  The affidavits do not even indicate Lemley devised a plan to commit a hate crime, much less that he began to execute that plan.  Although the affidavits suggest Mr. Lemley was involved with a group that harbored white-supremacist views, harboring such views is not prohibited by § 249.

### c.    Distribution of Controlled Substances

The September 5, 2019 affidavit and the subsequent affidavits claim probable cause to believe searches of the target locations would lead to evidence of Mr. Lemley's commission of the offense of distribution of controlled substances in violation of 21 U.S.C.

§ 841.  The only part of the affidavits that even tangentially relates to this offense is the allegation that at a training camp conducted by The Base, Lemley "offered Base members . . . the Schedule II Controlled Substance Adderall, prior to training," and "[a]t least some members in attendance took the Adderall."  Ex. A at 19.  There is no allegation that Lemley ever possessed or distributed any controlled substances on any other occasions.

At most, the affidavits establish that Mr. Lemley provided an unknown number of Adderall pills for consumption to some unknown number of Base members who attended a "training camp" on August 3-4, 2019.  There is no indication that Mr. Lemley or any other member of the Base were involved in trafficking controlled substances, that trafficking in controlled substances was an activity promoted by or engaged in by members of the Base, or that Mr. Lemley's purported offer of Adderall pills to other members at a training was anything more than a one-time incident.[4]  Moreover, "time is a crucial element of probable cause."  *United States v. Richardson*, 607 F.3d 357, 370 (4th Cir. 2010).  Accordingly, a "valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*."  *United States v. Bosyk*, 933 F.3d 319, 330 (4th Cir. 2019) (emphasis added).  An allegation of a one-time use of a controlled substance was undoubtedly "stale" by the time Agent Harrison submitted the affidavits.  *Id.*[5]  The affidavits therefore failed to establish probable cause of drug distribution or that evidence of drug distribution would be found.

---

[4] Tellingly, the wiretap affidavit, discussed *infra*, does not assert probable cause to believe the apartment would contain evidence of drug distribution.  Exh. J at 2.

[5] The January 14, 2020 affidavit submitted in support of the search of the Delaware residence alleged that on December 21, 2019, after the issuance of most of the challenged warrants, Mathews, Bilbrough, and Lemley participated in the manufacture of the controlled substance DMT.  Exhibit K at 74.  However, that evidence was only used in support of the Delaware residence search and was the fruit of illegal video and audio surveillance challenged herein.

#### d.      Bringing in and Harboring Unlawful Aliens

The October 2, 2019 warrant application added the target offense of bringing in and harboring unlawful aliens, under 8 U.S.C. § 1324 and that target offense was included in all subsequent affidavits.  Ex. B at 4.  Section 1324(a)(1)(A) contains four subsections that each prohibit a specified action with respect to unlawful aliens, as well as two subsections that prohibit aiding and abetting and conspiring to commit the substantive offenses.  Although the challenged affidavits do not identify which subsections Agent Harrison believed agents would find evidence of, it appears to have been referencing § 1324(a)(1)(A)(i) and § 1324(a)(1)(A)(iii), which contain language used in the affidavits.  The former provides penalties for anyone who, "knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry"; the latter covers anyone who, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation."  In addition, § 1324(a)(1)(A)(v)(I) criminalizes conspiracy to commit either offense.  The challenged affidavits do not give rise to probable cause to believe either Lemley or Mathews had committed any of these offenses.

#### i.      Bringing in aliens

With respect to the "bringing in" prong of § 1324(a)(1)(A), there is nothing in the affidavits to suggest Lemley transported Mathews across the U.S.-Canada border or otherwise took him into this country.  *See United States v. Flores-Blanco*, 623 F.3d 912, 920 (9th Cir. 2010) (noting a "brings to" violation generally requires evidence that a defendant "physically transport[ed] aliens across the border").  The affidavits allege that Canadian

police searched Mathews' home on August 19, 2019; that he was reported missing to the Canadian police on August 28th; that his truck was found abandoned near the Manitoba-Minnesota border on September 2nd; and that agents believed, based on conversations among Base members between late August and early September, that Mathews "may have crossed into the United States with the assistance of Base Members in the United States." *See, e.g.,* Ex. G at 40-41. In addition, they assert that on August 31st, Lemley traveled from Maryland to Howe, Indiana, where he "remained . . . for approximately two hours" before driving to Chincoteague, Virginia. *Id*. at 41-42.

None of these facts suggests anyone "brought" Mathews into the United States. Even assuming Lemley drove to Indiana to pick up Mathews, it does not follow that he brought Mathews into the country. Indiana is hundreds of miles from the Minnesota border, where Mathews apparently crossed into the United States, and Google location records—which agents used to track Lemley to Indiana—do not indicate he went any farther west or north. Ex. G at 47-48. *See United States v. Lopez*, 484 F.3d 1186, 1199-1200 (9th Cir. 2007) (en banc) ("The mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting a 'brings to' offense.").

The affidavit's allegation that Mathews "may have crossed into the United States with the assistance of Base Members" does not change the analysis. For one thing, the affidavit does not allege Lemley was among the members who assisted Mathews in crossing the border. If Agent Harrison had had reason to believe Lemley, specifically, was involved in bringing Mathews into the United States, he no doubt would have included this fact in the affidavit. But he did not. Moreover, although this allegation is not precisely worded, it

22

appears to suggest only that members of the Base picked up Mathews after he crossed the border; it does not indicate any Base members actually "physically transport[ed]" him across the border themselves. *Flores-Blanco*, 623 F.3d at 920.

And in any event, even if the affidavits established that Lemley or some other Base member brought Mathews into the United States, it does not demonstrate a nexus between that offense and the Newark apartment. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Doyle*, 650 F.3d 460, 471 (4th Cir. 2011). "Accordingly, residential searches have been upheld only where some information links the criminal activity to the defendant's residence." *Id.* Here, the affidavits do not describe what evidence of "bringing" Mathews into the United States would consist of. Nor does it give any reason to believe that evidence of that offense—whatever form it might take—would be found in the apartment. The requisite "nexus" is absent. *Id.*

### ii.        Harboring Aliens

The affidavits similarly fail to demonstrate probable cause as to concealing, harboring, or shielding aliens from detection.

***First,*** to establish harboring, the government must show a defendant knew or recklessly disregarded the fact that an alien "has come to, entered, or remains in the United States in violation of law." § 1324(a)(1)(A)(iii). "A defendant acts with reckless disregard where [he] is aware of but consciously ignores facts and circumstances clearly indicating that an individual is an undocumented alien." *United States v. Aguilar*, 477 F. App'x 1000, 1002 (4th Cir. 2012) (unpublished). Assuming for sake of argument that Mathews entered

the United States illegally, nothing in the affidavits indicates Lemley knew of or recklessly disregarded this fact.

The only portion of the affidavits that even comes close to addressing this issue is the allegation that Lemley, Mathews, and the UCE talked about a Vice article titled "U.S. Neo-Nazi Terror Group Harboring Missing Ex-Canadian Soldier: Sources." *See, e.g.*, Ex G. at 58-59. That article, according to the video affidavit, "discusse[d], among other things, MATHEWS and his disappearance, and information to suggest members of The Base [we]re harboring MATHEWS in the United States and taking steps to conceal his location." *Id*. at 58. Notwithstanding that the article mentioned "harboring" and "conceal[ing]" Mathews, it does not suggest he was in the United States illegally. The affidavit elsewhere asserts that a Canadian newspaper had revealed Mathews as a member of The Base, that Canadian police searched his home, that the Canadian Armed Forces had "relieved MATHEWS of duty," and that Mathews had been "reported missing" to Canadian police. *Id*. at 40. Mathews, in other words, was wanted by Canadian authorities because of his connections to a supposed "Neo-Nazi Terror Group." Under these circumstances, there is no reason to believe that the "harboring" mentioned in the Vice article had anything to do with Mathews' supposed unlawful immigration status, or even that the article mentioned that status.

The video affidavit and those thereafter also claim the UCE heard Mathews say he "wanted to move north within the United States and find work that did not require a social security card." *Id*. at 60. This statement might suggest Mathews lacked legal authorization to work in the United States. But even if lack of work authorization is the same thing as unlawful presence—which it is not—the affidavit does not indicate Lemley was present when

Mathews made this statement, and there is no reason to impute knowledge of the statement to Lemley.

The insufficiency of the affidavits on this point is clear from the December 18, 2019 affidavit Agent Harrison submitted in support of the wiretap order (the "wiretap affidavit"). In the latter affidavit, Agent Harrison wrote that intercepting oral communications within the Newark apartment was necessary because it would produce evidence of "LEMLEY's knowledge of MATHEWS's unlawful presence in the United States." Ex J. at 64. That investigators believed—even after executing the video and sneak-and-peek warrants—that they lacked evidence of Lemley's knowledge confirms that the affidavits did not establish that element of § 1324(a)(1)(A)(iii).

**Second,** to sustain a conviction under § 1324(a)(1)(A)(iii), "the government must prove conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting the alien's unlawful presence." *United States v. Silveus*, 542 F.3d 993, 1003 (3d Cir. 2008). Harboring, in other words, "encompass[es] an element of concealment" or "evading detection." *United States v. Vargas-Cordon*, 733 F.3d 366, 381 (2d Cir. 2013). In a harboring conviction, "the illegal status of the alien is inseparable from the decision to provide housing—it is a decision to provide a refuge for an illegal alien *because* he's an illegal alien." *United States v. Costello*, 666 F.3d 1040, 1045 (7th Cir. 2012) (emphasis in original).

The Second Circuit has explained:

> To "harbor" under § 1324, a defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, or other material comfort—and also is intended to help prevent the detection of the alien by the authorities. The mere act of providing shelter to an alien, when done without

> intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii).

*Vargas-Cordon*, 733 F.3d at 382; *see also Silveus*, 542 F.3d at 1003 (noting "cohabitation with [an alien], taken alone, does not constitute 'harboring' within the meaning of the statute" and holding "[r]easonable control of the premises" where an alien stays is insufficient to prove harboring); *Costello*, 666 F.3d at 1044 ("'[H]arboring,' as the word is actually used, has a connotation—which 'sheltering,' and *a fortiori* 'giving a person a place to stay'—does not, of deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to a safe location, or physical protection."); *United States v. Anderton*, 901 F.3d 278, 284 (5th Cir. 2018) ("[F]urnishing housing without more is not illegal 'harboring' under Section 1324(a).").

The latter affidavits assert Lemley rented an apartment at which he and Mathews lived together beginning in November 2019. See, e.g., Ex. G at 53-57. But it does not suggest Lemley tried to "conceal[]" Mathews there or housed Mathews so he could "evad[e] detection." *Vargas-Cordon*, 733 F.3d at 381. Indeed, the affidavit includes facts that demonstrate Lemley and Mathews were living openly at the apartment, without attempting to hide Mathews' presence. The affidavit asserts, for example, that "law enforcement agents have observed [Lemley and Mathews] entering the [apartment] on a regular basis," and that on multiple occasions agents saw the two men sitting in a car outside the apartment for extended periods of time. *Id*. at 57-58. These actions are inconsistent with an attempt to "conceal[]" Mathews or "evad[e] detection."

Moreover, even if Lemley was concealing Mathews, the affidavit offers no basis to conclude Lemley did so "*because* he's an illegal alien." *Costello*, 666 F.3d at 1045 (emphasis in original). As explained above, there is no evidence Lemley was even aware of

Mathews' illegal-immigration status.  And to the extent he was, it is unlikely, bordering on implausible, that Lemley concealed Mathews for fear that immigration officials would realize Mathews had entered the country outside a legal point of entry.  The far more reasonable inference to draw from the affidavit is that Lemley was concealing Mathews because he was wanted by Canadian authorities and because both men were members of an organization that wanted to keep its operations hidden from law enforcement.

As to harboring, the later wiretap affidavit contains only one additional fact arguably relevant to Lemley's knowledge of Mathews' unlawful immigration status.  The affidavit explains that during execution of the sneak-and-peek warrant, agents "obtained images" of Mathews' laptop, which contained a video in which he "discusses his illegal journey into the United States."  Ex. J at 68.  The affidavit does not assert, or give any reason to believe, that Lemley was aware of or had viewed this video.  Thus the video's existence is irrelevant to determining whether Lemley knew Mathews was in the country illegally.

### e.  Conspiracy

The affidavits also do not give rise to probable cause to believe the Newark apartment would contain evidence of a conspiracy to "bring" Mathews to the United States or to "harbor" him here.  "To establish an alien smuggling conspiracy [under § 1324(a)(1)(A)], the government must prove an agreement to carry out one of the substantive offenses, and that [the defendant] had the intent necessary to commit the underlying offense."  *United States v. Torralba-Mendia*, 784 F.3d 652, 663 (9th Cir. 2015); *accord United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018) (noting that under general conspiracy statute, 18 U.S.C. § 371, a conspiracy requires proof of an unlawful agreement to commit an offense and the defendant's knowing and willing participation in the conspiracy).  "The presence of a knowing and voluntary agreement distinguishes conspiracy from the completed crime and

is therefore an essential element of the crime of conspiracy." *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011).

Here, the affidavits do nothing to suggest Lemley agreed to "bring" Mathews to the United States.  There is no allegation that he was part of the process by which The Base decided to "physically transport" Mathews into the United States.  *Flores-Blanco*, 623 F.3d at 920.  To the extent the affidavits indicate Mathews entered into an agreement with other Base members to "bring" him into the country, the affidavits do not supply a nexus between that crime and the Newark apartment.  *Doyle*, 650 F.3d at 471.  Nothing in the affidavits, in other words, indicates that any evidence of such an agreement even exists, much less provide any reason to believe it would be located in the apartment.

Nor do the affidavits indicate Lemley and Mathews agreed to harbor Mathews in that apartment.  As explained above, the affidavits do not establish that Lemley knew of or recklessly disregarded Mathews' illegal immigration status.  He therefore could not have entered into an agreement to harbor Mathews "knowing or in reckless disregard of the fact that [Mathews] ha[d] come to, entered, or remain[ed] in the United States in violation of law."  § 1324(a)(1)(A)(iii).  And even assuming the two men agreed that Mathews would stay at an apartment rented by Lemley, there are no facts in the affidavit suggesting they acted with the "intention to help prevent [Mathews'] detection by immigration authorities or police."  *Vargas-Cordon*, 733 F.3d at 382.  That is, the affidavit does not indicate they agreed to harbor Mathews "*because* he's an illegal alien."  *Costello*, 666 F.3d at 1045 (emphasis in original).

### f.       Possession of a Firearm by an Unlawful Alien

The December 11, 2019 affidavit seeking permission to install a video camera in Mr. Lemley's apartment added the claim that the Newark apartment contained evidence of a

violation of § 922(g)(5).  Exh. G at 2.  That statute prohibits firearm possession by any "alien" who (1) "is illegally or unlawfully in the United States," or (2) "has been admitted to the United States under a nonimmigrant visa."  For two independently sufficient reasons, the December 11, 2019 affidavit and those after it were inadequate to establish probable cause that Mr. Lemley violated this statute.

**First,** the December 11, 2019 affidavit does not give rise to probable cause to believe Mathews possessed a firearm while staying in the Newark apartment.  The affidavit asserts that the UCE heard Mathews say he had "future intentions of . . . acquiring firearms" and that Mathews wanted to "mak[e] money in order to purchase firearms."  *Id*. at 60-61.  Mathews also allegedly said "that if he were told where to go, what to do, and given a means to do it, he would do so," and that he wanted to "begin doing 'jobs'" for The Base.  *Id*. at 61-62.  In addition, the affidavit claims that Mathews' "internet searches corroborate the statements he made about his desire to obtain firearms and tactical gear for operational purposes."  *Id*. at 63.

These facts demonstrate, at most, that Mathews *wanted* to obtain a gun, or that he *intended* to do so at some future time.  They do not add up to an allegation that Mathews had in fact acquired a gun by the time the video affidavit was written.  Indeed, in the video affidavit Agent Harrison asserts, based on his "training and experience," that he "believe[s] that MATHEWS *intends* to acquire firearms to conduct attacks."  *Id*. at 63 (emphasis added).  Thus the affidavit itself acknowledges Mathews did not yet possess a firearm.  Probable cause, however, "only exists when an officer has a reasonable belief that a law *has been broken*," and an "officer cannot have a reasonable belief that a violation of the law occurred when the acts to which an officer points as supporting probable cause are not prohibited by

law." *Williams*, 740 F.3d at 312 (emphasis added).  The video affidavit does not show that § 922(g)(5) "ha[d] been broken"; it shows only that Mathews wanted or intended to acquire a gun, which is "not prohibited by law." *Id.*

**Second,** in a § 922(g) prosecution, "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019).  A conviction in this case would therefore require proof that Mathews knew he was in the United States illegally or, under an aiding-and-abetting theory, that Lemley knew that fact.  *See id.* at 2195.

The video affidavit does not assert Mathews knew he was in the country illegally. The most it alleges is that Mathews said he wanted to find a job that did not require a Social Security card.  Ex. G at 60.  This fact means, at most, that Mathews was not a citizen and was not authorized to work here.  But lack of work authorization is not the same as unlawful presence in the United States; an alien who is in the country legally may nevertheless be unauthorized to accept employment while here.  And as explained above, the affidavit also does not establish that Lemley knew Mathews was in the country illegally.  Thus the affidavit does not demonstrate probable cause to believe § 922(g)(5) "ha[d] been broken."  *Williams*, 740 F.3d at 312.

The wiretap affidavit does contain several additional facts, beyond those in the video affidavit, that relate to possible firearm possession by Mathews.  Specifically, the wiretap affidavit alleges that,

- During execution of the sneak-and-peek warrant, agents searched Lemley's bedroom closet, where they found "empty rifle cases," among other things. Ex. J at 65.

- On the floor of the apartment's common area, agents discovered a pellet gun that "looked like a real firearm." *Id*.

- An empty pistol holster "was located near [Mathews'] bed." *Id*.

- In a closet in the apartment's common area, agents found "certain necessary items to build an assault rifle," including an upper receiver and lower receiver. The box in which those items were stored contained "drill shavings and drill bits," which suggested someone had already assembled the components into a firearm. *Id*. at 67-68.

- Agents found a list, supposedly written in Mathews' handwriting, that they believed contained "items that MATHEWS has acquired or is attempting to acquire." One of those items was written as "SKS," which agents believed was the assembled firearm. That item had been crossed off the list. *Id*. at 65-66.

- During agents' video surveillance on December 13, 2019, "MATHEWS was observed holding a revolver handgun while in conversation with LEMLEY." Agents believed the handgun "could be" the pellet gun mentioned above. *Id*. at 70.

Investigators, however, obtained all of this evidence pursuant to either the video warrant or the sneak-and-peek warrant. Because those warrants were invalid, the above facts must be scrubbed from the wiretap affidavit when determining the adequacy of probable cause. *DeQuasie*, 373 F.3d at 520. Without these additional facts, the wiretap affidavit contains only the information recited in the video affidavit, which, as explained above, does not add up to probable cause.

### g.      Attempt to Commit a Hate Crime

The last substantive offense identified in the December 11, 2019 video affidavit is attempt to commit a hate crime. Ex. G at 2. Under 18 U.S.C. § 249, it is illegal to "willfully cause[] bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempt[] to cause bodily injury to any person" because of the victim's race, color, national origin, or various other characteristics. The video

affidavit and those thereafter do not establish probable cause to believe Lemley or Mathews committed this offense.

"An attempt to commit a crime, which is recognized as a crime distinct from the crime intended by the attempt, punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance." *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003). To convict a defendant of attempt, the government must show he took a "substantial step" toward commission of a substantive offense. *United States v. Sterling*, 860 F.3d 233, 242 (4th Cir. 2017). A "substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose. It is more than mere preparation but less . . . than completion of the crime." *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012) (ellipsis in original).

Nothing in the video affidavit or those that followed it demonstrates that Lemley or Mathews "put in motion" events that would have resulted in a hate crime, "but for some intervening circumstances." *Pratt*, 351 F.3d at 135. There was no "substantial step" toward commission of a hate crime that constituted "more than mere preparation." *Engle*, 676 F.3d at 423. The affidavit does not even indicate Lemley or Mathews devised a plan to commit a hate crime, much less that they began to execute that plan. Although the affidavit suggests the two men held white-supremacist views, harboring such views is not prohibited by § 249.

### h.   Conspiracy to violate §§ 2101, 249, and 922(g)(5)

Finally, the video affidavit and those that followed it asserts probable cause to believe the Newark apartment contains evidence of a conspiracy to violate § 2101 (inciting a riot), § 249 (hate crimes), and § 922(g)(5) (possession of a firearm by an unlawful alien). Video App. at 8. Mr. Lemley is unaware of any facts in the affidavit that would support this

32

assertion.  To the extent the government argues in its response that probable cause exists as to these offenses, Lemley will address that argument in his reply.

### 2.    The Video and Wiretap Affidavits Failed to Establish Necessity

It should go without saying that surreptitious placement of audio and video recording equipment inside a private home allowing law enforcement to monitor all activity within that home for a period of weeks amounts to an extraordinary invasion of privacy.  In these circumstances, courts have required, at a minimum, proof that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See*, *e.g.*, *Koyomejian*, 970 F.2d at 541-42; *Mesa-Rincon*, 911 F.2d at 1437-38; *Falls*, 34 F.3d at 680.  This requirement is drawn from the wiretap statute at 18 U.S.C. § 2518(1)(c).  The "necessity" requirements are designed to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  Because the necessity requirement is of such importance, courts closely examine challenges for noncompliance and reject applications that misstate or overstate the difficulties involved.  *United States v. Lyons*, 507 F.Supp. 551, 555 (D. Md. 1981).  The Fourth Circuit, in particular, has mandated that the government's burden cannot be met "through a mere boilerplate recitation of the difficulties of gathering useful evidence." *United States v. Leavis,* 853 F.2d 215, 221 (4th Cir. 1988).

The video and wiretap affidavits here failed to meet this high bar.  The affidavits failed to adequately demonstrate that other investigative techniques had been tried in good faith and had been given enough time to achieve their stated purposes before the government turned to the extremely intrusive approach of installing monitoring equipment within the apartment.  Nor did the government explain convincingly why untried investigative techniques would not likely

have succeeded had they been tried or allowed to continue.  For example, the investigating agents had made effective use of a confidential informant in this case and the affidavits fail to adequately explain why that investigative tactic was unlikely to succeed.  The UCE had attended Base "training camps" with Lemley, Mathews, and others and had been able to record hours of conversations during which participants spoke without any evident discretion.  He participated in private Base chat rooms.  He communicated with Mathews and Lemley using an encrypted communication platform and was able to record that conversation.  Further, there can be no suggestion that the UCE was not permitted to enter Lemley and Mathews' apartment.  The affidavits make no mention of any effort to have the UCE visit the apartment prior to the time the affidavits were prepared.  In fact, the UCE later visited Lemley and Mathews on January 11, 2020 and spent hours inside the apartment discussing Base activities, all while wearing a wire.

In sum, the defense has no quarrel with the proposition that use of audio and video surveillance within the apartment offered opportunities to learn more information about what Lemley and Mathews were doing.  But that is not the test under 18 U.S.C. § 2518.  It is well established that electronic interceptions cannot be permitted if "traditional investigative techniques would suffice to expose the crime."  *Kahn*, 415 U.S. at 153 & n.12.  Here, it is clear that although invasive surveillance had the potential to yield further information, traditional investigative techniques were more than sufficient.

### 3.   Evidence Seized Pursuant to the Subsequent Search Warrants Is Inadmissible.

The exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. DeQuasie*, 373 F.3d 509, 519 (4th Cir. 2004).  When a warrant affidavit contains information obtained pursuant to a prior

warrant that issued in violation of the Fourth Amendment, courts cannot consider that information when deciding whether the second affidavit is sufficient.  *Id.*  Evidence seized pursuant to warrants following the initial September 5, 2019 warrant is inadmissible under this "derivative evidence" principle.  The affidavits in support of those latter warrants contain much of the same background information that is in the September 5, 2019 affidavit.  Apart from repeating this background information, the follow-up applications rely largely upon evidence obtained during execution of warrants that preceded them.  Evidence seized during execution of the subsequent warrants—the probable cause for which relied on that "fruit of the poisonous tree"—is therefore "derivative of [the] illegality" underlying the initial warrant. *DeQuasie*, 373 F.3d at 519.  As a result, evidence from the latter searches must also be suppressed.

## III.   CONCLUSION

For the reasons described above, this Court should suppress all evidence seized pursuant to the eleven search warrants challenged herein.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

        /s/

NED SMOCK
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770-4510
(301) 344-0600
(301) 344-0019 (fax)
Email: ned_smock@fd.org