**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. TDC-20-33** |
| | * | |
| **BRIAN MARK LEMLEY, JR., and** | * | |
| **PATRIK JORDAN MATHEWS,** | * | |
| | * | |
| **Defendants** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENSE MOTIONS

The defendants have filed a series of motions, none of which have merit, and all of which should be denied. The Government now responds.

### Summary Background

The defendants challenge almost all of the many search warrants obtained during the investigation. For ease of reference, the Government identifies those warrants here:

1. On September 5, 2019, United States Magistrate Judge Charles B. Day authorized a warrant for historical information related to TARGET TELEPHONE-1 (Lemley). *See* **Exhibit A** ("September 5th Warrant")

2. On October 2, 2019, United States Magistrate Judge Thomas M. DiGirolamo authorized warrants for prospective information related to TARGET TELEPHONE-1 (Lemley) and information associated with TARGET EMAIL-1 (Lemley). *See* **Exhibit B** ("October 2d Warrants").

3. On October 18, 2019, Magistrate Judge Day authorized a warrant for information associated with TARGET EMAIL-1 (Lemley). *See* **Exhibit C** ("October 18th Warrant").

4.  On October 22, 2019, Magistrate Judge Simms authorized warrants for historical and prospective information related to TARGET TELEPHONE-2 (Mathews), and for information associated with TARGET EMAIL-3 (Mathews), TARGET EMAIL-4 (Mathews), and TARGET EMAIL-5 (Mathews).  *See* **Exhibit D** ("October 22d Warrants").

5.  On October 29, 2019, Magistrate Judge Day authorized warrants for prospective information related to TARGET TELEPHONE-1 (Lemley); information associated with TARGET EMAIL-6 (Lemley); and information associated with TARGET TWITTER-1 (Lemley).  *See* **Exhibit E** ("October 29th Warrants").

6.  On November 8, 2019, Magistrate Judge Sullivan authorized warrants for information associated with TARGET EMAIL-1 (Lemley), TARGET EMAIL-3 (Mathews), TARGET EMAIL-4 (Mathews), TARGET EMAIL-5 (Mathews), and TARGET EMAIL-10 (Lemley).  *See* **Exhibit F** ("November 8th Warrants").

7.  On November 18, 2019, Magistrate Judge DiGirolamo authorized warrants for prospective information related to TARGET TELEPHONE-1 (Lemley) and TARGET TELEPHONE-2 (Mathews).  *See* **Exhibit G** ("November 18th Warrants").

8.  On December 11, 2019, United States District Court Judge Richard Andrews of the District of Delaware authorized a warrant to search a certain premises in Delaware at which Lemley and Mathews resided ("Delaware Residence").  *See* **Exhibit H** ("December 11th Warrant").

9.  Also on December 11, 2019, Judge Andrews authorized the monitoring and recording of visual, non-verbal conduct occurring in the Delaware Residence.  *See* **Exhibit I** ("December 11th CCTV Warrant").

10. On December 13, 2019, Magistrate Judge DiGirolamo authorized warrants for information associated with TARGET EMAIL-1 (Lemley), TARGET EMAIL-3 (Mathews), TARGET EMAIL-4 (Mathews), TARGET EMAIL-5 (Mathews), TARGET EMAIL-10 (Lemley), TARGET EMAIL-15 (Mathews), as well as for prospective information related to TARGET TELEPHONE-1 (Lemley) and TARGET TELEPHONE-2 (Mathews). *See* **Exhibit J** ("December 13th Warrants").

11. On December 18, 2019, Judge Andrews authorized the interception of oral communications in the Delaware Residence. *See* **Exhibit K** ("December 18th Title III").

12. On January 9, 2020, Judge Andrews authorized the continued use of CCTV recording and Title III interception in the Delaware Residence. *See* **Exhibit L** ("January 9th Extension").

13. On January 10, 2020, Magistrate Judge Simms authorized warrants for prospective information related to TARGET TELEPHONE-1 (Lemley) and TARGET TELEPHONE-2 (Mathews). *See* **Exhibit M**.

14. On January 14, 2020, United States Magistrate Judge Christopher J. Burke of the District of Delaware authorized warrants to search the Delaware Residence and Lemley's vehicle. *See* **Exhibit N** ("January 14th Delaware Warrants").

On January 14, 2020, United States Magistrate Judge Charles B. Day authorized criminal complaints charging the defendants—along with co-defendant William Garfield Bilbrough IV— with various federal crimes. The defendants were arrested two days later. On January 27, 2020, a federal grand jury for the District of Maryland returned an indictment alleging various federal crimes committed by the defendants. Lemley and Mathews were charged together with being (and aiding and abetting) an alien in possession of a firearm and ammunition (Counts Eight and Eleven),

and transporting a firearm and ammunition in interstate commerce with intent to commit a felony (Counts Nine and Twelve).  ECF No. 1.  Lemley also was charged with additional related offenses, including conspiracy to transport certain aliens (namely, Mathews; Count One); transporting certain aliens (namely, Mathews; Counts Two and Four); conspiracy to transport and harbor certain aliens (namely, Mathews; Count Three); harboring certain aliens (namely, Mathews; Count Five); transporting a machine gun in interstate commerce (Count Six); and disposing of a firearm to an illegal alien (namely, Mathews; Counts Seven and Ten).  ECF No. 1.

The following day, the defendants were charged with additional federal offenses in the District of Delaware, including transporting Mathews (Count One); harboring Mathews (Count Two); being (and aiding and abetting) an alien in possession of a firearm and ammunition (Count Three); possession of a machine gun (Count Four); possession of an NFA weapon (Count Five); and obstruction (Count Six).  *See* Crim. No. 20-09 (D. Del.).

On August 31, 2020, the defendants filed motions to suppress, dismiss, and sever.  ECF Nos. 102-107, 110.[1]

## <u>Applicable Legal Standards</u>

### A.      Search Warrants

When issuing a warrant and making a probable cause determination, judges use a "totality of the circumstances analysis."  *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005).  "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair

---

[1] The defendants filed additional motions—to adopt motions and for leave to file additional motions—which the Court granted or granted in part.  *See* ECF No. 108, 109, 115, 116, 117.

probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also Grossman*, 400 F.3d at 217.

The issuing judge is in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time. The magistrate judge's decision is one that courts review with "great deference." *Grossman*, 400 F.3d at 217. Indeed, this Court does not even review the magistrate judge's decision *de novo*; rather, this Court's role "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019).

Finally, in the event that the Court finds no substantial basis for concluding that probable cause existed, the good-faith exception prevents the suppression of information from the warrant when law enforcement acted in objectively reasonable reliance on the warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984); *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that the good-faith exception provides that "evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause").

Installation of a CCTV camera is a search under the Fourth Amendment, but not until Title III. Therefore, as Lemley recognizes, probable cause is sufficient to authorize a warrant for CCTV surveillance, though the Fourth Amendment (and Department of Justice policy) requires additional safeguards similar to Title III. ECF No. 110 at 15-16. *See United States v. Falls*, 34 F.3d 674 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536 (9th Cir.), *cert. denied*, 113 S. Ct. 617 (1992); *United States v. Mesa-Rincon*, 911 F.2d 1433 (10th Cir. 1990); *United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987); *United States v. Biasucci*, 786 F.2d 504 (2d Cir. 1986),

*cert. denied*, 479 U.S. 827 (1986); and *United States v. Torres*, 751 F.2d 875 (7th Cir. 1984), *cert. denied*, 470 U.S. 1087 (1985).

### B. Wiretaps

Title 18, United States Code, Section 2518(3)(b) permits a district court to enter an order authorizing a federal wiretap if "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." In applying for such an order, it is not necessary for the applicant to prove beyond a reasonable doubt that communications concerning the offense will be obtained, but only that there is a fair probability thereof. *See United States v. Alfano*, 838 F.2d 158, 162 (6th Cir.1988). Probable cause for a wiretap is "akin to the probable cause standard that governs ordinary search warrants." *United States v. Miller*, 50 F. Supp. 3d 717, 724 (D. Md. 2014) (citing *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983)).[2] The issuing judge is in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time. *See United States v. DePew*, 932 F.2d 324, 327 (4th Cir.1991). "Great deference is normally paid to such a determination by the issuing judge, and our role is to determine whether the issuing court had a substantial basis for concluding that electronic surveillance would uncover evidence of wrong doing." *DePew*, 932 F.2d at 327 (citing *Gates*, 462 U.S. at 236).

Several principles guide the Court's review of the wiretap affidavits. First, the Court reads the wiretap affidavit "in a common sense and realistic fashion," *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985), paying "great deference" to the determination of the issuing judge, who is "in the best position to determine if probable cause has been established in light of

---

[2] *Miller* was affirmed in *United States v. Miller*, 641 F. App'x 242 (4th Cir. 2016).

the circumstances as they appear at the time." *DePew*, 932 F.2d at 327; *United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992). Second, the burden is not on the government to defend the wiretap at the suppression stage. Rather, "the burden is on the defendant to show illegality in connection with the issuance of the wiretap order." *Miller*, 50 F. Supp. 3d at 725 (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)).

The federal wiretap statute (also known as the "Title III statute") expressly provides that, prior to authorizing a wiretap, the issuing judge must find, in addition to probable cause, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The purpose of this provision is to ensure that the device of wiretapping is "not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (citations omitted).

In construing this statutory requirement, which is often referred to as the "exhaustion" or "necessity" requirement, the Fourth Circuit repeatedly has held that the burden of the Government to show the inadequacy of normal investigative techniques "is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion' . . . that does not 'hamper unduly the investigative powers of law enforcement agents.'" *United States v. Smith,* 31 F.3d 1294, 1297 (4th Cir. 1994) (citations omitted); *Oriakhi,* 57 F.3d at 1298; *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir. 1977); *DePew*, 932 F.2d at 327. Indeed, the Fourth Circuit has expressly recognized that reading the "necessity" requirement in an "overly restrictive manner" would unduly harm the ability of law enforcement agents to use this "necessary tool of law enforcement." *United States v. Leavis,* 853 F.2d 215, 221 (4th Cir. 1988). Among other things, the Fourth Circuit has found that although the Government may not use mere conclusory statements about the use of other investigative techniques to justify a wiretap, the Government is

not required to show that other methods have been "wholly unsuccessful" or that it has exhausted "all possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (citations omitted) (emphasis in original). *Accord Clerkley*, 556 F.2d at 715 (it is quite clear that the "police need not exhaust every conceivable technique before making application for a wiretap"). In *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir 2007), the Fourth Circuit summarized the necessity requirement as follows:

> Congress has placed a burden on the Government to show the "necessity" of any wiretap Application via a full and complete statement as to whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3). The burden that this provision imposes on the Government, however, is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents. Although wiretaps are disfavored tools of law enforcement, the Government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence [such that] wiretapping becomes reasonable.

*Id.* (citations and quotations omitted) (brackets in original). In *Wilson* (a narcotics case), where the affidavit included an explanation of why various techniques—including confidential informants, search warrants, and reverse buys—would not achieve the goals of the investigation, the court rejected the defendant's argument that the fact that certain conspirators had been identified, controlled buys had been made, and some individuals arrested, established a lack of necessity for the wiretap. *Id.* at 309-10.

The Fourth Circuit somewhat recently applied these precedents in *United States v. Galloway*, 749 F.3d 238, 243 (4th Cir. 2014). In *Galloway*, the defendant argued that law enforcement's necessity explanations "amounted to bare conclusory statements and boilerplate recitations that would more or less apply to any drug trafficking investigation." *Galloway*, 749 F.3d at 242. The Fourth Circuit rejected that argument, observing that the affidavits "contained fairly extensive discussions of why the affiants believed the wiretaps were necessary." *Galloway*

749 F.3d at 243. The court found no abuse of discretion in the issuing court's necessity finding. *Id.*

The federal wiretap statute requires that electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). However, it is well-settled that the wiretapping statute does not require that all innocent communications be left untouched. *See Oriakhi*, 57 F.3d at 1300. Rather, the statute requires simply that unnecessary intrusions into speakers' privacy be minimized or "reduced to the smallest degree possible." *Id.* (citing *Clerkley*, 556 F.2d at 716).

In determining whether the minimization requirements of § 2518(5) have been met, courts apply a standard of reasonableness on a case-by-case basis. *Id.* Simply put, courts have recognized that the minimization requirement is satisfied if "on the whole, the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *Id.* (citations omitted).

In making this inquiry, courts have paid special attention to whether the investigation involved persons who were unidentified, thereby rendering it reasonable for agents to listen longer to certain conversations to determine whether the conversants were actually involved in the crime being investigated. *See Clerkley*, 556 F.2d at 717. Additionally, in making this inquiry, courts have looked favorably on cases in which the authorizing judge has required interim reports in which the government has advised the court about the amount of minimization being conducted by the monitoring agents. *Id.* Courts also have considered the number of targeted individuals, the ambiguity of the intercepted conversations, the complexity of the acts under investigation, and the general extent of the issuing judge's involvement in the electronic surveillance. *United States v. Ozar*, 50 F.3d 1440, 1447 (8th Cir. 1995). For example, when the investigation is focused on what is thought to be a widespread conspiracy—as in this case—more extensive surveillance may be

justified in an attempt to determine the precise scope of the enterprise. *See Scott v. United States*, 436 U.S. 128, 140 (1978).

Even if any evidence of a failure to minimize existed, suppression should be limited to the improperly minimized calls, not to all calls intercepted pursuant to the wiretap orders. *See, e.g.*, *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (suppression of a single call appropriate where "the totality of the circumstances demonstrates that the state police's minimization efforts were reasonably managed"); *United States v. Hoffman,* 832 F.2d 1299, 1307-08 (1st Cir.1987) (court rejected defendant's request to suppress all Title III evidence because the government flagrantly failed to minimize 22 calls between a suspect's wife and her attorney. Rather the court limited suppression to the 22 non-minimized conversations); *United States v. Manoori*, 304 F.3d 635, 648 (7th Cir. 2002) (appropriate remedy for a minimization failure is generally to suppress any conversation inappropriately monitored; wholesale suppression of all intercepted conversations is reserved for the "particularly horrendous case"); *United States v. Mullen*, 451 F. Supp. 2d 509, 538 (W.D.N.Y.2006) (stating that "suppression of all communications intercepted pursuant to any of the challenged Intercept Orders is not the proper remedy absent a 'pervasive disregard of the minimization requirement'") *(quoting United States v. Cirillo*, 499 F.2d 872, 881 n. 7 (2d Cir.1974)).

Moreover, wiretaps are subject to the *Leon* good-faith exception, as the Fourth Circuit recently held in a published opinion. *See United States v. Brunson*, ---F.3d---, 2020 WL 4374972 (4th Cir. July 31, 2020). *See also United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) ("Affiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception."). The defendants are therefore only entitled to suppression if they can show that the affidavit was so lacking in probable cause that no reasonable officer would have relied on the

District Court's order. *Miller*, 50 F. Supp. 3d at 729 (citing *Leon*, 468 U.S. 897 (1984)); *United States v. Couser*, 732 F.2d 1207, 1209 (4th Cir. 1984) ("Under *Donovan*, *Chavez* and *Giordano*, suppression is not the required remedy for technical violations of the type arguably found in the instant case, in the absence of bad faith conduct on the part of the Government.").

### C.    Statements

A defendant's statements are involuntary "if his will was overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).[3]  The Supreme Court has adopted a "totality of the circumstances" test for measuring the voluntariness of a confession.[4]  *Arizona v. Fulminante*, 499 U.S. 279, 286 (1991).  The Court evaluates "both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000).  Factors the Court considers include the length of questioning, the use of psychological or physical threats, the youth of the accused, the defendant's intelligence, and whether the defendant is mentally impaired. *Reck v. Pate*, 367 U.S. 433, 440 (1961).

The Supreme Court has also held that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (internal quotation marks omitted).  Thus, the Court in *Connelly* held that in order for the Court to suppress statements under the Due Process Clause, there must be a "link between coercive activity of the state, on the one hand, and a resulting confession by a defendant, on the other." *Id.* at 165.

---

[3] The Government bears the burden of showing that a confession was voluntary by a preponderance of evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

[4] In 1897, the Supreme Court held that a confession was involuntary if it was "extracted by any sort of threats or violence, obtained by any direct or implied promises, however slight, [or obtained] by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897).  In *Fulminante*, the Supreme Court repudiated the *Bram* test, holding that "*Bram*, under current precedent does not state the standard for determining the voluntariness of a confession." *Id.* at 285.

While "each case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a *substantial element* of coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140-41 (4th Cir. 2002) (emphasis added) (internal quotation marks omitted).[5]

### D. Severance

Federal Rule of Criminal Procedure 8(b) provides that two or more defendants may be charged in a single indictment, "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constitution an offense or offenses . . . ." Rule 8(b) explicitly states that "[t]he defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." *Id.* Federal Rule of Criminal Procedure 14(a) empowers trial courts to sever defendant or order separate trials when the joinder of defendants "appear to prejudice a defendant or the government."

It is well-settled that there is a preference in the federal system for joint trial of defendants who are indicted together. *See Zafro v. United States*, 506 U.S. 534, 537 (1993). Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir. 1992) (internal quotations omitted). Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the Government, and the witnesses, by requiring the presentation of the same case on multiple

---

[5] In *Connelly*, the defendant—a chronic schizophrenic—made incriminating statements to a police officer while in a psychotic state and responding to "commanding hallucinations" from the voice of God. *Id.* at 161. According to the defendant's expert, the defendant's mental condition at the time of the statements "interfered with his volitional abilities," including his decision whether to confess. *Id.* Nonetheless, the Court held that the statements could not be suppressed, and that "the involuntary confession jurisprudence is entirely consistent with the settled law requiring some sort of state action to support a [Due Process Clause] violation." *Id.* at 165.

occasions.  *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996).
Claims of potential prejudice thus are generally addressed through limiting instructions rather than
severance.  *See id.*

When defendants are properly joined under Rule 8(b), as in this case, severance under Rule
14 is justified only if there is a serious risk that a joint trial would compromise a specific trial right
of one of the defendants, or prevent the jury from making a reliable judgment about guilt or
innocence.  *See Zafiro*, 506 U.S. at 539.  The party moving for severance must establish that actual
prejudice would result from a joint trial and not merely that a separate trial would offer a better
chance of acquittal.  *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995).  Moreover, Rule 14
does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if
any, to the district court's sound discretion.  *Zafiro*, 506 U.S. at 538-39.

When moving for severance based on the need for testimony from a co-defendant, the
moving defendant must show (1) "a bona fide need for the testimony of his co-defendant," (2) "the
likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment
privilege," (3) "the substance of his co-defendant's testimony," and (4) "the exculpatory nature
and effect of such testimony."  *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983); *United
States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011).  Once these threshold requirements are met,
the Court then considers (1) "the significance of the testimony in relation to the defendant's theory
of defense," (2) "the extent of prejudice caused by the absence of the testimony," (3) "judicial
administration and economy," (4) "the timeliness of the motion," and (5) "the likelihood that the
co-defendant's testimony could be impeached."  *Parodi*, 703 F.2d at 779.  As the Fourth Circuit
has held, "[a] severance motion will not be granted unless the moving party demonstrates that her
co-defendant's testimony would be more than a "vague and conclusory statement ... of purely

cumulative or negligible weight or probative value." *Reavis*, 48 F.3d at 767 (*quoting Parodi*, 703 F.2d at 780).

### E.     Multiplicity

Multiplicity occurs when an indictment charges a single offense in separate counts. *See United States v. Fall*, 955 F.3d 363, 373 (4th Cir. 2020) (*citing United States v. Lawing*, 703 F.3d 229, 236 n.7 (4th Cir. 2012)). The Double Jeopardy Clause of the Fifth Amendment prohibits multiplicitous indictments for crimes that "are in law and in fact the same offense." *United States v. Schnittker*, 807 F.3d 77, 81 (4th Cir. 2015). To determine whether an indictment is multiplicitous, a court must determine "whether each [statutory] provision requires proof of a fact which the other does not." *United States v. Wilson*, 721 F.2d 967, 971 (4th Cir. 1983) (*citing Blockburger v. United States,* 284 U.S. 299, 304 (1932)). The Court in *Blockburger* further articulated: "a single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Id.*

**Legal Argument**

### I.     The Motions to Suppress Search Warrants (ECF No. 102, 110) Should Be Denied.

The defendants have moved to suppress various search warrants, including the September 5th Warrant, the October 2d Warrant, the October 18th Warrant, the November 8th Warrant, the November 18th Warrant, the December 11th Warrant, the December 11th CCTV Warrant, the December 13th Warrant, the December 18th Title III, and the January 14th Warrants.  ECF Nos. 102, 103, 110.  The motions should be denied.

#### a.     The warrant affidavits provide a substantial basis for finding probable cause.

As described below, the warrant affidavits in this case largely built off one another, incorporating substantial content and sometimes the entire signed prior affidavits by reference.

**September 5th Warrant**

The first was the September 5th Warrant, in which Agent Harrison submitted a lengthy, detailed affidavit in support of warrants for historical and prospective location information for TARGET TELEPHONE-1, Lemley's phone. **Exhibit A**. The affidavit includes 24 substantive pages and another six pages of attachments. The affidavit established a substantial basis for finding probable cause to believe that the warrants would lead to evidence of violations of 18 U.S.C. §2101 (inciting a riot), 18 U.S.C. §§ 371 and 249 (conspiracy to commit and attempt to commit a hate crime), and 21 U.S.C. § 841 (distribution of controlled substances). The affidavit set forth Agent Harrison's bona fides as an FBI agent and former DEA agent, including his participation in international and domestic terrorism investigations. **Exhibit A**, ¶ 4. The affidavit also described the extremist views of members of The Base, of which Lemley was indeed a member, including a description that "The Base has proclaimed war against minority communities within the United States and abroad." **Exhibit A**, ¶ 8. The affidavit described how Lemley and other members of The Base, using encrypted chat rooms, "have discussed, among other things, recruitment, creating a white ethno-state, committing acts of violence against minority communities (including African-Americans and Jewish-Americans), The Base's military training camps, and ways to make improvised explosive devices." *Id.* The affidavit gave additional information regarding the background of the investigation and Lemley's activities with respect to The Base, including his attendance at a Base training camp at which he distributed a controlled substance to other Base members and his attendance at another training camp at which Lemley coordinated with The Base's founder. **Exhibit A**, ¶¶ 25-31. TARGET TELEPHONE-1 was tied to Lemley, including

through subscriber records, and Lemley used TARGET TELEPHONE-1 as a contact number when purchasing a flight to attend a Base training camp. **Exhibit A**, ¶¶ 7, 15. The affidavit concluded that the historical and prospective location information "will lead to locations where LEMLEY and other Base members conduct firearms and tactical training; locations at which unidentified members of The Base reside; and locations where members of The Base store narcotics, firearms, and promotional materials and manuals used to plan, coordinate, and commit the TARGET OFFENSES." **Exhibit A**, ¶ 32.

### October 2d Warrant

In addition to the information included in the affidavit supporting the September 5th Warrant, the affidavit supporting the October 2d Warrant tied Lemley to TARGET EMAIL-1, and TARGET EMAIL-1 to Base propaganda and communications, and identified why obtaining location information for TARGET EMAIL-1 was supported by the evidence. The affidavit also discussed Lemley's role in harboring Mathews, and the incriminating evidence obtained from the September 5th Warrant—including Lemley's transportation of Mathews from Virginia to Georgia. **Exhibit B**, ¶¶ 39-45. Because of the additional investigation and information, the affidavit included an additional criminal statute under investigation, 8 U.S.C. § 1324 (bringing in and harboring certain aliens). **Exhibit B**, ¶ 10.

### The October 18th Warrant

The affidavit in support of the October 18th Warrant added additional information proving that additional content for TARGET EMAIL-1 was justified, including information obtained from prior warrants. **Exhibit C**, ¶¶ 19-22, 32, 35-36, 43-44. The affidavit explained how the content and additional information for TARGET EMAIL-1 constitute evidence of the offenses under investigation. *Id.*, ¶¶ 53-54.

### The October 22d Warrant

The affidavit in support of the October 22d Warrant added additional information, and sought information related to Mathews's telephone and email accounts.  **Exhibit D**.  The affidavit described how the press and law enforcement discovered Mathews's identity, how Mathews likely entered the United States illegally, and how Lemley likely transported harbored Mathews based on information available at that time.  *Id.*, ¶¶ 36-42.  Thereafter, the affidavit further established a nexus between Mathews and each warrant target.  **Exhibit D**, ¶¶ 43-53.  The remainder of the affidavit established known information regarding subjects like Mathews and accounts like the ones sought to be searched, all based on the extensive training and experience of Agent Harrison. **Exhibit D**, ¶¶ 54-62.

### The November 8th Warrant

The affidavit in support of the November 8th Warrant added additional information that justified searching TARGET EMAIL-1, TARGET EMAIL-3, TARGET EMAIL-4, TARGET EMAIL-5, and TARGET EMAIL-10.  This included Lemley, Mathews, and Bilbrough traveling to and participating in a Base training camp in Georgia, and other evidence obtained from executing the prior warrants.  **Exhibit F**, ¶¶ 86-90.

### The November 18th Warrant

The affidavit in support of the November 18th Warrant sought continued prospective location information for TARGET TELEPHONE-1 and TARGET TELEPHONE-2.  The information from prior warrants, including the prior historical and prospective location information, is used throughout the affidavit.  **Exhibit G**, ¶¶ 87-92.

### The December 11th Warrant

The affidavit in support of the December 11th Warrant incorporated the December 11th CCTV Warrant as its probable cause. Based on the additional investigation, the offenses under investigation expanded to include 18 U.S.C. §922(g)(5) (alien in possession of a firearm) and additional bases for conspiracy. **Exhibit H**, ¶ 4.

### The December 13th Warrant

The affidavit for the December 13th Warrant sought information for TARGET EMAIL-1, TARGET EMAIL-3, TARGET EMAIL-4, TARGET EMAIL-5, TARGET EMAIL-10, TARGET EMAIL-15, TARGET TELEPHONE-1, and TARGET TELEPHONE-2. This affidavit incorporated and expanded on the prior affidavits, adding information gleaned from prior warrants. **Exhibit J**, ¶¶ 99-110.

### The January 14th Delaware Warrant

The affidavit for the January 14th Delaware warrant sought to search the Delaware Residence and Lemley's truck. **Exhibit N**. The affidavit expressly incorporated the wiretap and CCTV affidavit from January 8, 2020. It also expanded the offenses under investigation from the prior electronic account warrants, to now include 18 U.S.C. § 922(a)(4) (transporting machine gun in interstate commerce), 18 U.S.C. § 922(d)(5) (disposing of any firearm to an alien illegally or unlawfully in the United States), 18 U.S.C. § 922(o) (machine gun possession), 18 U.S.C. § 924(b) (transporting firearm and ammunition in interstate commerce with intent to commit a felony), 18 U.S.C. § 924(c)(1)(B) (carrying semiautomatic assault weapon and machine gun in furtherance of crime of violence), 21 U.S.C. § 846 (narcotics conspiracy), and 18 U.S.C. § 231 (transporting a firearm in commerce intending it to be used unlawfully in furtherance of civil disorder). *Id.*, ¶ 5.

### b.      Lemley's arguments fail.

Lemley complains that none of the affidavits established probable cause "to believe that Lemley, Mathews, or anyone else had committed any of the enumerated Target Offenses, or that evidence of those offenses would be found in the target locations." ECF No. 110 at 19-20.  If true, the defendants' contention would mean that every single active Magistrate Judge in the Greenbelt federal courthouse – all four of them – made the same mistake, and did so over and over and over again.  Clearly, the defendants' argument is incorrect.  Rather than spend much time on each warrant, the defendants instead focus only on the first warrant that addressed each new crime under investigation.  The defendants believe that if their argument prevails on that one warrant, that all the later warrants must fall as well.  ECF No. 110 at 40-41.  If that is true, then so must be the converse: if the first warrant survives, so must each later one that relies on the first one.  Accordingly, the Government here addresses only the warrants that first introduce new crimes under investigation.[6]

### September 5th Warrant: 18 U.S.C. § 2101

For the September 5th Warrant, the defendant complains that there was no substantial basis regarding § 2101.  ECF No. 110 at 16-18.  The defendant's argument is wrong in several respects.  First, it ignores substantial portions of the supporting affidavit.  For example, the defendant ignores that The Base "has proclaimed war against minority communities."  **Exhibit A**, ¶ 8.  The Base, and Lemley, used encrypted chat rooms and online platforms, which certainly are facilities in interstate commerce, to discuss committing acts of violence.  *Id.*  Base members congregated and

---

[6] On a broad level, each of the defendants' arguments fail because they argue that each defendant or co-conspirator act, considered discretely, is not prohibited by law.  But this segmented analysis has been rejected by the Supreme Court and other courts, because the Magistrate Judge must look to the "totality of the circumstances."  *Grossman*, 400 F.3d at 217.

trained in advance of their goal, at training camps around the country—outside of Maryland. The Base's founder gave instructions and encouragement, including "Start your 3-man Trouble Trio cell ASAP," *Id.*, ¶ 19(g); "All legal aboveground activism should be focused on this ultimate goal concurrently with forming a clandestine military wing," *Id.*, ¶ 19(p); and "essentially operate like a glorified street gang thinking in terms of turf, vandalism, reprisals & extortion of enemies until demands are met," *Id.*, ¶ 19(h). The affidavit is replete with other evidence, which – taken together – provides an ample substantial basis.

Second, the defendant would have the Government prove a criminal violation beyond a reasonable doubt just to get a search warrant. ECF No. 110 at 17. That is not the law. All that is necessary is probable cause, which every Magistrate Judge found.

### **September 5th Warrant: 18 U.S.C. § 249**

For the September 5th Warrant, the defendants also complain that there was no substantial basis regarding § 249.[7] The defendants again make the same mistakes in their argument. First, they ignore sizable portions of the affidavit, including that the motivating factor for the conduct of the defendants and other Base members was racial animus toward minorities. The Base's founder gave encouragement, including "the system can't be replaced peacefully" and "Create a list of every anti-White hate crime you can think of in which there was a miscarriage of justice—These people have names & addresses. Go forth & balance the scales." **Exhibit A**, ¶ 19(c), (d).

Second, the defendant again would have the Government prove beyond a reasonable doubt that a crime occurred before getting court authorization to investigate whether or not a crime occurred. ECF No. 110 at 18-19 ("To convict a defendant…"). Again, this is not the law.

---

[7] The defendants make a similar, and similarly flawed argument, regarding § 249 in the context of the December 11 CCTV Warrant. ECF No. 110 at 32-33.

**September 5th Warrant: 21 U.S.C. § 841**

Finally for the September 5th Warrant, the defendants complain that there was no substantial basis regarding § 841. ECF No. 110 at 19-20. The defendants attempt to make § 841 into more than what it is, claiming that it cannot apply because Lemley was not "involved in trafficking." Among other things, Section 841 criminalizes distribution and possession with intent to distribute. The affidavit contained evidence that Lemley distributed a controlled substance to other Base members at a training event. **Exhibit A**, ¶ 27. Surely that is sufficient to establish a substantial basis for probable cause for an § 841 violation. The September 5th Warrant sought historical and prospective location information for Lemley's phone, which would provide evidence of the distribution that was known to have occurred as well as locations and co-conspirators in any distribution activity. The defendants' weak staleness argument also fails, ECF No. 110 at 20, at the very least because one of the warrants sought historical location information for a phone possessed by Lemley for the crime that occurred one month prior to the issuance of the warrant.

If the September 5th Warrant is supported by a substantial basis for any of these three statutes, then all of the following warrants – which rest on similar facts and the same statutes (and others) – should also survive.

**October 2d Warrant: 8 U.S.C. § 1324**

The defendants complain that the October 2d Warrant is not supported by a substantial basis that evidence of bringing in and harboring an alien would be obtained. ECF No. 110 at 21. Recall that the warrant sought prospective phone location information for Lemley's phone and certain content regarding Lemley's email account. **Exhibit B**. The facts, all in the affidavit, are undisputed that Mathews crossed the border illegally, that Mathews was a member of The Base, that agents believed Base members assisted Mathews in his border crossing, that encrypted chats

suggested "Lemley was harboring Mathews," and that the affidavit included a photograph of Lemley driving Mathews in Virginia, en route to another Base member's property in Georgia. **Exhibit B**, ¶¶ 39-45. In the defendant's view, all of this is normal activity, unsuggestive of bringing in or harboring an alien, or conspiring to do so. The Magistrate Judge appropriately saw otherwise.

It is also unclear why the defendant cherry-picks three parts of § 1324 to dispute, and ignores another other part of § 1324 that covers the facts in the affidavit: transporting an alien. And the defendant again makes the mistake of trying to have the Government prove the crime beyond a reasonable doubt just to get a warrant. ECF No. 110 at 25 ("to sustain a conviction…"). This is not the law.

### December 11th Warrant: 18 U.S.C. § 922(g)(5)

The defendant complains that no substantial basis exists regarding possession of a firearm by an alien because there was no proven nexus between firearm possession and the Delaware Residence and that the Government did not *prove* that Mathews knew he was in the country illegally. ECF No. 110 at 28-31. Again, the defendants' arguments fail.

First, the affidavit described Mathews's intention and plan to acquire firearms specifically in and around December 2019, and Mathews's successful completion of at least part of that plan, his internet searches for "Build your own AR-15" and other firearm-related items, and his attendance at a Base training camp in late October and early November 2019 in which ammunition and firearms were present. **Exhibit H**, ¶¶ 85, 95, 110-117. Firearms are kept in places where people have access to them, and that is especially true for an illegal alien secretly being moved around the country and residing under the radar.

Second, even if the search warrant had to separately address every element of § 922(g)(5), certain it is enough to show a substantial basis that Mathews knew he was in the county illegally since he crossed the U.S. border with Canada on foot, not at a legal point of entry, and that he was transported and harbored at various hidden locations throughout the United States by members of a secretive organization.

Third, the defendants again conflate the proof necessary at trial with that necessary to obtain a search warrant.

         **c.**        **Mathews's arguments fail.**

Mathews separately challenges the October 22d Warrants, the November 18th Warrants, and the December 13th Warrants.  ECF No. 102.  Notwithstanding the extensive affidavits, Mathews lodges three main complaints regarding the probable cause determinations: (1) "the section of the Affidavit relating to Patrik Mathews and his phone and email accounts . . . was short and failed to provide evidence that the search of Mr. Mathews's phone and email accounts was likely to provide evidence of the listed crimes in the warrant application,"  ECF No. 102 at 4; (2) "agents already had all the necessary information to locate the defendant" and to arrest him, ECF No. 102 at 4-5; and (3) the conduct detailed in the supporting affidavit amounted to free speech protected by the First Amendment, ECF No. 102 at 5.  None of these arguments have merit.

First, even the section of the October 22d affidavit that focuses more on Mathews and his facilities spans 12 pages (pages 24-36), and is replete with information supporting probable cause that Mathews had committed crimes and that the facilities would contain evidence of those crimes. Indeed, a similar warrant for TARGET EMAIL-1 already had proven certain types of information regarding Lemley and Bilbrough.  **Exhibit D**, ¶¶ 59-62.  The later affidavits contained even more information about Mathews and his criminal conduct.

Second, even if "agents already had all the necessary information to locate the defendant," there is no exhaustion requirement for search warrants. Nor was locating the defendant the only purpose of the warrants. For example, paragraph 58 of the affidavit sets out that the warrants could "provide crucial evidence of the 'who, what, why, when, where, and how' of the criminal conduct under investigation," which extended beyond simply Mathews's conduct but also to that of his conspirators. **Exhibit D**.

Third, the First Amendment has nothing to do with this case.[8] Speech and written words can prove intent and rationale behind criminal plans. *See, e.g.*, Sand, Modern Jury Instructions, 6-17 (knowledge, willfulness, and intent may be inferred from what a defendant says). The defendant cites no case at all that questions this central, foundational legal principle. Indeed, the defendant does just the opposite, all but conceding that 8 U.S.C. § 1324 provided a sufficient basis for the warrants. *See* ECF No. 102 at 8 ("While information obtained from the defendant's phone and email accounts could potentially show that he was being harbored, such evidence was not necessary, given the government already had a picture of Mr. Mathews in Mr. Lemley's truck . . . .").[9] What is required is that the Magistrate Judge finds a substantial basis that a crime has occurred. That is what happened here. The defendant does not challenge the validity of any of the underlying criminal statutes as violative of the First Amendment; he only challenges whether

---

[8] Even if a First Amendment violation could have occurred, the exclusionary rule applies only to Fourth Amendment violations. *United States v. Russ*, 2014 WL 1791359, at *5 n.2 (E.D. Tex. May 5, 2014)

[9] Mathews separately moved to suppress the December 11th Warrant. ECF No. 103. However, his motion included no specific arguments as to why probable cause is lacking for a search warrant. Rather, the entirety of the motion complains of the necessity and exhaustion with respect to the CCTV warrant, not the probable cause with respect to the residential search warrant. In the absence of any specific argument to rebut, the Government simply states that Judge Andrews had a substantial basis for finding probable cause, and in any event the good-faith exception applies.

his words can be used against him in order to prove criminal conduct. They can be. *See* Fed. R. Evid. 801.

### d. The good faith exception applies.

The defendants' motions do not even mention, much less discuss, the good faith exception. ECF No. 110. Perhaps that is because it is clear the exception applies. Even if the warrants lacked a substantial basis to support probable cause, or had other claimed deficiencies, the agents still acted in objectively reasonable reliance on warrants issued by each Magistrate Judge in Greenbelt and a federal district court judge in Delaware. The evidence obtained from the warrants should not be suppressed.

## II. The Motions to Suppress CCTV Warrant (ECF No. 103) Should Be Denied.

Mathews has moved to suppress the December 11th CCTV Warrant. ECF No. 103. Lemley joins in the motions. ECF No. 117. Lemley also makes related arguments in a separate motion. ECF No. 112. The motions should be denied.

### a. The warrant affidavits provide a substantial basis for finding probable cause, necessity, and exhaustion.

As previously described, Agent Harrison submitted an extensive 72-page affidavit in support of the December 11th CCTV Warrant. **Exhibit I**. That affidavit built off affidavits submitted throughout the investigation, and includes a lengthy recitation of facts supporting probable cause that evidence of many federal criminal violations would be found in the Delaware Residence, including 8 U.S.C. § 1324, 18 U.S.C. § 922(g)(5), 21 U.S.C. § 841; 18 U.S.C. § 2; 18 U.S.C. § 2101; 18 U.S.C. § 249, and 18 U.S.C. § 371. The affidavit describes in detail the Delaware Residence, linking it not just to the defendants but also to their criminal conduct. *Id.* at ¶¶ 97-110. Both the December 11th Warrant and the December 11th CCTV Warrant were issued by U.S. District Judge Andrews.

The affidavit also describes the need for the warrant. *See* **Exhibit I**, ¶¶ 111-120. In part, the CCTV was needed because Mathews intended "to acquire firearms to conduct attacks and is actively discussing future attacks when physically present with like-minded individuals—just as he is when he is inside" the Delaware Residence. *Id*, ¶ 117. CCTV monitoring "would uncover conduct between MATHEWS and LEMLEY regarding obtaining and possessing firearms (including who specifically possesses firearms), taking other actions suggestion violence and attack planning, showing in fact that LEMLEY is harboring MATHEWS, and taking other actions suggesting LEMLEY intends to relocate MATHEWS to other residences in order to maintain MATHEWS's status as a 'ghost' able to conduct attacks within the United States." *Id.*, ¶ 118. According to the affidavit, the CCTV warrant "is the only viable means of determining, among other things, the methods in which Base members have transported and harbored MATHEWS, the identities of co-conspirators involved in the harboring of MATHEWS, the presence and distribution of narcotics . . ., and the presence and possession of firearms." *Id.*, ¶ 120.

The affidavit further describes the exhaustion of alternative techniques, including confidential sources, physical surveillance, other surveillance techniques, mail covers, pen registers, cell phone data, location information, other search warrants, and grand jury subpoenas. *Id.*, ¶¶ 122. Those techniques either had been tried and failed or appeared unlikely to succeed if tried, in terms of fully achieving the goals and objectives of the investigation. *Id.* The affidavit spends twelve pages discussing exhaustion.

### b.     The defendants' arguments fail.

Notwithstanding the robust affidavit, the defendants complain about necessity, arguing that (1) the CCTV was unnecessary to prove that Lemley harbored Mathews, ECF No. 103 at 3-4; (2) the identification of co-conspirators and presence of controlled substances "both seem highly

inappropriate reasons for a search of this nature," *id.* at 4; and (3) it is unlikely that CCTV would show who possessed a firearm within the Delaware Residence. These arguments fail.

First, of course agents knew Lemley was harboring Mathews; the affidavit expressly says so. **Exhibit I**, ¶ 117 ("MATHEWS is actively being harbored by LEMLEY at the Target Residence in Delaware."). The CCTV had as one of its goals to show that Lemley would take other actions to transport Mathews to other residences, with other unknown co-conspirators, as already had happened in the past. *Id.*, ¶¶ 118-119. Additionally, § 1324 was only one basis for the warrant.

Second, the defendants do not explain how statutorily permitted bases for warrants—finding co-conspirators and proving the possession of controlled substances—are legally wrong, other than to make an unsupported moral claim that it is "highly inappropriate." That atmospheric language does not grapple with the law this Court is required to employ when reviewing the affidavit.

Third, the defendants fail to explain how it is unlikely that a video camera showing the inside of a residence in which two people reside with a firearm is "unlikely" to show which of them possessed the firearm. The affidavit specifically identified a counterfactual situation in which a regular search would not prove which of the two possessed a firearm, noting this was one reason why the CCTV was necessary. **Exhibit I**, ¶ 120. Judge Andrews agreed.

The defendants also complain about exhaustion, arguing that the CCTV was not necessary because "it was only a matter of time before Mr. Lemley or Mr. Mathews brought the suspected new rifle to the gun range or the undercover agent would be able to extract the necessary information without installing 24-hour surveillance within their residence." ECF No. 103 at 5. The defendant then invites the Court to look at what happened in actuality after the installation of

the CCTV.  The defendant then cites events that transpired roughly four weeks **after** the warrant was authorized.  ECF No. 103 at 5 (discussing conduct on January 8, 2020).  But this is not the proper viewpoint for the Court.  Otherwise, every search warrant for a stash house that actually discovered drugs could never be suppressed.  The defendants also misapprehend what is required, claiming—without citation—that "[t]he very definition of exhaustion is to attempt one method of surveillance, determine whether it was successful, and then apply for a more intrusive method only when absolutely necessary."  That is simply not the law.  Even in the somewhat more tightly circumscribed setting of a wiretap, the Government does not have to show that other methods have been "wholly unsuccessful" or that it has exhausted "all possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (citations omitted) (emphasis in original).  *Accord Clerkley*, 556 F.2d at 715 (it is quite clear that the "police need not exhaust every conceivable technique before making application for a wiretap").

### c.  The good faith exception applies.

Once again, Mathews makes a drive-by argument that "no objectively reasonable officer could have relied in good faith on the legality of the search warrant."  ECF No. 103 at 7.  This lone sentence, however, is insufficient to defeat the good faith exception.[10]  Certainly, the agent could objectively rely on Judge Andrews's issuance of the warrant.

### III.    The Motion to Suppress Title III (ECF No. 104) Should Be Denied.

Mathews has moved to suppress the December 18th Title III and the January 8th Extension of the Title III for the Delaware Residence.  ECF No. 104.  Lemley joins in the motion.  ECF No. 117.  Lemley also separately filed his own motion to suppress the Title III, which Mathews also joined.  ECF No. 110.

---

[10] Lemley's motion makes no mention at all of the good-faith exception.  ECF No. 112.

### a. The supporting affidavits provide a substantial basis for finding probable cause, necessity, and exhaustion.

The affidavit in support of the December 18th Title III largely mirrors the affidavit in support of the December 11th CCTV Warrant. *See* **Exhibit K**. It also includes the additional information gained from the initial December 11th sneak-and-peek search and the CCTV installation within the Delaware Residence, including the contents of Mathews's computer, including a video of Mathews discussing "his illegal journey into the United States" and his desire for "killing people in furtherance of 'the movement.'" *Id.*, ¶ 129. The additional evidence showed that Lemley and Mathews were speaking in the apartment while operating a firearm and while otherwise engaging in conduct prohibited by the authorizing statutes. *Id.*, ¶ 132. The affidavit also adds to the exhaustion narrative by explaining how even the CCTV is insufficient to achieve all the goals of the investigation. *Id.*, ¶ 136(b)(ii) and (vi) ("CCTV is unable to discern the content of the oral communications, and therefore is an inadequate substitute to the interception of oral communications").

Nonetheless, the defendants complain that (1) the affidavit failed to establish sufficient probable cause for the "majority" of the suspected crimes, ECF No. 104 at 5; (2) courts cannot rely on "free speech" to satisfy probable cause, ECF No. 104 at 6; (3) the Government already could have charged Lemley with violating 8 U.S.C. § 1324, *id.* at 13

First, the substantial bases for finding probable cause have been addressed in response to the suppression motions. The bottom line is Judge Andrews had more than enough evidence to conclude that a substantial basis existed.

Second, the defendants' reliance on "free speech" and *Brandenburg v. Ohio*, 395 U.S. 444 (1960) is a red-herring. The investigation was not directed at the First Amendment; it was directed at the several criminal statutes identified in the affidavit. Indeed, the defendants are not charged

with violating the First Amendment, even if that were possible; they are charged with violating discrete criminal statutes, including § 922(g)(5), which was one of the predicate offenses for the Title III. And as much as the defendants' protest that "speech is not evidence of a hate crime," this is patently false: speech, even protected speech, can form the basis for probable cause, just as it can be evidence of intent at trial.

Third, it is immaterial that the Government already could have brought a charge against Lemley for harboring Mathews. An objective of the investigation was to uncover co-conspirators whose identities were unknown.[11] Another objective was to prove that Lemley *knew* that Mathews was in the country illegally, which is an element of proof of a harboring charge.

### b. The warrant affidavits satisfy exhaustion.

The defendant's contest exhaustion. The defendants mainly rely, again, on conduct that occurred *after* the authorization for the Title III. ECF No. 104 ("Shortly after the wiretap was authorized, Mr. Mathews was observed working on the assembly of the AR-15 via CCTV footage."); ECF No. 110 at 40 ("the UCE later visited Lemley and Mathews on January 11, 2020 and spent hours inside the apartment discussing Base activities, all while wearing a wire."). This post-authorization conduct included an FBI undercover employee who was able to visit the Delaware Residence roughly three weeks after the Title III was authorized. Based on this post-authorization investigation, the defendants contend that "even the simplest investigative strategies had not even been attempted to determine who possessed the gun . . ." The defendants also contend that the Government should have just let the investigation—which already had been going on for several months—play out for another month in order to achieve the successful (and extraordinarily

---

[11] The defendants' argument is tantamount to saying that proof of controlled drug purchases from a single target prevent the Government from obtaining a wiretap on that target's phone. Of course that is not true; rather, the drug purchases *support* obtaining a wiretap.

dangerous) insertion of a UCE. ECF No. 110 at 40. Such statements only could be made by ignoring the 88-page affidavit in support of the Title III, eleven pages of which discuss exhaustion, including the fact that at the time of the authorization the UCE had not been in physical proximity to the defendants outside of the training Base training camps and that the defendants *intentionally left* the Delaware Residence when speaking to the UCE and had never told the UCE the location of the Delaware Residence. **Exhibit K**, ¶ 136(a). So too does the defendants' argument ignore the affiant's statement that "the highly compartmentalized manner in which Base members discuss their affairs makes it impossible for any single source or UCE to learn the full scope of Base member conduct or any other activities of the Target Subjects and the identities and locations of co-conspirators. No UCE is likely to be made aware of the detailed methods by which all Base members operate (including the extent to which members of The Base engage in violence in furtherance of their ideology) including the identities and locations of co-conspirators." *Id.* The affiant addressed exhaustion thoroughly. Judge Andrews agreed that the statutory requirements had been met, and authorized the Title III.[12]

### c. The good faith exception applies.

The defendants do not even mention the good-faith exception in their motion, thus apparently conceding that the agent operated in objectively reasonable reliance on the warrant. As the Court knows, the wiretap packages were reviewed by a division supervisor at the United States Attorney's Office, a line attorney from a specialized Department of Justice review unit, that

---

[12] The only contention as to the January 8th Extension is that it was unnecessary because all of the goals of the investigation had been achieved. ECF No. 104 at 20. The sole support for this one-paragraph claim is that a UCE was scheduled to go to the Delaware Residence but had not yet done so. Speculation about future events, including ones involving radical members of an anti-government organization keen on practicing operational security, is not an appropriate basis to find that exhaustion has not been met. Indeed, Judge Andrews thought otherwise.

attorney's supervisor, a Deputy Assistant Attorney General, and a federal District Judge. The affidavits are 80 and 104 pages long. Federal wiretap affidavits are not the "boilerplate" affidavits that fail the good faith standard in the Fourth Circuit—they are designed to be unassailable. Certainly the agent operated in good-faith that the process achieved a warrant upon which he could objectively rely.

### d.     Minimization

The defendants also contend that "minimization procedures were not properly employed." ECF No. 104 at 18. In support, the defendants argue broadly that "the 1136-page line sheet document detailing intercepted conversations" contained "very limited information pertaining to the predicate offenses of harboring an alien and alien in possession of a firearm." ECF No. 104 at 19. However, the defendants only identify two sessions in particular, Session 1016 and Session 376. The burden is on the defense to show that a particular session was not properly minimized, and the relief is to minimize that session—not the entire Title III.

Contrary to the defenedants' assertions, Session 376 is a good example of how wiretaps are supposed to work. **Exhibit O**. On December 22, 2019, the monitor initiated recording at 20:00:15 EST and stopped recording in this session at 22:14:19, roughly 14 minutes later. The monitor minimized the recording 16 different times in those 14 minutes. This is entirely consistent with the minimization guidelines, which authorized "spot checking" in order to guard against missing a relevant oral communication. When the conversation between Lemley and Mathews did not appear relevant, the monitor minimized the recording. Conversation that occurred during spot-checking was recorded. Even during spot-checking, the monitor heard relevant conversation, which is proven which is proven even just be looking at the next few seconds of conversation after the excerpt included in Mathews brief. *See* ECF No. 104 at 19-20. The next words uttered by Mathews after

the excerpt discuss murdering a military member.  **Exhibit O** ("no I mean id kill someone to steal they're uniform, that be the idea").  Mathews and Lemley then discussed having a "plan" when attending the "Virginia rally," which is directly relevant to several offenses under investigation, including inciting a riot and attempting a hate crime.

Session 1016 is also illustrative of appropriate monitoring.  **Exhibit P**.  On December 29, 2019, the monitor initiated recording at 14:53:50 EST and stopped recording in this session at 15:05:38 EST, roughly 12 minutes later.  The monitor minimized the recording four times in the 12 minutes, consistent with the minimization guidelines.  In the recorded portion, Mathews stated "I feel like riding up to your [relative]'s place and saying get in mother fucker we're starting a race war," and then when Lemley said that the relative is "not going to cooperate," Mathews double-downed by saying "He will when I tell him we are making weapons now."  Just this section alone is pertinent to several of the crimes under investigation, including alien in possession of a firearm, inciting a riot, and attempting a hate crime.

The monitors acted appropriately throughout the minimization, and the defendants have not proven otherwise.  There is no basis for suppression.

**IV.      The Motion to Dismiss Counts Nine and Twelve (ECF No. 105) Should Be Denied.**

Mathews has moved to dismiss Counts Nine and Twelve of the indictment on multiple bases, which all fail.  As set forth below, under applicable law, Counts Nine and Twelve are not multiplicitous, they properly allege a cognizable criminal act, and the indictment provides Mathews with adequate notice to prepare for trial.

**a.      Relevant Factual Background**

As the Government intends to prove at trial, on December 29, 2019, Mathews and Lemley discussed going to a gun range to test fire the assault rifle they constructed. During the

conversation, Lemley told Mathews that Mathews "might not be able to go because of your ID situation." Due to his fugitive status, Mathews did not have a lawful identification and therefore could not use a business-operated gun range. On January 2, 2020, an FBI agent saw Lemley leave the Delaware residence with the assault rifle and go to a gun range in Maryland. While at the gun range, an FBI agent saw Lemley at the gun range and heard what appeared to be rapid gunfire.

Three days later, Mathews, Lemley, and a minor child left the Delaware residence with at least one firearm and drove to the same gun range in Maryland where Lemley had gone on January 2, 2020. Prior to their arrival, the FBI set up a stationary camera in a vehicle near the gun range, and an ATF agent was in the vicinity of the range. The stationary camera captured and recorded Mathews in possession of a firearm. While Mathews appeared to shoot the firearm, Lemley, through an unattached rifle scope, watched Mathews shoot the firearm.

On January 11, 2020, Mathews, Lemley and an undercover agent left the Delaware apartment and drove to the same gun range in Maryland. While at the gun range, Mathews handled and fired the assault rifle.

### b.    Counts in the Indictment

In his motion, Mathews misstates the counts of the indictment. In paragraph three, Mathews states "Count 7 and 11 charge Brian Mark Lemley alone with the offense of Disposing of a Firearm and Ammunition to an Illegal Alien." The counts relevant to the motion to dismiss as alleged in the indictment are:

Count 7: Disposing of a Firearm and Ammunition to an Illegal Alien in violation of 18 U.S.C. § 922(d)(5) – Lemley.

Count 8:  Alien in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(5) and (2) – Mathews and Lemley.

Count 9: Transporting a Firearm and Ammunition in Interstate with Intent to Commit a Felony – Mathews and Lemley.

Count 10:  Disposing of a Firearm and Ammunition to an Illegal Alien in violation of 18 U.S.C. § 922(d)(5) – Lemley.

Count 11: Alien in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(5) and (2) – Mathews and Lemley.

Count 12: Transporting a Firearm and Ammunition in Interstate with Intent to Commit a Felony – Mathews and Lemley.

### c.    Counts Nine and Twelve Are Not Multiplicitous With Counts 8 and 11 Nor Defective

#### i.    Mathews' Claim of Multiplicity Fails

Mathews' claim of multiplicity must fail because the elements of proof for Counts Nine and Twelve are different than the elements for Counts Eight and Eleven.

Counts Nine and Twelve charge Mathews (and Lemley) with Transporting a Firearm and Ammunition in Interstate Commerce With Intent to Commit a Felony in violation of 18 U.S.C. §§ 924(b) and 2.  Count Nine alleges the crimes happened on January 5, 2020, and Count Twelve alleges the crimes happened on January 11, 2020.

 The elements of § 924(b) are that the defendant:  a) transported a firearm in interstate or foreign commerce; b) with the intent to commit a crime with the weapon, have actual knowledge that a crime will be committed with the weapon, or have reasonable cause to believe that a crime will be committed with the weapon; and c) the underlying crime is punishable by a term exceeding one year. *See, e.g.*, *In re Coleman*, 473 F. Supp. 2d 713, 718-19 (N.D. W. Va. 2007).   In both counts 9 and 12, the indictment further alleges aiding and abetting and identifies two potential underlying crimes:  violations of 18 U.S.C. § 922(d)(5) – Disposing of a Firearm and Ammunition

to an Illegal Alien and 18 U.S.C. § 922(g)(5) and (2) – Alien in Possession of a Firearm and Ammunition.[13]

Counts 8 and 11 charge Mathews (and Lemley) with being an Alien in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(5) and (2). The elements of this charge are that the defendant: a) knowingly possessed the firearm and/or ammunition as charged; b) at the time he or she possessed the firearm and/or ammunition, the defendant was an alien illegally and unlawfully in the United States; c) the firearm or ammunition must have traveled in or affected commerce. *See United States v. Al Sabahi*, 719 F.3d 305, 308 (4th Cir 2013).

Counts 9 and 12 differ substantially from count 8 and 11. As a result, Mathews' claim must fail. To prevail at trial on Count 9 and 12, the government must prove two elements that are not required for Counts 8 and 11 – 1) that the firearm/ammunition was transported in interstate commerce, and 2) with the intent to commit a crime with the firearm/ammunition, with knowledge that a crime will be committed with the weapon, or with reasonable cause to believe that a crime will be committed with the firearm/ammunition. Obviously, these two elements are not a part of the proof for Count 8 and 11. Presumably, a jury could find that Mathews is guilty of Count 9 – that he aided/abetted transport of the gun intending to possess it, because Count 9 allows for that future intent, without necessitating that the jury also find him guilty of Count 8 – intentional and illegal possession knowing he was forbidden. Because the jury could find him guilty of one and

---

[13] Circuits generally define the term "dispose of" under §922(d) to mean the "transfer a firearm so that the transferee acquires possession of the firearm" whether on a temporary or permanent basis, *United States v. Jefferson*, 334 F.3d 670, 673-74 (7th Cir. 2003) (*citing United States v. Monteleone*, 77 F.3d 1086, 1092 (8th Cir. 1996); or a transfer such that the "recipient comes into possession, control or power of disposal of a firearm." *Unites States v. Stegmeier*, 701 F.3d 574, 579 (citing *Monteleone*, 77 F.3d at 1092).

not the other, this demonstrates that these are separate crimes separately and appropriately charged.

Mathews' reliance on *Wilson* is misplaced. At issue in *Wilson*, were violations of 22 U.S.C. § 2278 –regulating the export or import of automatic and non-automatic firearms, and 18 U.S.C. § 924(b) – transporting or receiving a firearm or ammunition in interstate or foreign commerce, with the intent to commit therewith an offense punishable by imprisonment exceeding one year. *See Wilson*, 721 F.2d at 970. The court found that the prosecution of those offenses multiplicitous because "Wilson's § 2778 violations furnished the predicate felonies for his § 924(b) convictions." *Id.* Understandably, the court found "the specific intent to commit a §2778 violation . . . subsumes the intent to commit the predicate felony required by §924(b)" *Id.* at 970-71.  In other words, the act of illegally exporting and importing a firearm, whether in interstate or foreign commerce, by definition requires transporting the firearm.  A violation of § 2778 automatically proves a violation of § 924(b).  For this reason, the court found that reasoned that Congress "did not intend § 2778 and § 924(b) offenses to be punished more severely in combination than either could be punished separately . . ."

The same does not apply here.  Violations of §922(g)(5) and § 924(b) are separate and distinct crimes. An alien can illegally possess a firearm, but not transport it and thus violate § 922(g)(5) but not § 924(b).  It is likewise conceivable that Congress intended to punish both the unlawful simple possession of a firearm by an alien and also punish the alien, and others for transporting a firearm, with the intent to commit the felony of giving the firearm to an alien to illegally possess it. *See, e.g.*, *Torres v. Lynch*, 136 S. Ct. 1619, 1627 n.6 (2016) (separately listing violations of § 922(g)(5) and § 924(b) as predicate felony offenses for an immigration crime). For

these reasons, Counts 9 and 12 are not multiplicitous with Counts 8 and 11 and should not be dismissed.

### d. Counts 9 and 12 are Not Defective – Adequately state cognizable criminal act.

Mathews claims that Counts 9 and 12 are defective because they "fail to state a claim with respect to the underlying offense that alleges Mathews shipped, transported and received the firearm with intent to disposes of the firearm to an illegal alien – the illegal alien being himself." ECF No. 105 at 2. Mathews reads out one part of the indictment to the exclusion of another part.

The indictment is set forth in the conjunctive. The indictment alleges violations of 18 U.S.C. § 922(d)(5) – Disposing of a Firearm and Ammunition to an Illegal Alien <u>and</u> 18 U.S.C. § 922(g)(5) and (2) – Alien in Possession of a Firearm and Ammunition. Alleging violations of separate offenses in the same statute in the conjunctive is proper. *See, e.g., United States v. Whitfield*, 695 F.3d 308 (4th Cir. 2014). At trial, the government will prove a violation of § 922(d)(5) <u>or</u> a violation of § 922(g)(5) and (2). Should the jury find Mathews guilty of violating both statutes, such an error should be addressed at the sentencing phase. *Id.* Moreover, Fourth Circuit case law has clearly established that even if an indictment alleges, in the conjunctive, several ways a violation of a statute occurred, the conviction "'will stand' as long as the record evidence suffices to prove 'one or more means of commission.'" *United States v. Miselis*, 972 F.3d 518, 547 (4th Cir. 2020).

### e. FRCP Rule 7

After alleging multiplicity and failure to state an indictable offense, Mathews claims that the indictment is further insufficient because it fails to allege an intent to commit a specific felony. This claim fails for the same reasons the above arguments fail: the standard for an indictment is not the same as proof at trial.

### i.        Applicable Standard

Federal Rule of Criminal Procedure 7(c)(1) mandates that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Supreme Court has instructed that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted).

### ii.        The Indictment Provides Sufficient Notice

Counts 9 and 12 of the indictment tracks the necessary statutory language and provides an adequate basis that places Mathews on notice regarding the offenses. The Indictment satisfies the liberal notice pleading standard under *Hamling*. The Indictment pleads the essential elements of transporting a firearm in interstate and alleges the underlying felony violations are §922(d)(5) and §922(g)(5). The indictment apprises Mathews sufficiently adequately prepare for trial, and permits him to raise double jeopardy defenses in a future prosecution. Beyond the sufficient indictment, the government has provided ample discovery to date that belies any claim of inadequate pretrial notice and prejudicial surprise. For example, through discovery Mathews received a 103-page affidavit in support of an order authorizing the monitoring and recording of visual and nonverbal conduct through closed circuit television. The affidavit sets out in great detail the acts which give rise to the indictment.

Mathews claims the Counts 9 and 12 of the indictment insufficiently state "what felony Mr. Mathews intended to commit" and therefore must be dismissed. In other words, Mathews claims the indictment fails to allege Mathews intent. That argument must fail. At this stage, the

government is only required to *allege* -- not *establish* – intent. To the extent that Mathews claims that the government must pick a particular felony offense at the indictment stage, this is once again contradicted by case law and is duplicative of the above complaint that the government alleged two different underlying felony offenses at trial. Whether Mathews intended to violate §922(d)(5) or §922(g)(5) and (2) will be proven at trial. His complaints are, if anything, premature, and should be dismissed by this court.

### f. Statutory Purpose

Finally, without any legal support, Mathews argues that in addition to multiplicity and insufficient problems, Counts 9 and 12 are "irreparably flawed" because the statute only intended to impose an additional penalty for transporting firearms with the intent to commit a "future felony." ECF No. 105 at 7. Again, the Indictment pleads the essential elements of transporting a firearm in interstate and alleges the underlying felony violations are §922(d)(5) and §922(g)(5) and (2). At this stage, the government is only required to *allege* -- not *establish* – intent. Mathews' argument is best characterized as an attempt to address the sufficiency of the government's evidence. It is well-established that a court "lack[s] authority to review the sufficiency of evidence supporting an indictment" when determining whether to dismiss count of an indictment. *United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003). For the reasons previously stated, the indictment is sufficient. Examination of the indictment beyond the standard provided in *Hamling* is impermissible. The "future felony" requirement that Mathews wants the Court to apply is unsupported by any case law. By the plain and broad language of the statute, a violation § 924(b) encompasses the commission of <u>any</u> crime for which the term of punishment exceeds one year.

## V.    The Motion to Sever Defendants (ECF No. 106) Should Be Denied.

### a.    Lemley and Mathews are properly joined.

Both defendants are charged in the same twelve-count Maryland indictment. Counts 9 and 12 charge Mathews (and Lemley) with Transporting a Firearm and Ammunition in Interstate Commerce with Intent to Commit a Felony, and aiding and abetting an alien in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 2. Count 11 charges Mathews (and Lemley) with Alien in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(5) and (2). The charges stem from a series of events and transactions that occurred between August 2019 and January 2020, after Mathews, a Canadian citizen, unlawfully crossed the United States/Canada border. Lemley and Bilbrough picked up Mathews and ultimately transported him to Maryland and then subsequently to Delaware, where Mathews resided for several months with Lemley. Mathews claims his case should be severed from his co-defendants because the co-defendants are charged with "several crimes of which . . . Mathews is not charged." ECF No. 106 at 2. 14 Yet, Mathews omits that the indictment alleges that he and Lemley engaged in the same acts or transactions – traveling together to a gun range in Maryland together and firing weapons. *See, e.g., Zafiro*, 506 U.S. at 537-38; *United States v. Shealey*, 641 F.3d 627, 633 (4th Cir. 2011) (reaffirming the "preference in the federal system for joint trial of defendants who are indicted together). Accordingly, joinder is proper.

### b.    Mathews Has Failed To Meet His Burden For Severance.

---

[14] The government's response focuses on severance from co-defendant Lemley, because the government anticipates a disposition of Bilbrough's case within the next month. Thus, severance from Defendant Bilbrough's case will be moot. Should the parties not reach a plea agreement with Defendant Bilbrough, the parties can revisit the issue of severance at that time.

Mathews's severance claim should be denied, because Mathews generally asserts that he will suffer prejudice "because the jury will be unable to compartmentalize the evidence as it relates to him." ECF No. 106 at 2. Mathews fails to articulate any actual prejudice or demonstrate a "serious risk that a joint would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence," as required. *Zafiro*, 506 U.S. at 539. Instead, Mathews merely claims that the evidence is so overwhelming against Lemley such that "the spillover effect . . . will be highly and unfairly prejudicial to [him]." ECF No. 106 at 3. In other words, Mathews believes his likelihood of acquittal at trial is higher if his case is severed. It is well-settled that a defendant "is not entitled to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other." *Shealey*, 641 F.3d at 633(*citing United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001)). In short, Mathews has not demonstrated any actual prejudice that would result from a joint trial. Accordingly, the motion to sever should be denied.

## VI. The Motion to Suppress Mathews's Statements (ECF No. 107) Should Be Denied.

Mathews moves to suppress his post-arrest interview, because any statements "were obtained in violation of Mr. Mathews' privilege against self-incrimination, his right to counsel as guaranteed by the Fifth and Sixth Amendments of the United States Constitution, and the Supreme Court's holding in *Miranda*[.]" ECF 107 at 1-2. Contrary to Mathews's argument, no Constitutional violations occurred. While Mathews was in custody, his statements were elicited after a knowing, voluntary, and intelligent waiver of his Fifth Amendment rights. And Mathews's Sixth Amendment right to counsel had not yet attached at the time of the interview. Thus, his motion should be denied.

### a. Additional Factual Background

On January 16, 2020, law enforcement arrested Mathews at the Delaware Residence pursuant to an arrest warrant issued based on a federal criminal complaint. Mathews was transported to the FBI's Baltimore Field Office, in Woodlawn, Maryland ("Baltimore Field Office"). During that transport, law enforcement agents did not question Mathews, or engage him in any discussion, except to ask him if he wanted a Chick-fil-A sandwich or coffee. Law enforcement agents already at the Baltimore Field Office purchased a sandwich and coffee for Mathews.

Upon arrival at the Baltimore Field Office, Mathews was processed and placed in an interview room. The interview of Mathews was recorded by law enforcement. **Exhibit R**. A draft transcript was prepared and is provided. **Exhibit S**. Law enforcement asked Mathews if he needed to use the bathroom. Mathews said yes, and Mathews was taken to a bathroom.

Law enforcement asked Mathews about whether he had any medical concerns, to which Mathews answered no. Law enforcement then told Mathews that they were there to speak with him about some very specific things, but first wanted to get to know Mathews. When Mathews asked what specific things, an agent responded that law enforcement had allegations about Mathews's involvement in an organization, and wanted to hear about it from Mathews's perspective.

When Mathews asked if they meant "3 percenters," the agents told him that in order to have that discussion, they would need to go over some paperwork. When Mathews said, in sum and substance, that there was not a lot of choice involved (on his part), the agent responded that, in order to have a conversation about some specific questions, they needed to do some paperwork.

Mathews asked about the subject matter of the conversation, at which point an agent told Mathews that they would have to sign paperwork to get into specifics.  One of the agents then read part of FBI Form FD-395 (Advice of Rights) to Mathews titled "**YOUR RIGHTS**":

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

**Exhibit Q**.  Law enforcement then read Mathews the second part of the form, titled "**CONSENT**." That portion of the form then asks the person to sign the form, signifying that the person read the statement of rights, understood the statement, and is willing to proceed with the interview without an attorney: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."

Mathews asked about what happens if he does not sign the form.  Law enforcement told Mathews that they could not give him legal advice, but that the form is advising him of his rights, and that those rights apply to him.  When Mathews responded by saying that if he doesn't sign the form, he does not have to speak with law enforcement, they brought Mathews's attention back to the form, telling him that he (Mathews) had to understand his rights before they could ask him any questions.

Law enforcement then started to re-read the form, starting with the right to remain silent. Mathews responded in the affirmative. When law enforcement read the next four questions, Mathews responded "Hmmm." When asked about having the right to stop answering questions at any time, Mathews responded "Ok."

Mathews asked law enforcement if he had to sign the form to find out why he is in custody. Law enforcement responded by telling Mathews the United States Code sections in the criminal complaint, and their general statutory description. They then told Mathews, in summary, that he was being charged with having a firearm and being an illegal alien in the United States. When Mathews responded that he does not have firearms, law enforcement told him they were not going to have that discussion unless and until they (meaning Mathews and the agents) signed the form. Mathews then asked law enforcement questions about the confirmation of his identity through fingerprints. Law enforcement then told Mathews that if he wanted to sign the form, they could have a conversation, and that if he did not, that was his right.

Mathews then said, in sum and substance, damned if I do and damned if I don't. Law enforcement said that this form gave them the opportunity to have a discussion, and that law enforcement wanted to hear Mathews's side of the allegations. Mathews then asked if a signature was all that was required. Law enforcement told Mathews where he could sign the form. Mathews then signed the form.

During the interview, Mathews stated that he was 27 years old, born in Winnipeg, Manitoba, and was living in Beausejour, Manitoba, working as a carpenter for a construction company. Mathews also said that he was an Army Reservist for 8 years, and that he was a Combat Engineer in the Canadian Army, joining in late 2010. Mathews left the Canadian Army as a Master Corporal.

At one point during the interview, Mathews complained about his handcuffs, so law enforcement took them off.[15]  Mathews and law enforcement then discussed Mathews's family. Law enforcement asked Mathews when he left Canada, to which Mathews responded he did not remember exactly, and would not say when, because he did not want to make a false statement.

When asked at one point why he would break his phone, Mathews replied that he did not own a phone.  When asked again about the phones broken in his apartment, he said he had nothing to say, and did not know.  Mathews also denied ownership or possession of anything discussed in the charges set out in the criminal complaint.  Mathews discussed having various firearms in Canada that were seized by Canadian law enforcement.

Law enforcement spoke with Mathews for approximately two and a half hours.  During the interview, law enforcement offered water, coffee, and several bathroom breaks.  At no point during the interview did Mathews ask for an attorney. More than thirty times during the interview, Mathews responded to law enforcement questions by stating "I have nothing to say" about a particular topic.

### b.    No Fifth Amendment Violation Occurred.

There is no merit to Mathews's argument that his statements were coerced. With respect to the characteristics of the accused, Mathews was a 27 year old male, who had served for eight years in the Canadian military.  During the interview, Mathews was adroit in avoiding questions he did not want to answer, probing his interviews for information about his case.

With respect to the circumstances of the interview, the officers did not subject Mathews to "any form of physical coercion or deprivation." *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir.

---

[15] Law enforcement put Mathews back in handcuffs later in the interview when opening the interview door, before taking him to the bathroom.  Once back in the room, law enforcement again took off the handcuffs.

1995).  The agents limited the interview to only 2.5 hours; gave Mathews bottled water, coffee, food, and bathroom breaks during the interview; informed Mathews of the charges and nature of the investigation; and used a conversational tone with Mathews throughout the interview.  *See United States v. Nichols*, 438 F.3d 437, 443-44 (4th Cir. 2006) (finding no coercion where officers used "conversational" tone during four hour interview).

Compare Mathews's interview to *United States v. Bryers*, 649 F.3d 197 (4th Cir. 2011).  In *Bryers*, the 21-year-old defendant was arrested and placed in an interview room where he was handcuffed to the wall and questioned about a murder for 14 hours. After midnight (and approximately 12 hours into the interview), the detective told the defendant that the police had evidence pointing to the defendant's involvement in the murder, the interview would not stop until they got "to the bottom of this," and there were "no time limits" to the interview.  *Id.* at 216.  The detective did not inform the defendant that he was under arrest for murder until the end of the 14 hour interview. Under those facts, the Fourth Circuit perceived "no coercion either from the length of time Bryers was detained before being formally notified of the specific charges or from the other circumstances surrounding" the interview.  *Id.* at 217.  *See also Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1990) (holding statements voluntary even though eight police officers interviewed defendant, officers failed to record the actual confession, and defendant provided inconsistent and false information).

Here, while Mathews's motion does not allege how his statements were unconstitutionally obtained, or otherwise involuntary, his written, signed waiver, and the conversation with law enforcement about that waiver, refute any claim of law enforcement coercion.

### c.     No Sixth Amendment Violation Occurred.

Defendant argues that his interview violated his Sixth Amendment right to counsel.  ECF 107 at 2.  However, law enforcement interviewed Mathews upon his arrest for a criminal complaint—and before his initial appearance on that complaint—so no Sixth Amendment right had attached.

The right to counsel under the Sixth Amendment "attaches only at or after the initiation of adversary judicial proceedings against the defendant.'" *United States v. Alvarado*, 440 F.3d 191, 199 (4th Cir. 2006) (quoting *United States v. Gouveia*, 467 U.S. 180, 187) (1984).  An arrest does not constitute the initiation of adversary judicial proceedings.  In equating the filing of a federal criminal complaint with the filing of an affidavit in support of a search warrant, the Fourth Circuit in *Alvarado* held that "[t]he filing of a federal criminal complaint does not commence a formal prosecution." *Alvarado*, 440 F.3d at 200.  As the purpose of the Sixth Amendment's protections are to "assure that the criminal defendant is not forced to face the prosecutorial forces of organized society alone, the right attaches as the process shifts from investigation to prosecution, and not before." *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (internal citations omitted).

Here, Mathews was interviewed before he had an initial appearance on the criminal complaint.  Because Mathews was interviewed before any Sixth Amendment right had attached, there is no basis for suppression of any statements on Sixth Amendment grounds.

## Conclusion

The defendants' motions should be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/ _____
Thomas P. Windom
Thomas M. Sullivan
Assistant United States Attorneys

Adrienne Dedjinou
Special Assistant United States Attorney