**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
|  | * |  |
|  | * |  |
| **UNITED STATES OF AMERICA** | * | **Criminal Nos. 20-cr-033 TDC** |
|  | * | **21-cr-205 TDC** |
| **v.** | * |  |
|  | * |  |
| **BRIAN MARK LEMLEY, JR..** | * |  |
| **PATRIK JORDAN MATHEWS, and** | * |  |
| **WILLIAM GARFIELD BILBROUGH,** | * |  |
| **IV** | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BRIAN MARK LEMLEY'S REPLY**
**TO GOVERNMENT'S SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

I.      The Government Proposes a Sentence Exponentially Higher than Those Imposed in
        Cases of Similarly Situated Defendants Across the Country ...........................................2

II.     The Defendants Spoke in the Abstract and Did Not Act ................................................3

III.    The Defendants' Statements Demonstrate They Did Not Plan to Initiate Violence .......6

IV.     The Defendants Took No Meaningful Steps Towards Committing More Serious
        Offenses.........................................................................................................................9

        A. Joining the Base......................................................................................................9

        B. Participating in "Training Camps" ...................................................................10

        C. Obtaining Weapons and Ammunition ............................................................10

V.      Proposed Guideline Enhancements Sought by the Government
        Should Not be Applied .................................................................................................11

        A. The Terrorism Enhancement Does Not Apply and Applying it Would
           Circumvent Basic Due Process ...........................................................................12

           i.   Congress directed the Sentencing Commission to make
                § 3A1.4 applicable only to defendants convicted
                of a crime enumerated in § 2332b(g)(5)(B) ...............................................13

           ii.  Assuming § 3A1.4 can validly apply to someone not convicted of an
                enumerated statute, Mr. Lemley's conduct does not fall within the scope
                of the enhancement ...................................................................................17

           iii. If the Court concludes § 3A1.4 applies to Mr. Lemley, it should depart
                down to criminal history category I ...........................................................19

        B. The Commentary to § 3A1.4 Does Not Authorize an Upward Departure ......21

        C. Mr. Lemley Did Not Use or Possess a Firearm in Connection with Another
           Felony Offense ....................................................................................................22

        D. The Catchall Departure at U.S.S.G. § 5K2.0 Does Not Apply ......................24

CONCLUSION....................................................................................................................25

**INTRODUCTION**

The defendants' statements in the government's sentencing memorandum are undeniably repugnant. Yet when one focuses solely on permissible sentencing considerations, the fact remains: despite all the talk between these two damaged military veterans, the government still fails to produce evidence of a plan for imminent violent conduct or meaningful steps towards any such conduct by either defendant. Lost in the torrent of *statements* in the government's sentencing memorandum is the *conduct* for which the defendants are actually being sentenced here. The FBI devoted many agents and thousands of hours to the investigation of Mr. Lemley and Mr. Mathews. The government sought more than a dozen search warrants, took the highly unusual step of placing recording devices inside the defendants' apartment and monitoring their activities 24 hours per day, and an undercover agent infiltrated the organization. The FBI's extensive investigation revealed that Mr. Lemley committed the offenses for which he was charged and pled guilty. It was certainly appropriate to investigate, arrest, and charge him. But he should be sentenced for *those offenses*, not for target offenses or conduct for which the government never developed sufficient evidence to indict Mr. Lemley. The government now appears to be seeking a sentence commensurate not with Mr. Lemley's conduct, but instead with the resources and time it committed to this case. This, of course, is not an appropriate sentencing consideration.

The government seeks a sentence of 25 *years'* imprisonment despite the fact that the sentencing guidelines for the charged offenses call for 33-41 *months*. The government seeks a sentence here that is exponentially higher than those imposed in federal courts across this country for other defendants involved in extremist groups who discuss violence and possess weapons. Mr. Lemley is charged with non-violent crimes and did not engage in violence, yet the sentence proposed by the government is commonly imposed in this District in cases where defendants have

committed *murders*. The government's sentencing recommendation is untethered to the charges, the facts of the case, and the sentencing guidelines. It should be disregarded entirely.

## ARGUMENT

I.    **The Government Proposes a Sentence Exponentially Higher than Those Imposed in Cases of Similarly Situated Defendants Across the Country**

Uniformity in sentences for defendants convicted of similar conduct with similar records is a primary consideration in the sentencing statute. 18 U.S.C. §3553(a)(6) (requiring courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"); *United States v. Davis*, 434 F.3d 684 (4th Cir. 2006) (reversing sentence when court failed to consider potential disparities). The sentence proposed by the government here would create precisely the disparity the sentencing statute seeks to avoid. In contrast, the guideline sentence proposed by the defense is squarely within the heartland of sentences imposed upon defendants who engaged in similar conduct in federal courts around the country.

Attached at Defense Exhibit 18 is a chart prepared by the defense listing cases involving defendants who engaged in comparable conduct. As the chart reveals, defendants who were (1) involved in extremist groups; (2) made statements about an intent to commit violent acts; (3) possessed weapons and ammunition (and in some cases explosives); and (4) in some cases either engaged in violence or took significant steps towards doing so have received sentences ranging from probation up to five years in prison. For example:

- A member of the white-supremacist Feurkrieg Division who planned to firebomb a synagogue, solicited surveillance of the synagogue, had sketched plans for attacking a bar and a McDonald's, and possessed two rifles and components for bomb-making received 24 months' imprisonment and 6 months' home confinement.[1]

---

[1] *United States v. Conor Climo*, 19-cr-232 (D. Nev.).

- Another member of Feuerkrieg Division who provided information about making explosives to an FBI undercover, planned to "create chaos" and overthrow the government, spoke about destroying cell towers or a local new station and about killing members of Antifa received a sentence of 30 months' imprisonment.[2]
- A member of a militant white-supremacist organization called the "Rise Above Movement" who attended combat training and attended rallies in California and Charlottesville where he committed multiple acts of violence that resulted in serious injuries received a sentence of 27 months' imprisonment.[3]

It is fair to assume that were a hidden recording device placed inside the home of any of these individuals, one would have also heard comparable vitriolic and violent language being spoken. Defendants who received sentences higher than the 33-month guideline sentence proposed by the defense here engaged in conduct that was far more serious than these defendants. For example:

- A member of Atomwaffen Division received a 60-month sentence because he spoke of killing people and bombing infrastructure and a search of his home resulted in the recovery of explosive precursors and two radioactive substances, electric matches and ammunition casings with fuses that could be used to detonate destructive devices, and he was arrested in a car with assault rifles, body armor, and more than 1,000 rounds of ammunition.[4]

Instead of recommending a sentence proportionate to those imposed across the country in similar cases, the government's 25-year sentencing recommendation is consistent with the 25-30 year sentences regularly imposed in this District for defendants who actually kill one or more people.[5]

## II.    The Defendants Spoke in the Abstract and Did Not Act

The government's sentencing recommendation is not based upon these defendants' conduct, but instead upon their words.[6] There is a huge chasm between speaking in the abstract about outrageous acts and actually engaging in such acts. The government utterly fails to bridge

---

[2] *United States v. Jarrett Smith*, 19-cr-40091 (D. Kan.).
[3] *United States v. Michael Miselis*, 18-cr-25 (W.D. Va.).
[4] *United States v. Brandon Russell*, 17-cr-283 (M.D. Fla.).
[5] Attached at Defense Exhibit 19 is a chart of recent sentences in gang-related prosecutions in this District in which the defendant was implicated in one or more homicides.
[6] Many of the statements by Mr. Mathews detailed in the government's sentencing memorandum were made when Mr. Lemley was not even present. *See, e.g.*, U.S. Exhibits 25, 26, 27, 28, 39, 40

this chasm in its 43-page sentencing memorandum.[7] Anyone who listened to the hundreds of hours of conversations between these defendants would struggle to discern any line of consistent thought, reasoning, or planning. The government cites far-fetched, unrealistic scenarios discussed by the two: targeting law enforcement officers after the commencement of an imagined civil war; breaking Dylann Roof out of prison; murdering a state representative; derailing trains; taking down the power grid. Even articulating any of these ideas is repellent, no matter how farfetched they are. But we do not punish people for discussing violence. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927 (1982) (advocacy of the use of force or violence is protected).

No one truly believes that these two men were going to try to break Dylann Roof out of a high security federal prison. Beyond talking about it in one of their hours-long stream-of-consciousness conversations, they took no step towards doing so. The same is true of the discussion of causing harm to the Speaker of the Virginia House of Delegates. It was a topic that was raised briefly during another of their interminable rambling exchanges and was never raised again. There is absolutely no connection to reality. Their discussions of how they would conduct themselves in an imagined civil war were similarly inherently unrealistic.

In fact, the defendants' conduct reflected their true intent. Both men had full-time jobs and both spoke in the recordings of continuing to work. The government cites discussion within the Base chat room about how members would react if law enforcement showed up with warrants, including shooting it out with law enforcement, "suicide by cop," and not letting law enforcement take them alive if they come with a warrant. U.S. Memo, p. 13. But when law enforcement came to Mr. Lemley and Mr. Mathews' apartment with a warrant and called Mr. Lemley on his phone telling them to come out of the apartment, Mr. Lemley and Mr. Mathews did so peacefully.

---

[7] The Court set a 50-page limit for each party's opening and responsive sentencing memoranda combined. Sentencing Order, ECF No. 161

In contrast, defendants in other cases have taken substantial steps towards a clear goal that demonstrated an intent to commit a serious violent crime tied to extremist ideologies. The most prominent recent example is that of the militia members who planned to kidnap Michigan Governor Gretchen Whitmer. In that case, the defendants were members of an extremist militia group called the Wolverine Watchmen which included members who promoted the "Boogaloo movement."[8] The defendants developed a detailed plan to kidnap the Governor and took part in several "field training exercises" in which they practiced combat tactics including assaulting motor vehicles using semiautomatic rifles and live ammunition, constructed a range for live-fire training, attempted to detonate two improvised explosive devices, and discussed tactics for fighting the Governor's security detail with IEDs, a projectile launcher, and other weapons. At one training camp, the defendants constructed a "shoot house" to resemble the Governor's vacation home and assaulted it with firearms. Members of the group were well equipped: among other items, they obtained AR-15 rifles, semi-automatic pistols, a bullet-proof helmet, a night vision scope, a silencer, a high-voltage stunning device, and a 37-millimeter projectile launcher. They exchanged messages in which they suggested taking down a highway bridge near the Governor's vacation home in order to hinder law enforcement response. They conducted nighttime surveillance of the Governor's vacation home using two-way radios and the night vision scope.[9] One member of the conspiracy met with an undercover agent to make payment towards explosives and other supplies. Given all these actions, it was entirely reasonable to believe that these defendants were going to try to carry out their plan to kidnap the Governor. Yet the first defendant sentenced in that conspiracy – said to have been one of the leaders of the scheme – recently received a sentence of

---

[8] Graham Macklin, *The Conspiracy to Kidnap Governor Gretchen Whitmer*, CTC Sentinel, July/August 2021,  available at https://ctc.usma.edu/the-conspiracy-to-kidnap-governor-gretchen-whitmer/
[9] Plea agreement, *United States v. Ty Garbin*, No. 20-183 (W.D. Mich.), ECF No. 142.

75 months' imprisonment following his guilty plea.[10] The attached comparison chart includes several other defendants who spoke of committing specific violent acts and had the weaponry to do so, yet courts did not sentence them to decades in prison as if the act itself were carried out.

### III.    The Defendants' Statements Demonstrate They Did Not Plan to Initiate Violence

The overwhelming majority of Mr. Lemley and Mr. Mathews' discussions about violent conduct related to how they pictured conducting themselves during battle in an imagined civil war, and Mr. Lemley said that he was not planning to commit acts of violence in an effort to start a war. The most that can be determined from the hundreds of hours of rambling, disjointed discussions between these two men is that Mr. Lemley *might* go to an area 150 miles from Richmond, Virginia, to see whether an imagined civil war would break out at the rally there, at which point he would retreat even further to try to muster other Base members to join "warfare" that was entirely a figment of their imagination. In other words, the engagement they discussed was premised on a condition precedent that was never going to happen: the start of a civil war in this country. In Government Exhibit 30 Mr. Lemley tells Mr. Mathews he is not advocating being a "guerilla" who would initiate violent action at this time and that he is "not really comfortable doing it alone or like doing it being the first." The government's other exhibits demonstrate the fact that neither Mr. Lemley nor Mr. Mathews were contemplating engaging in violence unless and until an imagined war had started:

- Exhibit 29 is a rant by Mr. Mathews that is utterly disconnected from reality about derailing train lines, shutting down highways, and kicking off economic collapse. But all of those imagined and completely unplanned ideas would occur "within a week *after the Boog starts*." U.S. Exhibit 29a.
- In Exhibit 30 Mr. Lemley and Mr. Mathews described waiting for an imagined civil war to start before acting. Mr. Mathews described engaging in conduct "while the conflict is going." U.S. Exhibit 30.

---

[10] Judgment, *United States v. Ty Garbin*, No. 20-183 (W.D. Mich.), ECF No. 300.

- In Exhibit 43 Mr. Lemley describes his conception of how he might engage in battle if a war started, making clear that his plan was tied into his conspiracy-theory-influenced views about "agent provocateurs on the ground" and "intelligence agencies out there." Mr. Lemley said: "I don't know what we, what we're gonna do, like we haven't really like, nobody's really like drawn up a real plan. Like I always thought that we would kinda merge together and like start doing gang shit together because fuck it. . . the government is like effectively shut down."  U.S. Exhibit 43a.

When listening to and watching the defendants for nearly a month failed to unearth a plan on their parts to initiate violence, the FBI sent in the undercover agent to see if he could get them to articulate one. On January 11, 2020, only 9 days before the Richmond rally, the agent who had infiltrated the Base went to the defendants' apartment and spent several hours with them, including a visit to a firing range. It quickly became clear that Mr. Lemley and Mr. Mathews were packing and preparing to depart for a meeting of other Base members in Michigan and were not preparing to instigate violence at the Virginia rally. The two planned to leave for Michigan on Thursday, January 16, the day they were arrested. Early in their conversation, Mr. Mathews explained to the agent that: "[r]ight now we're not going we're we're right now eschewing the Virginia plan for the Michigan plan. . . ." U.S. Exhibit 43a, p. 4. Although Mr. Lemley had a few days of vacation available, Mr. Mathews needed to be at work on January 20, the day of the Richmond rally. Mr. Lemley told the agent: "So we're definitely going up to Michigan and um we'll be heading back about sometime before 6pm on Sunday that'll get us back here by like 6am Monday so he can go to work."  U.S. Exhibit 43a., p. 4. Mr. Lemley then explained that he had been thinking about going to Virginia by himself to "watch[] what's going on," but he explained that "I certainly don't want to be in the crowd and I certainly don't want to be storming any buildings with a bunch of retards." *Id.*

As the night progressed and Mr. Lemley and Mr. Mathews became more intoxicated, the agent told them he was ready to act and repeatedly prodded them to articulate a plan.[11] The men had come to admire this older man and did describe outlandish scenarios and tactics they imagined employing if they were engaged in battle. But despite insistent encouragement from this agent, they never described a plan to go to Virginia to initiate violent action. After several hours, the agent decided to leave and again encouraged Mr. Lemley to involve him in some sort of violent conduct in Virginia. Mr. Lemley demurred, telling him *not* to go to Virginia:

UCE:      If I don't make it to Michigan, where [are] we meeting, and what do you need me?

Lemley:  So if you don't make it to Michigan, I'll just talk to you personally and tell you what I'm doing. I'll tell you, hey I'm in Virginia, and it's like, things are getting really crazy and oh…
              ….

UCE:      Well, me personally, I don't want you to be in Virginia by yourself –

Lemley:  Well, you should just. . . you should. . . I wouldn't worry about that. I think you should just like, check over your stuff, and make sure that you're like in a state of –

UCE:      We're thinking like a Sunday, I should start heading to Virginia?

Lemley:  No no no, you should just say, "Am I in a state of readiness, or not? Am I ready to go?"

U.S. Exhibit 45a, pp. 5-6. Mr. Lemley then described his plan to be "way in the back," "just kind of looking at things, seeing how things are going. . . ."  *Id.* This is as far as the defendants went in discussing a plan for Virginia: Mr. Lemley *might* go to observe from afar to see whether a civil war broke out.

---

[11] "So what do we do?" "Tell me show me it's gonna work I'm ready I've been ready you show me what the fuck I we don't need no bullshit no half ass shit you tell me what the fuck we're gonna do. . . ."  "I'm just trying to see where you're at." "You may start to lose me here . . . . OK who am I killing? . . . . I'll do whatever you need me to do." U.S. Exhibit 44a.

## IV.   The Defendants Took No Meaningful Steps Towards Committing More Serious Offenses

The government did not charge the defendants with any of the more serious offenses listed in the initial search warrant applications or the terrorism-related charges in the § 3A1.4 guideline enhancement. Nor did the government charge either defendant with inchoate offenses related to those offenses. The reason is clear: the defendants did not take steps towards completion of those crimes that would have warranted an indictment, let alone a conviction. Although the majority of the government's sentencing memorandum is focused on the defendants' words, the government identifies a handful of acts by the defendants none of which – taken alone or together – warrant harsher punishment than that contemplated in the guidelines for the actual crimes of conviction.

### A.   Joining the Base

The government has focused on Mr. Lemley's involvement with the Base and suggested that his membership evidences a commitment to violent action in furtherance of creating a white ethno-state. The Base was a group of approximately 50 people. Although the rhetoric of the leader of the Base, Rinaldo Nazzaro, was violent and although members discussed violent action, the group did not commit any violent acts. In fact, co-defendant William Bilbrough, who can be heard in recordings advocating violent conduct, left the Base before his arrest *not* because he was concerned that it was a violent and dangerous organization, but instead because he felt it was *not violent enough*. The government acknowledged this at Mr. Bilbrough's sentencing.[12]  It is entirely unclear why, if the government is correct that Base members Lemley and Mathews were preparing to engage in imminent shocking acts of violence, a man who had spent countless hours with them

---

[12] In addressing the question of deterrence of Mr. Bilbrough, the government stated:
> I think that Mr. Bilbrough will require certain specific deterrence, though we recognize that he had disassociated himself from The Base as of the time of the arrest. There is a debate as to whether that was because The Base was not as proactive as Mr. Bilbrough would like.

Bilbrough Sentencing Transcript, p. 45, attached as Defense Exhibit 20.

parted ways after concluding that the Base was "not as proactive as Mr. Bilbrough would like." Moreover, the defense's chart of comparator cases attached at Defense Exhibit 18 demonstrates that many individuals who were members of violent white nationalist organizations including Atomwaffen Division have received sentences less than that proposed by the *defense* here.[13]

B.     *Participating in "Training Camps"*

The government continues to refer to meetings of Base members as "training camps" and describes those present participating in "tactical training and firearms drills."  U.S. Memo, p. 13. This makes the meetings sound far more sophisticated and directed than they were. The meetings of members typically involved no more than ten people at a time. As far as the defense can tell, either an undercover agent or a citizen informant were present at every meeting of members these defendants attended. Other than talking, eating, and trying to perform Pagan rituals, those present fired their weapons and took photos of each other that they hoped to use as recruiting tools. But they did not engage in any sophisticated tactical training or drills consistent with a military group and none of the meetings involved preparation for any particular planned action. Many of the defendants in the attached chart of comparator cases were members of extremist groups who attended meetings of members that were referred to as "training camps" or "hate camps" at which those defendants practiced hand-to-hand combat and did shooting drills – and sometimes more.

C.     *Obtaining Weapons and Ammunition*

Mr. Lemley and Mr. Mathews each had a firearm and some ammunition was recovered from their apartment by law enforcement. Possession of these items does not establish a plan to commit a specific violent act. The defendants had been using ammunition during their trips to a

---

[13] According to the Southern Poverty Law Center, Atomwaffen Division is a terroristic neo-Nazi organization committed to accelerationism towards societal collapse.
https://www.splcenter.org/fighting-hate/extremist-files/group/atomwaffen-division

firing range and they planned to use ammunition at the meeting they were going to in Michigan. Many defendants in the attached comparison chart had much more significant caches of weaponry and ammunition; some had a dozen or more firearms and thousands of rounds of ammunition.

**V.      Proposed Guideline Enhancements Sought by the Government Should Not Be Applied**

The defense proposes a sentence of 33 months, which is within the Guidelines range calculated by Probation and proportionate to sentences imposed in cases involving similarly situated defendants around the country. The government, however, seeks to ratchet up Mr. Lemley's sentence to one that is grossly disproportionate to the offenses of conviction by asking the Court to apply the terrorism enhancement found at U.S.S.G. § 3A1.4. This enhancement is rarely applied nationally, and for good reason. Out of 345,143 cases in fiscal years 2016-2020, federal courts applied § 3A1.4 only 169 times—about 0.05 percent of cases. And in only *one* of those cases did the enhancement apply to a defendant convicted under *any* of the statutes to which Mr. Lemley pled guilty (8 U.S.C. § 1324, 18 U.S.C. §§ 922(d), 922(g)(5), 924(b), 1519).[14]

The government clearly charged every offense it felt it could prove to a jury in this case – Mr. Lemley was charged here with 18 different counts in two districts. Surely if the government thought it had evidence to prove a terrorism-related offense (including attempt or conspiracy to commit any such offense), it would have included that charge. Yet in a blatant end-run around the right to a jury trial and the standard of proof beyond a reasonable doubt, the government now seeks a sentence as if it had charged Mr. Lemley with these offenses and obtained convictions. The government uses this massive, tail-wagging enhancement as a rationale for multiplying Mr.

---

[14] These figures were extracted from the Sentencing Commission's "Individual Offender Datafiles" spanning fiscal years 2016 to 2020. The Commission's "Individual Offender Datafiles" are publicly available for download on the Commission website. United States Sent. Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles.

Lemley's sentencing range—then goes even further, asking for a sentence that is several years higher than the already hugely inflated range. The government's argument must be rejected.

> A.      *The Terrorism Enhancement Does Not Apply and Applying it Would Circumvent Basic Due Process*

Section 3A1.4 adds 12 offense levels and places a defendant in criminal history category VI if his "offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  For purposes of § 3A1.4, "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." *Id.* cmt. n.1. That statute, in turn, defines "federal crime of terrorism" as "an offense that" (A) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (B) "is a violation of" certain enumerated statutes (e.g., those prohibiting destruction of aircraft, assassinating members of Congress, and using biological weapons). § 2332b(g)(5). Section 3A1.4 has two prongs: (1) the "involved" prong, which applies if a defendant's conduct constitutes a violation of one of the statutes enumerated in § 2332b(g)(5)(B), and (2) the "intended to promote" prong, which applies if "the defendant commits a felony with a goal or purpose . . . to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B)," even if the defendant has not necessarily committed the crime. *United States v. Kobito*, 994 F.3d 696, 702 (4th Cir. 2021).

The terrorism enhancement does not apply here. When Congress directed the Sentencing Commission to amend § 3A1.4 in 1996, it specifically provided that the enhancement should "only appl[y] to Federal crimes of terrorism," i.e., to crimes of conviction that are violations of a statute enumerated in § 2332b(g)(5)(B). Because Mr. Lemley has not been convicted of any of those crimes, § 3A1.4 cannot apply to him. Even assuming § 3A1.4 does not require conviction of an enumerated offense, it does not apply to Mr. Lemley, who never formed a serious intent to actually carry out any conduct that would violate an enumerated statute. And even if the Court finds the enhancement applicable, it should depart down to criminal history category I, which more

accurately reflects Mr. Lemley's (non-existent) criminal history. Nor can application note 4 to the § 3A1.4 commentary authorize an upward departure for defendants not convicted of an enumerated crime. Even if it could, that commentary is inconsistent with the text of § 3A1.4, and therefore invalid.

          *i.*      <u>Congress directed the Sentencing Commission to make § 3A1.4 applicable only to defendants convicted of a crime enumerated in § 2332b(g)(5)(B</u>)

Although the Sentencing Commission has some discretion in drafting and revising the Guidelines, it "must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). If a guideline is "at odds with [a congressional directive's] plain language, it must give way." *Id.* Accordingly, any guideline that is "inconsistent with [a directive's] plain language" is invalid. *Id.* at 753.

Section 3A1.4 is such a guideline. In the Violent Crime Control & Law Enforcement Act of 1994, Congress "directed" the Commission "to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime" (the "1994 Directive"). Pub. L. No. 103–322, § 120004, 108 Stat. 1796, 2022. In response, the Commission promulgated § 3A1.4, which instructed that "[i]f the offense is a felony that involved, or was intended to promote, international terrorism," courts should add 12 offense levels and place the defendant in CHC VI. *See* U.S.S.G. App. C, amend. 526 (Nov. 1, 1995).

Two years later, in the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Congress directed the Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code" (the "1996 Directive"). Pub. L. No. 104-132, § 730, 110 Stat. 1214. The Commission responded by enacting an amended guideline

that simply substituted "a federal crime of terrorism" for "international terrorism."  U.S.S.G. § 3A1.4 (1996 Supp.). The new guideline therefore applied if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." *Id.* Consistent with the 1996 Directive, the amended guideline pegged the meaning of "federal crime of terrorism" to the definition in § 2332b(g)(5). *Id.* cmt. n.1.

The resulting guideline is inconsistent with the 1996 Directive, and therefore invalid. The 1996 Directive instructs that § 3A1.4 should "only appl[y] to [a] Federal crime[] of terrorism," defined in relevant part as "an offense" that "is a violation of" a statute enumerated in § 2332b(g)(5)(B). The word "offense," as used in Title 18 of the U.S. Code, means the crime of which a defendant is convicted. *See, e.g.*, 18 U.S.C. § 3663A(a)(1) ("[W]hen sentencing a defendant *convicted of an offense* described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense." (emphasis added)); 18 U.S.C. § 3551(a) ("[A] defendant who has been *found guilty of an offense* described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter." (emphasis added)); 18 U.S.C. § 3559(d)(1) (providing that "a person who is *convicted of a Federal offense* that is a serious violent felony" is subject to life imprisonment under certain circumstances (emphasis added)). Thus a "federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5), means a crime of conviction (i.e., an "offense") that "is a violation of" an enumerated statute.

Putting these pieces together, Congress' intent in the 1996 Directive becomes clear: the § 3A1.4 enhancement should "only appl[y]" to a crime of conviction that "is a violation of" a statute enumerated in § 2332b(g)(5)(B). If the defendant's crime of conviction is not a violation of an enumerated statute, then § 3A1.4 cannot "appl[y]." The current § 3A1.4, which extends to defendants who have not been convicted of an enumerated crime, *see Kobito*, 994 F.3d at 702, is therefore "at odds with [the 1996 Directive's] plain language," *LaBonte*, 520 U.S. at 757.

The Commission apparently believed it had complied with the 1996 Directive by substituting "a federal crime of terrorism" for "international terrorism" while leaving intact § 3A1.4's "intended to promote" language. But this interpretation of the 1996 Directive reads into it language that does not appear there. As one judge has explained:

> [W]hen Congress directed the Sentencing Commission to amend § 3A1.4 to apply to a "Federal crime[] of terrorism," it did not state that the enhancement applies to offenses that "*involved*" or "*intended to promote*," rather the Sentencing Commission was directed to amend the guidelines so that the enhancement *applies only to 'Federal crimes of terrorism' as defined in section 2332b(g)*. While prior directions to the Sentencing Commission used the language "involved" or "intended to promote" together with the term "international terrorism," the directions given with the enactment of section 730 of the AEDPA did not contain such language. The directions rather were to apply the enhancement to "Federal crimes of terrorism" as defined under § 2332b.

*United States v. Graham*, 275 F.3d 490, 537 (6th Cir. 2001) (Cohn, J., dissenting) (emphasis in original). If Congress had meant the amended enhancement to apply to any defendant whose offense was "intended to promote" a federal crime of terrorism, it would have said so, as it did in the 1994 Directive. But Congress chose a different tack, and the Commission failed to honor that congressional choice.[15]

An additional textual difference between the two directives confirms the change in Congress' intent. The 1994 Directive instructed the Sentencing Commission to provide an enhancement for any felony "that involves or is intended to promote international terrorism, *unless such involvement or intent is itself an element of the crime*." Pub. L. No. 103–322, § 120004, 108 Stat. 1796, 2022 (emphasis added). If the defendant's crime of conviction involved or was intended

---

[15] The *Graham* majority held a "defendant need not have been convicted of a federal crime of terrorism" for § 3A1.4 to apply. 275 F.3d at 517. In so holding, however, it did not acknowledge— much less attempt to refute—the argument the dissent made based on the 1996 Directive. *Id.* at 513-19; *see United States v. Salim*, 287 F. Supp. 2d 250, 322 (S.D.N.Y. 2003) ("The *Graham* majority addressed neither the question of the Sentencing Commission's authority nor the proper scope of U.S.S.G. § 3A1.4 in light thereof."). The majority opinion is therefore entitled to no weight on question of § 3A1.4's validity.

to promote international terrorism, the enhancement did not apply. In other words, the 1994 Directive explicitly targeted only people who were *not* convicted of being involved in or promoting international terrorism. But the 1996 Directive does not contain a similar "unless" clause. Instead, it simply directs the Commission to amend § 3A1.4 so that the enhancement "only applies to Federal crimes of terrorism." Rather than being expressly targeted at people who did not commit a predicate crime, the amended enhancement "only applies" to predicate crimes, i.e., "offense[s]" that are "a violation of" statutes enumerated under § 2332b(g)(5). This change in language is consistent with a desire to limit § 3A1.4 to defendants who have actually been convicted under an enumerated statute.

Legislative history supports this straightforward reading of the 1996 Directive. The final Conference Report for AEDPA describes the 1996 Directive as follows:

> This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to *apply only to* federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed *in connection with* a crime of international terrorism [sic]. This section of the bill will make that new provision *applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes* with the necessary motivational element to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

142 Cong. Rec. H. 3337 (1996), 1996 WL 174947 (emphasis added).[16] As this report indicates, the previous version of § 3A1.4 applied to any "offense[] committed *in connection with*" a predicate crime, i.e., to an offense that was "intended to promote" international terrorism. But Congress provided that the revised § 3A1.4 should "apply only to" those predicate crimes

---

[16] The "motivational element" in this passage refers to § 2332b(g)(5)(A)'s requirement that a "federal crime of terrorism" be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

themselves, "upon conviction of those crimes." *Id.* This statement of congressional intent, contained in the final Conference Report for AEDPA, is entitled to substantial weight. *See Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir. 1986) ("Inasmuch as the conference report represents the final statement of terms agreed upon by both houses of Congress, next to the statute itself, it is the most persuasive evidence of Congressional intent behind the enactment of a statute."); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 881 (4th Cir. 1996) (same).

Citing this legislative history, the plain language of the 1996 Directive, and the Supreme Court's *LaBonte* opinion, the court in *United States v. Arnaout*, 282 F. Supp. 2d 838, 844 (N.D. Ill. 2003), held § 3A1.4's enabling legislation "plainly preclude[s] application of the terrorism enhancement" to defendants who are not convicted of an offense "included in" § 2332b(g)(5)(B). *Arnaout* concluded that by writing the amended § 3A1.4 to cover "conduct beyond the offense of conviction," the Commission impermissibly "preempt[ed] the specific directives of Congress." *Id.* at 845.[17]  This Court should conclude the same.[18]

 ii.  Assuming § 3A1.4 can validly apply to someone not convicted of an enumerated statute, Mr. Lemley's conduct does not fall within the scope of the enhancement

Even if § 3A1.4, as written, is valid, it does not apply to Mr. Lemley. The government does not contend that, under § 3A1.4's "involved" prong, Mr. Lemley's offense conduct constituted a

---

[17] The Seventh Circuit ultimately reversed the district court in *Arnaout*, concluding "a defendant need not be convicted of a federal crime of terrorism as defined by § 2332b(g)(5)(B) for the district court to apply § 3A1.4." *United States v. Arnaout*, 431 F.3d 994, 1000-01 (7th Cir. 2005). In announcing that holding, however, the Seventh Circuit misconstrued the district court's order. The Seventh Circuit read the district court to have held that § 3A1.4, as written, is inapplicable to defendants who have not been convicted of an enumerated "federal crime of terrorism." *See id.* at 1002. But the district court actually held that, assuming § 3A1.4 does apply to such defendants, it is inconsistent with the 1996 Directive. 282 F. Supp. 2d at 844. The Seventh Circuit's opinion did not address this latter point, i.e., the guideline's consistency with the 1996 Directive.

[18] Another defendant in this district has argued on appeal that § 3A1.4, as currently written and interpreted by the Fourth Circuit, is inconsistent with the 1996 Directive. *See United States v. Hasson*, No. 20-4126, Dkt. #17 at 48-58 (4th Cir. June 8, 2020). The Fourth Circuit held oral argument in *Hasson* on March 12, 2021, but has not yet issued an opinion.

violation of any statute enumerated in § 2332b(g)(5)(B). Rather, the government argues his offense conduct satisfies the enhancement's "intended to promote" prong, because (1) his goal or purpose was to bring about several enumerated crimes (18 U.S.C. §§ 1114, 1362, 1366(a), 1992, 844(i)), and (2) those crimes, when committed, would have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." § 2332b(g)(5)(A); *see Kobito*, 994 F.3d at 702.

At page 38 of its sentencing memorandum, the government identifies particular statements by the defendants that it contends establish a goal of bringing about specific enumerated crimes in order to influence the conduct of government. Yet review of the statements themselves, drawn from among hundreds of hours of stream-of-consciousness discussions detached from reality or any particular concrete plan of action, shows how strained the government's argument is. These statements were no more than braggadocio and idle talk by two troubled military veterans speaking inside their apartment about acts they never intended to carry out. Were there any indication that the two were serious about killing federal employees, damaging communication lines, damaging energy or rail facilities, or committing arson, there might be a basis to exponentially increase Mr. Lemley's sentence.  But as explained above, the supposed plans identified by the government were inherently unrealistic, e.g., breaking Dylann Roof out of the federal death row; the defendants discussed those "plans" on isolated occasions and then never returned to them; the defendants did not take any steps toward actually executing those plans, such as identifying particular rail lines to damage or buildings to set on fire; and despite insistent prodding by the FBI undercover agent, Mr. Lemley declined to plan for anything more serious than driving to a spot 150 miles from a rally so that he could respond in case a hypothetical, fanciful "civil war" broke out. The government's statements do not establish that Mr. Lemley actually "intended to promote" any

enumerated crimes. At most, they prove that he and Mr. Mathews *talked about* those crimes in theoretical, detail-free terms.

      iii.    <u>If the Court concludes § 3A1.4 applies to Mr. Lemley, it should depart down to criminal history category I</u>

Application of § 3A1.4 would increase Mr. Lemley's criminal history category (CHC) from I to VI. If the Court determines § 3A1.4 applies, it should depart down to CHC I, which reflects Mr. Lemley's actual criminal history, since the enhancement's automatic CHC bump is unsupported by any empirical data or persuasive rationale. *See* U.S.S.G. § 4A1.3(b) (providing "a downward departure may be warranted" if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history").

When writing the Guidelines, the Commission typically "base[s] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). But the Supreme Court has recognized that certain guidelines "do not exemplify the Commission's exercise of its characteristic institutional role" and, as a result, may "fail[] properly to reflect § 3553(a) considerations even in a mine-run case." *Id.* The terrorism enhancement is such a guideline, as it "result[ed from] a congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies." *United States v. Nayyar*, No. 09-cr-1037-RWS, 2013 WL 2436564, at *8 (S.D.N.Y. June 5, 2013).

Although the guideline does not say, Congress may have believed an automatic CHC VI was appropriate because terrorism defendants are more likely to recidivate. But such "assumptions about recidivism" are "unsubstantiated," *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014 (N.D. Cal. 2019), and § 3A1.4 "is not backed by any empirical evidence," *United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886, at *10. (D. Colo. July 18, 2018). Indeed, "while the

question of recidivism after terrorism-related detention is empirically fraught, the very limited data suggests that individuals convicted of terrorism offenses do <u>not</u> recidivate at higher rates than those convicted of other crimes." *Alhaggagi*, 372 F. Supp. 3d at 1015 (emphasis in original); *see also id.* at 1014.

Congress may also have provided for an automatic CHC VI because terrorism is a serious crime. But that fact is irrelevant: "it is the <u>offense level</u> that reflects the seriousness of a charged offense," whereas "[a] defendant's <u>criminal history category</u> reflects something different." *Id.* at 1013 (emphasis in original). "[A]utomatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect . . . the seriousness of the defendant's previous criminal convictions." *Id.* at 1014. For this reason, defaulting to CHC VI "is fundamentally at odds with the design of the Guidelines" and "import[s] a fiction into the calculus," since it "impute[s] to a defendant who has had no criminal history a fictional history of the highest level of seriousness." *Jumaev*, 2018 WL 3490886, at *9 (quoting *United States v. Mehanna*, No. 1:09-cr-10017-GAO (D. Mass. Apr. 12, 2012)).

Given the lack of empirical basis or theoretical justification for § 3A1.4, courts that apply the enhancement frequently depart down from CHC VI when sentencing defendants with little to no criminal history. *See United States v. Hasson*, No. 8:19-cr-96-GJH, ECF No. 134 at 237 (D. Md. Jan. 31, 2020) ("I'm going to depart down to a criminal history one for the fairly simple reason that that's his criminal history."); *Alhaggagi*, 372 F. Supp. 3d at 1017; *Nayyar*, 2013 WL 2436564, at *8-9; *United States v. Benkahla*, 501 F. Supp. 2d 748, 759 (E.D. Va. 2007); *United States v. Aref*, No. 04-CR-402, 2007 WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007); *United States v. Garey*, 383 F. Supp. 2d 1374, 1379-80 (M.D. Ga. 2005); *United States v. Sihai Cheng*, No. 13-cr-10332-PBS, 2016 WL 413077, at *5 (D. Mass. Feb. 1, 2016); *Jumaev*, 2018 WL 3490886, at *9. This Court should do the same.

**B.     The Commentary to § 3A1.4 Does Not Authorize an Upward Departure**

The government urges the Court, if it finds § 3A1.4 inapplicable, to depart upward under application note 4 in the guideline's commentary. Gov't Sent. Mem. at 39-41. The commentary notes that § 2332b(g)(5)'s "federal crime of terrorism" definition has two parts: (1) the motivational element, i.e., the requirement that an offense be calculated to influence government conduct, and (2) the list of enumerated statutes. § 3A1.4 cmt. n.1. Application note 4 provides that if the government establishes one, but not both, of these elements, "an upward departure would be warranted." *Id.* Departing upward under application note 4 would be improper here.

Guidelines commentary is not "controlling" if it "[1] violates the Constitution or a federal statute; [2] is inconsistent with the Guidelines; or [3] constitutes a plainly erroneous reading of the Guidelines." *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019). Here, application note 4 purports to authorize a terrorism-related upward adjustment for all defendants, even those who have not been convicted of a crime enumerated in § 2332b(g)(5)(B). But as explained above, the 1996 Directive instructed the Sentencing Commission to amend § 3A1.4 so that the terrorism enhancement "only applies" to defendants convicted of an enumerated crime. Application note 4 therefore "violates . . . a federal statute," i.e., AEDPA, which contained the 1996 Directive.

In addition, application note 4 is "inconsistent with" the Guidelines. *Hawley*, 919 F.3d at 256. The text of § 3A1.4 says a 12-level enhancement applies if the defendant's offense "involved, or was intended to promote, a federal crime of terrorism"—defined as an offense that *both* (1) satisfies § 2332b(g)(5)(A)'s motivational element, *and* (2) is a violation of a statute enumerated in § 2332b(g)(5)(B). The plain meaning of the word "and" in § 2332b(g)(5) is conjunctive. *See United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020) ("Both parts of § 2332b(g)(5) must be satisfied for the enhancement to apply."). But application note 4 reads this conjunctive definition out of the guideline, rendering it disjunctive instead. Where a guideline requires the

21

government to satisfy two criteria, an application note necessarily conflicts with the guideline if it permits the government to apply the enhancement based on satisfying only one of those criteria. *See United States v. Allen*, 909 F.3d 671, 674 (4th Cir. 2018) (explaining commentary is "inconsistent with the Guidelines when following the commentary would violate the dictates of the relevant Guidelines").

Nor is the Commission's interpretation of § 3A1.4 in application note 4 entitled to any deference.  Under a doctrine known as *Auer* deference, courts should defer to an agency's (here, the Commission's) reasonable reading (here, the commentary) of an ambiguous regulation (here, § 3A1.4).  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019).  But "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Id.* at 2415. And the text of § 3A1.4 is not at all ambiguous with respect to whether the government must prove both, or only one, of the elements in § 2332b(g)(5)'s "federal crime of terrorism" definition. The guideline makes clear that to qualify as a "federal crime of terrorism," an offense must satisfy *two* criteria: the motivational element and the enumerated-statutes element. This text provides no license to apply § 3A1.4 where a defendant's offense involved or was intended to promote a crime that *either* (1) satisfies the motional element *or* (2) is a violation of an enumerated statute.

### C.   Mr. Lemley Did Not Use or Possess a Firearm in Connection with Another Felony Offense

The government urges the Court to apply a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because Mr. Lemley supposedly possessed a firearm (1) "in connection with another felony offense" (first prong) or (2) "with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense" (second prong). Gov't Sent. Mem. at 41. On this record, the government has not borne its burden of showing that § 2K2.1(b)(6)(B) applies. *See United States v. Blount*, 337 F.3d 404, 411 (4th Cir. 2003) (assigning burden to government).

Section 2K2.1(b)(6)(B)'s first prong has three "necessary elements": (1) the defendant "possessed a firearm," (2) "at the same time as he committed 'another felony offense,'" and (3) his possession was "in connection with" the other felony offense. *United States v. Jenkins*, 566 F.3d 160, 162 (4th Cir. 2009). "A defendant possesses a firearm 'in connection with' another felony when the firearm facilitated, or had the potential of facilitating the other offense." *United States v. McKenzie-Gude*, 671 F.3d 452, 463 (4th Cir. 2011). According to the government, the other felonies in this case are the crimes enumerated in § 2332b(g)(5)(B) that also justify applying the terrorism enhancement (18 U.S.C. §§ 1114, 1362, 1366(a), 1992, 844(i)). Gov't Sent. Mem. at 41. But Mr. Lemley did not "commit[]" any of those offenses, and the government does not claim he did. Because the "commi[ssion]" of another felony offense is an "essential element" of § 2K2.1(b)(6)(B)'s first prong, that prong does not apply here. *Jenkins*, 566 F.3d at 162.

Section 2K2.1(b)(6)(B)'s second prong does not require that another felony actually be committed. Instead, the "guidelines use the phrase 'would be' to indicate the future tense," which means the second prong applies as long as another felony "ha[s] the capacity or a strong possibility for developing into a state of actuality." *United States v. Martinez*, 964 F.3d 1329, 1335 (11th Cir. 2020). But "not every far-flung fantasy to commit a future felony will result in a section 2K2.1(b)(6)(B) enhancement." *Id.* If the government shows only that a defendant "was wishing and hoping and thinking about" committing another felony, the enhancement is inapplicable. *Id.* at 1335. For the enhancement's second prong to apply, a defendant "must have formed a firm intent to use the gun for a felonious purpose." *United States v. Jimison*, 493 F.3d 1148, 1149 (9th Cir. 2007). The government must show the other felony "would have (rather than may or might have) happened but for the defendant's arrest or something else getting in the way." *Martinez*, 964 F.3d at 1331.

23

The government has not even come close to shouldering that burden. The statements cited in the government's sentencing memorandum—taken from chat rooms and recordings of Mr. Lemley's apartment—may demonstrate that he was "wishing and hoping and thinking about" committing another felony. But even if they do, they fall well short of establishing a "firm intent" to actually commit any of those felonies. As explained above, Mr. Lemley's supposed plans were unrealistic; he took no concrete steps toward carrying them out; and even persistent cajoling from the FBI undercover agent failed to push Mr. Lemley toward committing another crime. There is no reason to believe another felony "would have (rather than may or might have) happened but for the defendant's arrest or something else getting in the way."

**D.      The Catchall Departure at U.S.S.G. § 5K2.0 Does Not Apply**

The Court should reject the government's request to apply U.S.S.G. § 5K2.0(a)(2)(B), which provides that "[a] departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." *See* Gov't Sent. Mem. at 41-42. The government argues this departure is appropriate because of Mr. Lemley's "intent and preparation to commit acts of domestic terrorism." Gov't Sent. Mem. at 42. But the terrorism enhancement in § 3A1.4 makes clear the Commission *has* identified intent to commit terrorism as among the circumstances relevant to calculating the Guidelines range. The problem, from the government's perspective, is not that the Commission failed to identify domestic terrorism as warranting an enhancement, but rather that the enhancement it wrote does not cover Mr. Lemley— and also that, as explained above, the 1996 Directive deprived the Commission of the authority to extend § 3A1.4 to defendants who have not been convicted of a crime enumerated in § 2332b(g)(5)(B). By its terms, therefore, § 5K2.0(a)(2)(B) is inapplicable.

24

**CONCLUSION**

We ask the Court to strip away all of the rhetoric and speculation and to sentence Mr. Lemley proportionately to the offenses he actually committed. The defense seeks a sentence that is within the applicable guideline range and is consistent with sentences imposed in cases around the country with analogous – or worse – facts. Deterrence is certainly a worthy goal. A sentence of almost three years in prison for a U.S. Army veteran with no criminal record who has been deeply scarred by trauma during his childhood and his service in Iraq sends a message and is certainly an extremely strong deterrent. Neither Mr. Lemley nor any other otherwise law-abiding citizen in his shoes would ever want to engage in this type of activity after imposition of this harsh sentence.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

*/s/*

_____

Ned Smock
Cullen Macbeth
Assistant Federal Public Defenders
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Phone: (301) 344-0600
Fax: (301) 344-0019
Email: ned_smock@fd.org